# EXHIBIT "B"

**A STOCK COMPANY**



# MARKEL AMERICAN INSURANCE COMPANY

4521 Highwoods Parkway
Glen Allen, VA 23060

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

_____
**Secretary**

_____
**President**



# MARKEL AMERICAN INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS –
## NOTICES AND CLAIM REPORTING

Our address for any notice pursuant to the conditions of the policy is:

Lancer Claim Services
681 South Parker Street, Suite 300
Orange, CA 92868
Phone: 800-821-0540
Fax: 714-978-8023

To report a **Claim**, or a **Wrongful Act** or **Management Wrongful Act** reasonably expected to give rise to a **Claim**, send written notice to the address shown above to the attention of the Claims Service Center, or send by email to:

firstreports@lancerclaims.com



INTERLINE

# MARKEL AMERICAN INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                                          Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>• publicly-available information from government records;<br><br>• de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you<br>complete an application or other form for insurance<br>perform transactions with Us, Our Affiliates, or others<br>file an insurance claim or provide account information<br>use your credit or debit card<br>We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only<br>sharing for Affiliates' everyday business purposes – information about your creditworthiness<br>Affiliates from using your information to market to you<br>sharing for Nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies. <br>• Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies. <br>• Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you. <br>• Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. <br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information. <br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |

INTERLINE

# MARKEL AMERICAN INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**Markel American Insurance Company**

# COMPANY SPONSORED LIFE INSURANCE AGENTS
# PROFESSIONAL LIABILITY MASTER POLICY DECLARATION

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER IN WRITING DURING THE CERTIFICATE PERIOD AS SHOWN IN THE CERTIFICATE OF INSURANCE OR EXTENDED REPORTING DISCOVERY PERIOD, IF APPLICABLE.**

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

MASTER POLICY NUMBER.: MKLM7PLCA00065          RENEWAL OF MASTER POLICY: MKLM7PLCA00047

**Sponsoring Company Master Policy Holder** and Mailing Address (No., Street, Town or City, County, State, Zip Code)

**PENN MUTUAL LIFE INSURANCE COMPANY**
**600 DRESHER ROAD**
**HORSHAM, PENNSYLVANIA 19044**

**BROKER/DEALER:    HORNOR, TOWNSEND & KENT, LLC**

Policy Period: From _8/1/2022_____ to _8/1/2023_____ at 12:01 A.M. Standard Time at the mailing address shown above.

| Retroactive Date | |
|---|---|
| Retroactive Date: | See definition of Retroactive Date contained in the Policy. |

| Limit Of Liability | Deductible |
|---|---|
| **AGENTS AND REGISTERED REPRESENTATIVES:** **SEE INDIVIDUAL CERTIFICATE OF INSURANCE** <br><br> **BROKER/DEALER:** **$1,000,000 EACH CLAIM/$3,000,000 AGGREGATE** <br><br> NOTE: A separate $1,000,000 each Claim and in the Aggregate applies to Claim Expenses as to all Insureds. | **AGENTS AND REGISTERED REPRESENTATIVES:** **SEE INDIVIDUAL CERTIFICATE OF INSURANCE** <br><br> **BROKER/DEALER:** **$100,000 EACH CLAIM** |

| Forms and Endorsements |
|---|

Forms and Endorsements applying to and made part of this Policy at time of issuance:

- Policy Jacket
- Notice To Policyholders - Notices And Claim Reporting
- Privacy Notice
- U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory Notice To Policyholders"
- Declarations
- Schedule of Coverage and Premium Options
- Master Policy
- Endorsements:
1. Professional Services Amendatory Endorsement
2. Cyber Management with Extortion Demand, Business Interruption and Network Restoration Cost Coverage Endorsement
3. Social Engineering Claim Coverage Endorsement
4. Liberalization Endorsement
5. Broker/Dealer and Sponsoring Company Choice of Defense Counsel Endorsement
6. Broker/Dealer Selling Away Liability Endorsement
7. Pennsylvania Amendatory Endorsement
8. Cover Oregon Increased Limits of Liability Endorsement
9. Cryptocurrency and NFT Exclusion Endorsement
- Trade or Economic Sanctions

| Producer Number, Name and Mailing Address |
|---|
| **CALSURANCE ASSOCIATES; A DIVISION OF BROWN & BROWN PROGRAM INSURANCE SERVICES, INC.**<br>**681 SOUTH PARKER STREET, SUITE 300**<br>**ORANGE, CALIFORNIA 92868** |

**These declarations, together with the completed and signed Application, the Policy and any Endorsement(s) attached hereto, shall constitute the contract between the Insurer and Insureds.**

Countersigned: _____September 28, 2022_____    By: _____
                              **DATE**                                  **AUTHORIZED REPRESENTATIVE**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065

# MARKEL AMERICAN INSURANCE COMPANY

## SCHEDULE OF COVERAGE AND PREMIUM OPTIONS

COMPANY SPONSORED INSURANCE AGENTS PENN MUTUAL LIFE INSURANCE COMPANY

The coverage and premium options available under the Policy are as follows:

| Options | LIMITS OF LIABILITY | |
|---|---|---|
| **Emerging Advisor (EA):  (Agent Type: 201)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **Career Builders:  (Agent Type: 205)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **Full-Time:  (Agent Type: 206-Y)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **HTK Representatives:  (Agent Type: 207 & 208)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |

| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
|---|---|---|
| **Functional Specialists/Regional Annuity Specialists: (999)** | | |
| | $1,000,000 each Claim; $1,000,000 Aggregate | |
| **2nd Line Field Manager:  (Agent Type: 213)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **1st Line Field Manager:  (Agent Type: 214)** | | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |
| **Life Only (HTK-No):  (Agent Type: 206-N)** | | |
| Option 1 | $1,000,000 each Claim; $1,000,000 Aggregate | |
| Option 2 | $2,000,000 each Claim; $2,000,000 Aggregate | |
| Option 3 | $3,000,000 each Claim; $3,000,000 Aggregate | |
| Option 4 | $5,000,000 each Claim; $5,000,000 Aggregate | |

**Sales Assistants:**  (Agent Type: 216)
$1M/$1M
$2M/$2M

**OPTIONAL COVERAGES**

Individual RIA Coverage

Discretionary Authority

Both RIA & Discretionary Authority

**DEDUCTIBLES**

**AGENTS OR REGISTERED REPRESENTATIVES**

$1,500  each Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products

$2,000  each Claim arising from non-proprietary products sold through the Broker/Dealer

$3,000  each Claim arising from all other products

$1,500  each Cost of Correct Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products

$2,000  each Cost of Correct Claim arising from Securities sold through the Broker/Dealer

**NON-AFFILATED HTK/LIFE ONLY AGENTS**

$1,500  each Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products

$3,000  each Claim arising from all other products

$1,500  each Cost of Correct Claim arising from products of the Sponsoring Company, Subsidiaries and non-life brokered products



# MARKEL AMERICAN INSURANCE COMPANY

## COMPANY SPONSORED LIFE INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY

**PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.**

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER IN WRITING DURING THE CERTIFICATE PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.**

**THIS POLICY PROVIDES INSURANCE TO THE AGENT OR MANAGING AGENT SHOWN IN THE CERTIFICATE OF INSURANCE SUBJECT TO THE MASTER POLICY DECLARATIONS ISSUED TO THE SPONSORING COMPANY.**

**WORDS OR PHRASES IN BOLD MAY HAVE SPECIAL MEANING. REFER TO SECTION IV – DEFINITIONS.**

In consideration of the payment of premiums and in reliance upon the statements contained in the **Application**, which is incorporated into this Policy and forms a part hereof, and subject to the terms, limitations, conditions and exclusions of this Policy, the **Insurer** agrees as follows:

## SECTION I – INSURING AGREEMENTS

### A. Professional Liability

The **Insurer** shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Insured**, provided:

1. Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

2. As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**.

### B. Managing Agents Management Liability

The **Insurer** shall pay, on behalf of a **Managing Agent**, **Damages** which a **Managing Agent** becomes legally obligated to pay because of a **Claim** that is both made against a **Managing Agent** and reported to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Management Wrongful Act** or **Interrelated Management Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by a **Managing Agent**, provided:

1. Such **Management Wrongful Act** or any **Interrelated Management Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period**; and

2. As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Management Wrongful Act** or any **Interrelated Management Wrongful Act** could result in a **Claim**.

### C. Sponsoring Company Vicarious Liability

The **Insurer** shall pay, on behalf of the **Sponsoring Company**, **Damages** which the **Sponsoring Company** becomes legally obligated to pay as the result of vicarious liability asserted in a **Claim** that is both made against the **Sponsoring Company** and reported to the **Insurer** in writing during the applicable **Certificate Period**, or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated**

**Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Agent** for a client, provided:

1. The **Claim** against the **Sponsoring Company** must arise out of a **Wrongful Act** of an **Agent** committed in an **Agent's** rendering of or failing to render **Professional Services** for a client; and not any actual or alleged independent acts, errors, conduct or bad faith of any nature committed by the **Sponsoring Company**, including, but not limited to, deceptive or improper marketing of insurance and negligent hiring, retention, training or supervision of an **Agent**;

2. Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the applicable **Certificate Period**;

3. As of the inception date of this Policy as shown in the Master Policy Declarations, neither the **Sponsoring Company** nor any other **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Claim**; and

4. The **Claim** against the **Sponsoring Company** must be otherwise covered pursuant to all terms, provisions, limitations, exclusions and conditions of the Policy, and the **Sponsoring Company** shall not be entitled to any rights greater than those available to an **Agent**.

In the event that a **Claim** against the **Sponsoring Company** includes allegations that are both covered and uncovered pursuant to this Section I – Insuring Agreement **C.** Sponsoring Company Vicarious Liability, as well as other terms, limitations, exclusions and conditions of the Policy, then payments of **Damages** and **Claim Expenses** must be allocated between the **Insurer** and **Sponsoring Company**. The **Insurer** and **Sponsoring Company** shall use their best efforts to reach a fair and reasonable agreement as to allocation. Notwithstanding the foregoing, under no circumstances will the **Insurer** be required to make any payments of **Damages** and **Claim Expenses** hereunder if a **Claim** does not include any allegations against the **Sponsoring Company** that are covered hereunder.

## SECTION II – DEFENSE AND CLAIM EXPENSES

**A.** The **Insurer** shall have the right and duty to defend a **Claim** against an **Insured** seeking **Damages** that is covered by this Policy.

**B.** The **Insurer's** right and duty to defend a **Claim**, subject to the Sub-Limit Of Liability for **Claims Expenses** provided in Section **VIII** – Limits Of Liability, as well as all other obligations under this Policy, shall terminate when the applicable Limit Of Liability Each Claim is paid by the **Insurer** for **Damages**, regardless of whether a **Claim** continues to proceed against an **Insured**. The **Insurer's** rights and duties to defend all **Claims**, as well as all other obligations under this Policy, shall terminate upon payment of each **Insured** Aggregate Limit Of Liability for **Damages**. In the event that the Limits Of Liability are exhausted by the **Insurer's** payment of **Damages**, then the **Insurer** shall tender the defense to the **Insured**, who will be responsible for continued defense and payment of **Claim Expenses** without recourse to the Policy.

**C.** The **Insurer** shall select defense counsel for a **Claim** that is covered by this Policy and pay associated **Claim Expenses**.

**D.** In the event that applicable law allows the **Insured** to control selection of defense counsel when a conflict of interest arises between the **Insured** and **Insurer**, the **Insurer** will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who shall act solely in the interest of the **Insured**, and the **Insured** shall direct such defense counsel to cooperate with the **Insurer**. Such cooperation shall include, without limitation:

1. Providing on a regular basis, but no less frequently than every 3 months, written reports on alleged **Damages**, potential liability, progress of any litigation or arbitration, any settlement demands and any investigation developments that materially affect the **Claim**;

2. Providing any other reasonable information requested;

3. Submission of itemized billing on a periodic basis at rates which are paid by the **Insurer** to other attorneys or law firms in the jurisdiction where the **Claim** is pending; and

4. Cooperating with the **Insurer** in resolving any discrepancies with respect to the **Claim**.

## SECTION III – SETTLEMENT OF CLAIMS

The **Insurer** shall investigate and settle a **Claim** in a manner that it deems appropriate. The **Insurer** shall not settle or compromise a **Claim** without the written consent of an **Insured**. If the **Insured** refuses to consent to a settlement or compromise acceptable to the **Insurer**, then the **Insurer's** duty to defend the **Insured** shall cease as of the date of the **Insured's** refusal to consent. Thereafter, the limit of liability applicable to such **Insured** shall be reduced to an amount equal to the **Damages** for which the **Claim** could have been settled or compromised, which amount shall not exceed the applicable Each Claim or Aggregate Limits Of Liability.

**SECTION IV – EXTENSIONS OF COVERAGE**

Subject to all other terms, conditions and exclusions stated herein, coverage under the Policy also extends as follows:

**A.  Disciplinary Proceedings**

1. In addition to the applicable Limits of Liability, the **Insurer** shall reimburse an **Agent** or **Registered Representative** for reasonable and necessary attorney's fees and costs only incurred in responding to a **Disciplinary Proceeding** commenced against an **Agent** or **Registered Representative** during the **Certificate Period** or Extended Reporting Period, if applicable.

2. The maximum payment by the **Insurer** pursuant to the Extension of Coverage shall be $10,000 for each **Agent** or **Registered Representative**, regardless of the number of **Disciplinary Proceedings**.

3. The Deductible shall not apply to payments under this Extension of Coverage.

4. The **Insurer** shall not pay any amount under this Extension of Coverage until the conclusion of the **Disciplinary Proceeding** and only if such **Disciplinary Proceeding** has not resulted in the suspension of revocation of an **Agent's** license.

**B.  Subpoena Compliance**

1. In addition to the applicable Limits of Liability, the **Insurer** shall pay reasonable and necessary attorney's fees and costs only in connection with the receipt of a subpoena by an **Agent** or **Registered Representative** during the **Certificate Period** or Extended Reporting Period, if applicable, for document production or representation in giving sworn testimony related to **Professional Services** that is issued in a lawsuit in which an **Agent** or **Registered Representative** is not a party.

2. The maximum payment by the **Insurer** pursuant to the Extension of Coverage shall be $25,000 for each **Agent** or **Registered Representative**, regardless of the number of subpoenas.

3. The Deductible shall not apply to payments under this Extension of Coverage.

**SECTION V – DEFINITIONS**

For purposes of this Policy, the terms in bold type shall have special meanings that are designated below. All other terms shall have those meanings commonly understood by professionals who are engaged in the business of insurance.

**A.  Agent** means an **Insured** person who:

1. Maintains an agent or field manager contract with the **Sponsoring Company**;

2. Has elected to enroll for coverage under this Policy, either at the inception date of the **Policy Period** or prior to the expiration date of the **Policy Period**, and whose enrollment is on file with the **Sponsoring Company**;

3. Is shown as such in a Certificate Of Insurance;

4. Has paid the applicable premium; and

5. Is licensed by all necessary federal, state or local governmental authorities to render **Professional Services** where both the **Agent** and client are located.

An **Agent** shall not be provided with coverage under Section **I** – Insuring Agreement **B.** Managing Agents Management Liability, unless the **Agent** is also a **Managing Agent**.

**Agent** shall also mean:

6. An individual who was an **Agent** of the **Sponsoring Company** and who retired from the business of providing **Professional Services** prior to July 31, 2011;

7. An individual who was an **Agent** of the **Sponsoring Company** and who because of a disability could no longer provide **Professional Services** prior to July 31, 2011; and

8. The estate of an **Agent** of the **Sponsoring Company** who died prior to July 31, 2011;

    Provided that with respect to Subsections **6.**, **7.** and **8.**, above, such individual was enrolled in the Penn Mutual Life Insurance Company sponsored errors and omissions insurance program at the time of his/her retirement, disability

or death, is otherwise covered under the Policy for a **Claim** and if the actual or alleged **Wrongful Acts** or **Interrelated Wrongful Acts** occurred prior to such retirement, disability or death;

9. An individual who was an **Agent** as of the effective date of this Policy whose contract terminated with the **Sponsoring Company** during the **Policy Period**, but only for **Professional Services** rendered under the definition of **Professional Services** 1.a and h.

**B.  Application** means:

1.  The application for this Policy and for any policy issued by the **Insurer**, or any of its affiliates, of which this Policy is a direct or indirect renewal or replacement;

2.  Any attachment to any such application;

3.  Any other materials submitted with or incorporated into any such application; and

4.  Any documents submitted in connection with the underwriting of any such policy.

**C.  Associated Person** means "Affiliated Person" as that phrase is defined in the Investment Company Act of 1940, and any amendments thereto, or a "Person Associated with an Investment Adviser" as that phrase is defined in the Investment Advisors Act of 1940, and any amendments thereto, and who is performing services on behalf of clients of the **Sponsoring Company** and/or its **Subsidiaries**, but when not providing services for any other broker-dealer. **Associated Person** shall also mean a person providing services provided on behalf of an Outside **Registered Investment Advisor** which is scheduled and on file with the **Broker/Dealer**. Such individuals shall be explicitly approved and in compliance with the outside investment advisory procedures of the **Broker/Dealer** and their names shall be on file with the **Broker/Dealer**. Coverage as an **Associated Person** of an Outside **Registered Investment Advisor** applies solely to this individuals who have elected this coverage and have paid an additional premium. Evidence of this election shall be kept on file by CalSurance.

**D.  Broker/Dealer** means the entity designated as such in the Declarations, Horner, Townsend & Kent, LLC.

**E.  Certificate Period** means the period of time from the inception date and time shown in the Certificate Of Insurance to the earlier of the expiration date and time shown in the Certificate Of Insurance or the effective date of the termination of this Policy.

**F.  Claim** means a written demand received by an **Insured** for **Damages** (including pleadings received in a civil litigation or arbitration) because of an actual or alleged **Wrongful Act** or, with respect to Section **I** – Insuring Agreement **B.** Managing Agents Management Liability, an actual or alleged **Management Wrongful Act**.

**Claim** shall also mean a cost of correction resulting from a negligent act, error or omission of an **Insured** or employee of the **Broker/Dealer** arising out of the rendering of **Professional Services** which would have been a valid covered **Claim** if not corrected, and shall be limited to: (1) demands for an amount less than $20,000 by the **Sponsoring Company** or **Broker/Dealer** in indemnifying a client of an **Insured**; and/or (2) **Damages** incurred by a client of an **Insured** in excess of $20,000 that are reported to the **Insurer** within a reasonable amount of time from the date of when the act, error or omission was discovered, provided that such timely report is otherwise provided to the **Insurer** during the **Policy Period** or Extended Reporting Period, if applicable.

A **Claim** does not include the following:

1.  A demand for declaratory, injunctive or other non-monetary relief;

2.  Any form of criminal proceeding; or

3.  Any proceeding commenced by a governmental or quasi-governmental official or agency or any self-regulatory official or agency, except for a **Disciplinary Proceeding**, but only with respect to coverage provided by Section **IV. – Coverage Extension A.**  or if the agency or official is a client of the **Insured** in connection with the rendering of **Professional Services**.

**G.  Claim Expenses** means reasonable and necessary amounts incurred by the **Insurer**, or by the **Insured** with the prior written consent of the **Insurer**, in the defense of a **Claim** that is covered under this Policy, including attorneys' fees, costs of investigation, court or arbitration costs and premiums for appeal, attachment or similar bonds. The **Insurer**, however, is not required to provide such bonds. **Claim Expenses** do not include the wages, salaries, fees or costs of the directors, officers, employees, representatives, in-house counsel, agents or servants of any **Insured**.

**H.  Damages** means monetary judgments, settlements or awards resulting from a **Claim**. **Damages** do not include the following:

1.  Taxes, fines or penalties, unless incurred by a claimant and made part of a **Claim** against an **Insured**;

2.  Punitive or exemplary damages;

3.  The multiplied portion of a multiplied damage award;

4.  The return, restitution, reduction, compromise or refund of commissions, fees or charges;

5.  Costs incurred as a result of non-monetary, declaratory or injunctive relief;

6.  Any matters that are deemed uninsurable under the law; and

       **7.** **Claim Expenses**.

**I.** **Disciplinary Proceeding** means any proceeding by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct by an **Agent** arising solely from the performance of **Professional Services**.

**J.** **Due Diligence Services** means services in connection with the investigation of representations made by an issuer of **Securities** approved by the **Broker/Dealer** in order to determine the accuracy of such representations in connection with the purchase of sale of such **Securities** or the advisability of purchasing such **Securities**.

**K.** **Insured** means:

    **1.** An **Agent** shown as such in a Certificate Of Insurance;

    **2.** A **Managing Agent** shown as such in a Certificate Of Insurance;

    **3.** A **Registered Representative** shown as such in a Certificate Of Insurance;

    **4.** A corporation, partnership or other business entity owned by and in which an **Agent**, **Managing Agent** or **Registered Representative** has an ownership interest, or in which an **Agent**, **Managing Agent** or **Registered Representative** is an employee, but solely with respect to the liability of such organization as it arises out of an **Agent**, **Managing Agent** or **Registered Representative** rendering of or failing to render <u>**Professional Services**</u>; Coverage hereunder shall not be afforded for any actual or alleged **Wrongful Act** or **Management Wrongful Act** of such organization, but shall only apply to a **Claim** arising out of the actual or alleged **Wrongful Act** of an **Agent** or **Registered Representative** or the **Management Wrongful Act** of a **Managing Agent**;

    **5.** A person acting on behalf of an **Agent**, **Managing Agent** or **Registered Representative**, who was or is a partner, officer, director, stockholder or an employee of an **Agent**, **Managing Agent** or **Registered Representative**, or the business entity of an **Agent**, **Managing Agent** or **Registered Representative**, provided such person is not a party to an agent, general agent or registered representative contract with any insurance company or broker-dealer and only with respect to the **Professional Services** of an **Agent**, **Managing Agent** or **Registered Representative**;

    **6.** Heirs, executors, administrators or legal representatives of an **Agent**, **Managing Agent** or **Registered Representative**, in the event of death, incapacity or bankruptcy;

    **7.** A Pre-Contract Career Builder, but solely in connection with **Professional Services** provided by an **Agent** and while under an **Agent's** supervision;

    **8.** Past enrollers of an **Agent** acting in his or her capacity as such on behalf of an **Agent**, but solely if such past enroller does not earn any commission under an agent/broker contract with any insurance company as a result of the provision of **Professional Services** provided by an **Agent**;

    **9.** The lawful spouse or domestic partner of any individual who qualifies as an **Insured** under Subsections 1., 2., 3., 5., 6., 7., and 8., above, for a **Claim** arising solely out of his/her spousal or domestic partner status, and not any independent **Wrongful Acts** of such individual;

    **10.** The **Broker/Dealer**;

    **11.** Any former, current or future principal, partner, executive officer, director or employee of the **Broker/Dealer**, but solely in connection with **Professional Services** provided on behalf of the **Broker/Dealer** and any subsidiary or affiliate;

    **12.** The **Sponsoring Company** shown as such in the Master Policy Declarations, but only with respect to coverage provided under Section **I** – Insuring Agreement **C.** Sponsoring Company Vicarious Liability;

    **13.** An individual who makes referrals to an **Agent** through the Professional Advisors Alliance created by the **Sponsoring Company**, only for products approved in writing by the **Sponsoring Company**;

    Coverage shall be afforded only if such individual is named as a co-defendant with an **Agent** and such individual maintains his/her own professional liability insurance; and

    **14.** An affiliated **Associated Person** of an Outside **Registered Investment Advisor**. The Outside **Registered Investment Advisor** shall be specifically approved, and designated by name, by the **Broker/Dealer**, and in compliance with the outside investment advisory procedures of the **Broker/Dealer**.

The Limits of Liability available to **Insureds** defined in Subsections **4.** through **9.**, **12.**, **13.**, and **14.**, above, shall be shared with and shall not be in addition to the Limits of Liability of the **Agent**, **Registered Representative** or **Broker/Dealer** whose **Wrongful Act** gave rise to the **Claim** or the **Agent**, **Registered Representative** or **Broker/Dealer** who is responsible for the **Wrongful Act** of such other **Insured**.

**L.** **Insurer** means the insurance company providing this insurance shown in the Master Policy Declarations and Certificate Of Insurance.

**M. Interrelated Management Wrongful Acts** means any **Management Wrongful Acts** that are:

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**N. Interrelated Wrongful Acts** means any **Wrongful Acts** that are:

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**O. Managing Agent** means an **Insured** person shown as such in a Certificate of Insurance who is contracted with the **Sponsoring Company** or **Broker/Dealer** as a managing general agent, registered principal, manager or other designation for recruiting, selecting, hiring, contracting, supervising or training of agents or registered representatives and who otherwise qualified as an **Agent**.

**P. Management Wrongful Act** means a negligent act, error or omission committed by a **Managing Agent** in the course of:

1. Recruiting, selecting, hiring, contracting, supervising or training an **Agent**, but only with respect to such **Agent's Professional Services**; or

2. Terminating a contract between an **Agent** and the **Managing Agent** or **Sponsoring Company** or **Broker/Dealer**;

provided, however, that a **Management Wrongful Act** shall not include any form of actual or alleged discrimination, harassment, disparagement of an **Agent**, failure to promote or grant tenure, improper disciplinary action, improper evaluation or performance reviews, failure to provide an adequate workplace or employment procedures or any other employment-related acts besides those specifically referenced in Subsections **1.** and **2.**, above.

**Q. Personal Injury Act** means libel, slander, defamation, disparagement or violation of a right to privacy committed unintentionally during the course of rendering **Professional Services**.

**R. Placement of Coverage with Multiple Employer Welfare Arrangements** means plans placed with Multiple Employer Welfare Arrangements ("MEWA") as defined by the Employee Retirement Income Security Act of 1974, as amended, and shall include 419 Plans.

**S. Policy Period** means the period of time from the inception date and time shown in the Master Policy Declarations to the earlier of the expiration date and time shown in the Master Policy Declarations or the effective date and time of the cancellation of this Policy.

**T. Private Placements** means an offering of **Securities** by an issuer that meets the requirements of Sections 3(b) or 4(2) of the Securities Act of 1933 or must follow the conditions set out under Regulation D of the Securities Act of 1933.

**U. Professional Services** means:

1. The solicitation, sale or servicing of the following:

   a. Life insurance, accident and health insurance, workers' compensation insurance as part of a 24-Hour accident and health insurance product, managed care organization contracts, long term care products, disability income insurance and fixed annuities including when these products are sold on a group basis;

   b. Variable insurance products, including, but not limited to, variable annuities, flexible and scheduled premium annuities and variable life insurance through a broker-dealer;

   c. Mutual funds and unit investment trusts that are registered with the SEC and authorized or approved by and distributed through a broker-dealer;

   d. 529 plans sold through a broker-dealer that is a member of FINRA;

   e. Registered **Securities** (other than variable annuities, variable life insurance and mutual funds) that are authorized or approved by and actually processed through the **Broker/Dealer**, except for those products specifically referenced in Subsection **f.**, below;

   f. **Private Placements**, limited partnerships, non-trade Real Estate Investment Trusts ("REITS"), Tennant-In-Common/IRS 1031 Exchanges or hedge funds, all of which are approved in writing at the time of the transaction and sold through the **Broker/Dealer**, provided that **Registered Representative** who solicited, sold or serviced such product was specifically authorized in writing to do so by the **Broker/Dealer** at the time of the transaction;

In addition, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, the solicitation, sale or servicing of the foregoing products shall be subject to the following Sub-Limits of Liability (which are part of and not in addition to, the other Limits of Liability provided by the Policy):

Each **Claim**:                           $1,000,000

Policy Aggregate:                    $10,000,000

**g.**   Employee benefit plans, including, but not limited to, **Placement of Coverage with Multiple Employer Welfare Arrangements**, **Self-Funded Plans**, group plans, group or ordinary pension or profit sharing plans, retirement annuities, KEOGH retirement plans, life, accident and health and/or disability plans; other than those described in a. above;

However, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, **Placement of Coverage with Multiple Employer Welfare Arrangements** is subject to the following Sub-Limits of Liability (which are part of an not in addition to the other Limits of Liability provided by the Policy) and Deductible, unless **Placement of Coverage with Multiple Employer Welfare Arrangements** is made in accordance with the **Sponsoring Company's** written procedures for such placement and same is funded.in whole or in part, by insurance products issued by the **Sponsoring Company**:

Each **Claim**:                           $500,000

**Agent** Aggregate:                  $500,000

Deductible (**Damages** only):    $5,000

In addition, coverage for **Claims** based upon, arising out of or in any way involving **Self-Funded Plans** is applicable to **Claims Expenses** only, and not **Damages**; and

**h.**   Pharmacy benefit management plans either approved by the Centers for Medicare and Medicaid Services or that are sold in conjunction with a group or individual medical plan;

**2.**   Providing advice, consultation, administration and/or services in connection with any of the products listed in Paragraph **1.**, above, whether or not a separate fee is charged;

**3.**   Consultation with participants in an employee benefit plan in order to explain the provisions of such plan and the handling of day-to-day ministerial functions required by such plan including, but not limited to, enrollment, record keeping and filing reports with governmental agencies;

**4.**   Provision of financial, investment or economic advice as a: (a) **Registered Investment Advisor** or **Associated Person** while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor** or (b) an Outside **Registered Investment Advisor** or an affiliated **Associated Person** of an Outside **Registered Investment Advisor**; An Outside **Registered Investment Advisor** and affiliated **Associated Person** shall be specifically approved, and designated by name, by the **Broker/Dealer**, and in compliance with the outside investment advisory procedures of the **Broker/Dealer**;

**5.**   Provision of financial planning services including, but not limited to, the recommendation or preparation of a financial program for a client involving the client's present and anticipated assets and liabilities, and shall include recommendations regarding savings, investments, insurance, anticipated retirement, estate planning or other employee benefits, whether or not a separate fee is charged;

**6.**   **Due Diligence Services** and **Supervisory Services** by the **Broker/Dealer**;

**7.**   Notary Public Services; or

**8.**   The purchase, sale or giving advice regarding life settlements arranged through a provider approved by the **Sponsoring Company** provided:

**a.**   On or before the life insurance policy is settled, the **Insured** obtained a signed and dated waiver from all beneficiaries of the life insurance policy acknowledging that the life settlement will occur;

**b.**   On or before the life insurance policy is settled, the owner(s) of the life insurance policy has/have signed the provider's life settlement purchase and/or sale agreement;

**c.**   The **Insured** was approved in writing by the **Sponsoring Company** or the **Broker/Dealer** to engage in life settlement transactions;

**d.**   The life settlement transaction complies with the **Sponsoring Company's** or the **Broker/Dealer's** policies and procedures for life settlement transactions; and

**e.**  The life settlement does not involve terminally ill clients in accordance with the definition of "terminally ill" by the relevant state.

**V.**  **Registered Investment Advisor** means an "Investment Advisor," as that term is defined by the Investment Company Act of 1940 or the Investment Advisors Act of 1940, as amended, who is currently registered with the SEC as an Investment Advisor under the Investment Advisors Act of 1940, as amended.

**W.**  **Registered Representative** means an **Insured** person who:

**1.**  Maintains a registered representative contract with the **Broker/Dealer**;

**2.**  Has elected to enroll for coverage under this Policy, either at the inception date of the **Policy Period** or prior to the expiration date of the **Policy Period**, and whose enrollment is on file with the **Broker/Dealer**;

**3.**  Is shown as such in a Certificate Of Insurance;

**4.**  Has paid the applicable premium; and

**5.**  Is licensed by and properly registered with FINRA and all necessary federal, state or local governmental authorities to render **Professional Services**, at the time such services are rendered, where both the **Registered Representative** and client are located.

**Registered Representative** shall also mean:

**6.**  An individual who was a **Registered Representative** of the **Broker/Dealer** and who retired from the business of providing **Professional Services** prior to July 31, 2011;

**7.**  An individual who was a **Registered Representative** of the **Broker/Dealer** and who because of a disability could no longer provide **Professional Services** prior to July 31, 2011;

**8.**  The estate of a **Registered Representative** of the **Broker/Dealer** who died prior to July 31, 2011;

Provided that with respect to Subsections **6.**, **7.** and **8.**, above, such individual was enrolled in the Penn Mutual Life Insurance Company sponsored errors and omissions insurance program at the time of his/her retirement, disability or death, is otherwise covered under the Policy for a **Claim** and if the actual or alleged **Wrongful Acts** or **Interrelated Wrongful Acts** occurred prior to such retirement, disability or death; and

**9.**  An individual who was a **Registered Representative** as of the effective date of this Policy whose contract terminated with the **Broker/Dealer** during the **Policy Period**, but only for **Professional Services** rendered under the definition of **Professional Services** 1.a and h.

**X.**  **Retroactive Date** means:

**1.**  With respect to a **Claim** arising out of or based upon the rendering of or failing to render any **Professional Services** defined in Paragraphs **U.1.** (Subsections **a.**, **b.**, **c.**, **d.**, **g.** and **h.**), **U.2.**, **U.3.**, **U.5.**, **U.7.** and **U.8.** of the definition of **Professional Services** above , the earlier of the date of the **Agent's** and/or **Registered Representative's** first:

**a.**  Continuously renewed life insurance agents or registered representatives professional liability coverage, which was in effect without interruption from the date of the **Wrongful Act** or first **Interrelated Wrongful Act** related to the **Claim** to the date when the **Claim** is first made, subject to submission of proof of such coverage to the **Insurer**; or

**b.**  First uninterrupted and continuously effective agent contract with the **Sponsoring Company** or **Broker/Dealer**.

**2.**  With respect to a **Claim** arising out of or based upon the rendering of or failing to render any **Professional Services** as defined in Paragraphs Paragraphs **U.1.** (Subsections **e.** and **f.**) and **U.4.** of the definition of **Professional Services** above, the date of the **Agent's** and/or **Registered Representative's** first uninterrupted and continuously effective contract with the **Broker/Dealer**.

**3.**  With respect to a **Claim** against a **Managing Agent** for a **Management Wrongful Act**, the date of the **Managing Agent's** first uninterrupted and continuously effective general agent, compliance officer, registered principal or manager contract with the **Sponsoring Company**.

**4.**  With respect to the **Broker/Dealer**, July 31, 1995.

**Y.**  **Securities** shall have the same meaning as the term used in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940 or the Investment Advisors Act of 1940, and any amendments thereto.

**Z.**  **Self-Funded Plans** means any employee benefit plan involving self-funding, in whole or in part, by an employer, when issued with stop-loss coverage provided by an insurance company.

**AA. Sponsoring Company** means the insurance company or organization shown as such in the Master Policy Declarations, and any **Subsidiary**.

**BB. Subsidiary** means a corporation in which the **Sponsoring Company**:

    **1.** Owns, as of the inception date of the **Policy Period**, more than 50% of the issued and outstanding voting stock either directly or indirectly though one of more **Subsidiaries** and which corporation is engaged in **Professional Services**; or

    **2.** Forms or acquires during the **Policy Period**, if the **Sponsoring Company** owns, directly or indirectly through one or more of its **Subsidiaries**, more than 50% of the issued and outstanding voting stock and which corporation is engaged in **Professional Services**, provided that notice of such formation or acquisition was disclosed to the **Insurer** within a reasonable time for it to consider any changes or modifications to this Policy which may be necessary, including, but not limited to, additional premium. Under no circumstances shall coverage be afforded to the newly acquired **Subsidiary** for a **Claim** arising out of or based upon a **Wrongful Act** committed prior to the date when the **Sponsoring Company** or one or more of its **Subsidiaries** acquired more than 50% of its issued and outstanding voting stock.

**CC. Supervisory Services** means the supervision of activities of a **Registered Representative**, who is contracted with the **Broker/Dealer**, in accordance with statutes, regulations or procedures established by governmental or self-regulatory authorities, including, but not limited to, the SEC and FINRA, or duties imposed under common law, but only in connection with activities of such **Registered Representative** that are covered under this Policy.

**DD. Wrongful Act** means a negligent act or omission, including a **Personal Injury Act**, committed by an **Insured** in the rendering of or failing to render **Professional Services** to a client.

## SECTION VI – EXCLUSIONS

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

**A.** For any actual or alleged sickness, disease, death or other bodily injury, including, but not limited to, emotional distress and mental anguish, or damage to or destruction of property, including loss of use thereof;

**B.** Against an **Insured**:

    **1.** By or on behalf of any other **Insured**, any enterprise that owns, operates or controls an **Insured** or any enterprise that an **Insured** owns, operates or controls, provided, however, that this Exclusion shall not apply to any **Claim** otherwise covered under Section I – Insuring Agreement **B.** Managing Agents Management Liability;

    **2.** By or on behalf of any individual, company or entity that is not a client of the **Insured**, including, but not limited to, an insurance company or insurance agent or broker; provided, however, that this exclusion shall not apply to a **Claim** brought by or on behalf of an actual or alleged beneficiary of a product referenced in Paragraph **1.** of Definition **P. Professional Services** above;

**C.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

    **1.** Any **Wrongful Act** or **Management Wrongful Act** alleged in any **Claim** which has been reported, or any circumstance of which notice has been given, prior to the **Policy Period**; or

    **2.** Any other **Wrongful Act** or **Management Wrongful Act**, whenever occurring, which together with a **Wrongful Act** or **Management Wrongful Act** which has been the subject of such **Claim** or notice, would constitute **Interrelated Wrongful Acts** or **Interrelated Management Wrongful Acts**, regardless of the legal grounds upon which such **Claim** is predicated upon any:

        **a. Claim,** demand, suit, proceeding or investigation of which the **Insured** had knowledge, pending on or prior to the inception date of the **Policy Period**; or

        **b.** Fact, matter, circumstance, situation, transaction or event underlying or alleged in such demand, suit, proceeding, **Claim** or investigation, regardless of the legal grounds upon which such **Claim** is predicated;

**D.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any:

    **1.** Actual or alleged dishonest, purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute, by, at the direction of or with the knowledge of any **Insured**; or

    **2.** Gaining of profit, remuneration or monetary advantage to which an **Insured** is not legally entitled.

However, the **Insurer** shall continue to defend a **Claim** alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against any **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for the costs of defending the **Claim**. Moreover, an actual or alleged dishonest,

purposeful, malicious, fraudulent or criminal act or willful violation of any federal, state or local statute of one **Agent** or **Managing Agent** will not be imputed to another **Agent** or **Managing Agent**;

**E.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged conversion, commingling, use, handling, entrustment, safeguarding, inability to pay or failure to pay premiums, funds or any form of money;

**F.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged liability of others assumed by any **Insured** under an agreement, contract, guarantee or warranty unless the **Insured** would be liable in the absence of such agreement, contract, guarantee or warranty;

**G.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged rendering of services as an actuary, accountant, attorney, real estate agent, real estate broker, third-party claims administrator, property and casualty agent or broker or expert witness, regardless of whether such services are incidental to the rendering of **Professional Services**; however, this exclusion shall not apply to tax advice provided to a client as a necessary part of rendering **Professional Services**;

**H.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged placement of a client's coverage or funds, directly or indirectly with any organization, entity or vehicle of any kind, nature or structure which is not licensed or authorized to do business in the state or jurisdiction with authority to regulate such business; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement of insurance or coverage with an eligible surplus lines insurer in the state or jurisdiction with authority to regulate such business;

**I.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged insolvency, receivership, conservatorship, liquidation, bankruptcy, failure or inability to pay of any company, organization, entity, vehicle or arrangement of any nature in which an **Insured** placed, recommended to be placed or obtained coverage or in which an **Insured** placed, recommended to be placed funds or an investment of any nature; however, this exclusion shall not apply to a **Claim** based upon or arising out of the placement, recommendation for placement or obtaining coverage with an insurance company rated by A.M Best's as B+ or better at the time when coverage is placed, recommended or obtained;

**J.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any pension plan, profit sharing plan, health and welfare or any other employee benefit plan or trust sponsored by an **Insured**, in which an **Insured** is a participant, trustee or named fiduciary;

**K.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any pension plan, profit sharing plan, health and welfare or any other employee benefit plan or trust or which are self-funded, in whole or in part;

**L.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any ownership, formation, operation or administration of any insurance company, captive, risk retention group, self-insurance program or purchasing group;

**M.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged:

    **1.**  Unfair competition;

    **2.**  Anti-competitive acts;

    **3.**  Restraint of trade;

    **4.**  Price fixing;

    **5.**  Monopolization;

    **6.**  Misuse of confidential or proprietary information;

    **7.**  Copyright, patent, trade mark or trade secret infringement;

    **8.**  Piracy, theft or conversion of ideas, employees, contacts or business methods; or

    **9.**  Illegal, improper or deceptive advertisement;

**N.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged actual or alleged discrimination or harassment in any form or manner;

**O.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any failure, malfunction or breakdown of any computers, electrical, electronic or mechanical systems or machines;

**P.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged notarization of documents without authorization or without the signatory's actual presence before an **Insured**;

**Q.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged guarantee, promise or warranty as to interest rates, market values, earnings, future values or future premiums or payments in connection with variable life insurance, variable annuities, scheduled premium annuities, mutual funds or **Securities**;

**R.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any **Securities** (other than variable life insurance, variable annuities and mutual funds) or **Private Placements** that were not authorized or approved by and actually processed through the **Broker/Dealer**;

**S.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any function of an **Insured** as a specialist or market maker for any **Securities**, an **Insured** failing to make a market for any **Securities**, or the purchase, sale or failure to sell **Securities** when the **Insured** is a specialist or market maker for such **Securities**;

**T.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving an **Insured's** actual or alleged exercise of discretionary authority over a client's assets, funds or liabilities, undertaking of trades or transactions on a discretionary basis or any trading or transactions without the express authority of a client; however, this exclusion shall not apply to the exercising of discretionary authority:

    **1.** By the **Broker/Dealer** as a **Registered Investment Advisor**;

    **2.** As an **Associated Person** while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor** with respect to mutual funds, variable annuities or variable life products;

    **3.** As an **Associated Person** while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor** while providing asset management allocation services for a fee with respect to mutual funds, variable annuities or variable life products;

    **4.** As an Outside **Registered Investment Advisor** or an affiliated **Associated Person** of the Outside **Registered Investment Advisor** while providing an advisory program where an outside money manager is used, provided that such activity is authorized and approved in writing by the **Broker/Dealer**;

    **5.** As an Outside **Registered Investment Advisor** or an affiliated **Associated Person** of the Outside **Registered Investment Advisor**, provided that such activity is authorized and approved in writing by the **Broker/Dealer**; or

    **6.** As an **Associated Person**, who has elected this coverage and paid an additional premium, while acting on behalf of the **Sponsoring Company's Subsidiary Registered Investment Advisor**, provided such activity is authorized and approved in writing by the **Broker/Dealer**. Evidence of this election shall be kept on file by CalSurance.

    It is agreed with respect to coverage above (items 1 – 6) for the **Broker/Dealer**, shall be subject to the following Sub-Limits of Liability (which are part of and not in addition to, the other Limits of Liability provided by the Policy):

    Each **Claim**:        $500,000

    Policy Aggregate:    $500,000

**U.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

    **1.** Promissory notes, viatical settlements involving terminally ill clients in accordance with the definition of "terminally ill" by the relevant state, or any **Securities** backed by promissory notes or such viatical settlements;

    **2.** Commodities, commodity futures and option contracts, except for option contracts that are covered by ownership of the underlying **Securities**, cash or cash equivalent, not including margin;

    **3.** Any "junk bonds" or "high yield bonds" (for purposes of this exclusion, "junk bonds" or "high yield bonds" mean bonds which, at the time of purchase or sale were unrated or rated as below investment grade by any rating agency, including, but not limited to, Moody's bonds of Ba or lower or S&P bonds of BB or lower);

    **4.** Any **Securities** sold exclusively outside of the United States of America or Canada;

    **5.** Actual, attempted or threatened mergers, acquisitions, divestitures, tender offers, proxy contests, leveraged buy-outs, going private transactions, reorganizations, capital restructuring, recapitalization, fairness opinions, spin-offs, primary or secondary offerings of **Securities** (regardless of whether the offering is a public offering or a private placement) or other efforts to raise or furnish capital or financing for any company, corporation, enterprise or entity or disclosure requirements in connection with any of the foregoing, as well as any other investment banking activities;

6. Structured settlements; however, this exclusion shall not apply to a **Claim** arising out of or based upon the sale or servicing of the underlying product, if otherwise covered by this Policy;

7. Any **Securities** that are wholly or partially owned by any **Insured**;

8. Callable certificates of deposit and debentures; and

9. any **Securities** or investment/financial products backed by mortgages, including, but not limited to CMOs, CDOs, and CDS;

V. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving actual or alleged use or disclosure, aiding or abetting use or disclosure or participation after the fact in use or disclosure of non-public or insider information as prohibited by any federal, state or local laws, statutes, regulations or ordinances, including but not limited to, the Insider Trading and Securities Fraud Enforcement Act of 1988, Section 10(b) of the Securities Exchange Act of 1934 and Securities Exchange Commission Rule 10b-5 thereunder;

W. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving, actual or alleged advice, consultation or recommendations of any type of mortgage, including, but not limited to, a reverse mortgage, regardless of whether an incidental part of the rendering of **Professional Services**; and

X. Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving **Securities**, **Private Placements** and/or investment or financial products issued by the following and/or any related, associated or affiliated companies, organizations, partnerships, syndicates or entities of any nature:

1. ETS/ATM Payphones;

2. DBSI Management and DBSI, Inc.;

3. Provident Royalties;

4. Medical Capital Note Program;

5. Shale Royalties;

6. Black Diamond Program;

7. Desert Capital REIT;

8. IMH Secured Loan Fund; and

9. GPB Capital Holdings, LLC. and/or any company, corporation, parent, subsidiary, partnership or other business entity directly or indirectly owned or controlled by or associated or affiliated with GPB Capital Holdings, LLC or any employee, partner, officer, director, agent, representative or other person associated with any of the foregoing.

## SECTION VII – TERRITORY

This insurance applies to **Wrongful Acts** or **Management Wrongful Acts** committed anywhere in the world, provided that the **Claim** is made against an **Insured** in the United States of America, its territories or possessions, Puerto Rico or Canada.

## SECTION VIII – LIMITS OF LIABILITY

### A. Limit Of Liability Each Claim:

Subject to Paragraph **B.** below, the limit of the **Insurer's** liability for **Damages** for a **Claim** made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section **XI** – Notice Of Claim below, or Extended Reporting Period, if applicable, shall not exceed the Limit Of Liability Each Claim shown in the Certificate Of Insurance.

The Limit Of Liability Each Claim does not include **Claim Expenses**. However, the **Insurer's** payment of **Claim Expenses** shall be subject to a $1,000,000 Sub-Limit Of Liability Each Claim for each **Insured**. The **Insurer's** payment of **Claim Expenses** for each **Claim** against an **Insured** will under no circumstances exceed $1,000,000, regardless of the other Limits Of Liability that are implicated.

The **Insurer's** obligations under this Policy as to a **Claim** against an **Insured**, including the duty to defend and pay **Claim Expenses**, shall cease after the applicable Limit Of Liability Each Claim has been paid by the **Insurer** for **Damages**. The inclusion of multiple **Insureds** in a **Claim** shall not increase the applicable Limit Of Liability Each Claim. Only one Limit Of Liability Each Claim shall apply to such a **Claim**.

The Limit Of Liability Each Claim applicable to a **Claim** involving multiple **Insureds** shall be the single largest such Limit Of Liability, in the event that different Limits Of Liability Each Claim, or Sub-Limits of Liability, are implicated.

### B. Limit Of Liability Aggregate:

The Limit Of Liability for **Damages** for all **Claims** made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period**, or as allowed by Section XI – Notice Of Claim below, or Extended Reporting Period, if applicable, shall not exceed the Limit Of Liability Aggregate shown in the Certificate Of Insurance.

The Limit Of Liability does not include **Claim Expenses**. However, the **Insurer's** payment of **Claim Expenses** shall be subject to a $1,000,000 Sub-Limit of Liability Aggregate for each **Insured**. The **Insurer's** payment of **Claim Expenses** for all **Claims** against an **Insured** will under no circumstances exceed $1,000,000, regardless of the other Limits Of Liability that are implicated.

The **Insurer's** obligations under this Policy as to all **Claims** against an **Insured**, including the duty to defend and pay **Claim Expenses**, shall cease after the applicable Limit Of Liability Aggregate has been paid by the **Insurer** for **Damages**.

If multiple **Insureds** are implicated in a **Claim**, the Limit Of Liability Aggregate shown in the **Certificate of Insurance** for each implicated **Insured** shall be decreased in equal amounts.

**C. Limits Of Liability Applicable To The Sponsoring Company:**

The Limit Of Liability available to the **Sponsoring Company** for a **Claim** against the **Sponsoring Company** that is covered under Section **I** – Insuring Agreement **C.** Sponsoring Company Vicarious Liability, as well as other terms, limitations, exclusions and conditions of the Policy, shall be shared with and not in addition to the Limits Of Liability applicable to the **Agent** implicated by the **Claim**. As with all other **Insureds**, all of the **Insurer's** obligations as to the **Sponsoring Company**, including those pertaining to its defense, shall cease after the applicable Limits Of Liability are paid by the **Insurer** for **Damages**.

## SECTION IX – DEDUCTIBLE

**A.** The Deductible shown in the Certificate Of Insurance shall apply to **Damages**, if any, that are incurred in each **Claim**. The **Insured** must pay the Deductible to the **Insurer** at the time of settlement.

**B.** If multiple **Insureds** are implicated in a **Claim**, then only one Deductible shall apply to the **Damages** that may be incurred in such **Claim**. Such Deductible shall be the largest, in the event that different Deductibles are implicated by a **Claim**. The **Sponsoring Company** must pay the Deductible to the **Insurer** at the time of settlement.

## SECTION X – MULTIPLE CLAIMS

**A.** All **Claims** based upon or arising out of the same **Wrongful Act**, **Interrelated Wrongful Acts**, **Management Wrongful Act**, or **Interrelated Management Wrongful Acts**, shall be considered a single **Claim** and each such single **Claim** shall be deemed to have been made on the earlier of the following:

    **1.** When the earliest **Claim** arising out of such **Wrongful Act, Interrelated Wrongful Acts, Management Wrongful Act,** or **Interrelated Management Wrongful Acts** was first made; or

    **2.** When notice was provided concerning a **Wrongful Act, Interrelated Wrongful Acts, Management Wrongful Act,** or **Interrelated Management Wrongful Acts** giving rise to such **Claim** under the Policy or any other policy;

regardless of whether before the **Policy Period** or the term of any preceding policy.

**B.** Such single **Claim** shall be subject to one Limit Of Liability Each Claim and one Deductible, even if involving multiple claimants, **Insureds** or proceedings.

## SECTION XI – NOTICE OF CLAIM

**A.** As a condition precedent to the obligations of the **Insurer** under this Policy, an **Insured** shall give the **Insurer** written notice of a **Claim** made against the **Insured** as soon as practicable, but in no event later than either:

    **1.** The end of the **Certificate Period**, or Extended Reporting Period, if applicable;

    **2.** 30 days after the end of the **Policy Period**, or Extended Reporting Period, if applicable, as long as such **Claim** is first made within the final 30 days of the **Policy Period** or Extended Reporting Period; or

    **3.** Notwithstanding the requirements of 1. and 2. above, if continuous coverage is in effect pursuant to consecutive policies issued by the **Insurer**, a **Claim** may be reported to the **Insurer** in writing, as soon as practicable, during the policy period consecutive to and immediately following this **Policy Period** without constituting a violation of this provision. In such condition, the **Claim** will be deemed reported on the last day of the **Policy Period.**

**B.** Written notice of a **Claim** shall be addressed to the **Insurer**.

**C.** A **Claim** shall be deemed reported at the time when the **Insurer** receives written notice.

**D.** The **Insured** shall provide the **Insurer** with copies of all documents received by the **Insured** concerning a **Claim**, including, but not limited to, a summons, complaint, statement of claim or any other papers served in a civil litigation or arbitration. In addition, the **Insured** shall provide the **Insurer** with the following:

**1.** The name of the claimant;

**2.** The name of each **Insured** involved in the **Claim**;

**3.** A detailed description of the **Wrongful Act** or **Management Wrongful Act** giving rise to the **Claim**;

**4.** The **Damages** that may result from the **Claim**; and

**5.** The circumstances by which the **Insured** became aware of the **Claim**.

## SECTION XII – NOTICE OF A WRONGFUL ACT OR MANAGEMENT WRONGFUL ACT

**A.** An **Insured** may provide the **Insurer** with written notice of a **Wrongful Act** or **Management Wrongful Act** committed during the **Certificate Period** which reasonably may be expected to give rise to a **Claim** as soon as practicable after the **Wrongful Act** or **Management Wrongful Act** becomes known to the **Insured**. Such notice may not be provided after the **Certificate Period** expires, nor during any Extended Reporting Period.

**B.** The **Insured** shall provide the **Insurer** with the following concerning any such **Wrongful Act** or **Management Wrongful Act**:

**1.** The name of the potential claimant;

**2.** The name of each **Insured** allegedly responsible for such **Wrongful Act** or **Management Wrongful Act**;

**3.** A detailed description of the fact, allegation, circumstance or situation that could result in a **Claim**;

**4.** The **Damages** that may result from the **Wrongful Act** or **Management Wrongful Act**;

**5.** The circumstances by which the **Insured** became aware of the **Wrongful Act** or **Management Wrongful Act**; and

**6.** The reasons for anticipating a **Claim**.

**C.** A **Claim** arising from a **Wrongful Act** or **Management Wrongful Act** and reported in accordance with Paragraphs **A.** and **B.** above shall be deemed to have been first reported when the **Insurer** receives written notice of the **Wrongful Act** or **Management Wrongful Act**.

**D.** Such written notice of a **Wrongful Act** or **Management Wrongful Act** which reasonably may be expected to give rise to a **Claim** must be given to the **Insurer**.

## SECTION XIII – ASSISTANCE AND COOPERATION

**A.** The **Insured** shall cooperate with the **Insurer** and provide such assistance and information as the **Insurer** may reasonably request, including submission to examination and interrogation by a representative of the **Insurer**, under oath if required. The **Insured** shall assist with the defense of a **Claim** and shall attend hearings, depositions, trials and otherwise assist in the conduct of suits, including but not limited to effecting settlement, securing evidence and giving evidence, obtaining the attendance of witnesses, and giving written statements to the **Insurer's** representatives.

**B.** The **Insured** shall not take any action which may increase exposure or **Damages**. The **Insured** shall not admit liability, agree to settlement, mediation or arbitration of any **Claim** or incur any cost or expense without the written consent of the **Insurer** which shall not be unreasonably withheld.

**C.** If any **Insured** shall commit fraud in reporting any **Claim**, the insurance provided by this Policy shall be void from the date such fraudulent **Claim** is reported to the **Insurer**.

## SECTION XIV – EXTENDED REPORTING PERIODS

**A. Optional Group Extended Reporting Period**

**1.** In the event of cancellation or non-renewal of this Policy by the **Insurer**, the **Sponsoring Company**, on behalf of the **Insureds**, shall have the right to purchase an Extended Reporting Period for payment of an additional premium equal to 200% of the total annual premium paid for the Policy. Such an Extended Reporting Period, if purchased, shall be for 3 years commencing on the date of cancellation or non-renewal and ending 36 months thereafter. During this Extended Reporting Period, if purchased, the **Insureds** may report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the date of cancellation or non-renewal. A **Claim** reported under the Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

2.  Notwithstanding any of the provisions of this Policy, the Extended Reporting Period provided herein shall not apply if an **Insured** has other insurance that applies to a **Claim**, in whole or in part.

3.  The Extended Reporting Period provided herein shall not apply if the **Sponsoring Company** terminates the Policy as provided for in Section **XV** – Termination Of Coverage below or decides not to renew this Policy.

4.  The Extended Reporting Period provided herein shall not reinstate, increase or affect the applicable Limits Of Liability nor extend the **Policy Period**.

5.  The Extended Reporting Period provided herein shall include, and not be in addition to, the Extended Reporting Periods provided by Paragraph **B.** below.

**B.  Automatic Agent, Managing Agent Or Registered Representative Extended Reporting Period**

1.  Upon termination of an **Agent's**, **Managing Agent's** or **Registered Representative's** coverage under this Policy for the reason stated in Paragraph **A.2.** of Section **XV** – Termination Of Coverage below, such an **Insured** shall have an automatic Extended Reporting Period of one year commencing on the date of the **Insured's** termination and ending 12 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** termination. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

2.  Notwithstanding any other provision of this Policy, the Extended Reporting Period provided herein shall not apply if an **Agent**, **Managing Agent** or **Registered Representative** has other insurance that applies to a **Claim**, in whole or in part.

3.  The Extended Reporting Period provided herein shall not apply if the **Sponsoring Company** or **Broker/Dealer** terminates an individual **Agent's**, **Managing Agent's** or **Registered Representative's** contract because of a failure to comply with the **Sponsoring Company's** or **Broker/Dealer's** rules, requirements or guidelines governing the conduct, business or activities of **Insureds**.

4.  The Extended Reporting Period provided herein shall not reinstate, increase or otherwise affect the applicable Limits Of Liability nor extend the **Certificate Period**.

5.  A **Claim** which is properly reported during this Extended Reporting Period will be deemed to have been first made on the last day of the **Certificate Period**.

6.  The Extended Reporting Period provided herein shall only apply if the **Insurer** continues coverage under a renewal or replacement policy issued to the **Sponsoring Company** one year after the **Agent's**, **Managing Agent's** or **Registered Representative's** contract with the **Sponsoring Company** or **Broker/Dealer** is terminated. In the event that the **Insurer** does not continue coverage, the Extended Reporting Period provided herein shall end 30 days after the expiration date of the last policy issued by the **Insurer** to the **Sponsoring Company**.

**C.  Automatic Agent, Managing Agent Or Registered Representative Extended Reporting Period Due To Disability, Retirement Or Death**

1.  If an **Agent**, **Managing Agent** or **Registered Representative** becomes disabled, retires from the business of providing **Professional Services** in accordance with the formal retirement procedures of the **Sponsoring Company**, or dies, then such **Insured** or the estate of the deceased **Insured** shall have an automatic Extended Reporting Period of 2 years commencing on the date of the **Insured's** disability, retirement or death and ending 24 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period.

2.  Notwithstanding any other provision of this Policy, the Extended Reporting Period provided herein shall not apply if an individual **Insured** or the estate of a deceased **Insured** has other insurance that applies to a **Claim**, in whole or in part.

3.  The Extended Reporting Period provided herein shall not reinstate, increase or otherwise affect the applicable Limits Of Liability nor extend the **Certificate Period**.

4.  A **Claim** which is properly reported during this Extended Reporting Period will be deemed to have been first made on the last day of the **Certificate Period**.

5.  The Extended Reporting Period provided herein shall only apply if the **Insurer** continues coverage under a renewal or replacement policy issued to the **Sponsoring Company** 2 years after the **Insured's** disability, retirement or

death. In the event that the **Insurer** does not continue coverage, the Extended Reporting Period provided herein shall end 30 days after the expiration date of the last policy issued by the **Insurer** to the **Sponsoring Company**.

**D.** **Optional Agent, Managing Agent Or Registered Representative Extended Reporting Period Due To Disability, Retirement Or Death**

**1.** If an **Agent**, **Managing Agent** or **Registered Representative** becomes disabled or retires from the business of providing **Professional Services** in accordance with the formal retirement procedures of the **Sponsoring Company**, or dies, then such **Insured** or the estate of the deceased **Insured** may elect to purchase one of the following Optional Extended Reporting Periods:

**a.** 3 years commencing on the date of the **Insured's** disability, retirement or death and ending 36 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period. The cost of such optional Extended Reporting Period shall be 200% of the **Insured's** last annual premium, and must be paid within 60 days after termination of such **Agent's** contract with the **Sponsoring Company** because of disability, retirement or death.

**b.** 5 years commencing on the date of the **Insured's** disability, retirement or death and ending 60 months thereafter during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period. The cost of such optional Extended Reporting Period shall be 300% of the **Insured's** last annual premium, and must be paid within 60 days after termination of such **Agent's** contract with the **Sponsoring Company** because of disability, retirement or death.

**c.** An unlimited amount of time commencing on the date of the **Insured's** disability, retirement or death during which to report **Claims** for **Wrongful Acts** or **Management Wrongful Acts** occurring on or after the **Retroactive Date** but before the **Insured's** disability, retirement or death. A **Claim** reported under this Extended Reporting Period must be otherwise covered pursuant to the terms, provisions, conditions and exclusions of this Policy. Notice of **Wrongful Acts** or **Management Wrongful Acts** that may result in **Claims** may not be reported during this Extended Reporting Period. The cost of such optional Extended Reporting Period shall be 400% of the **Insured's** last annual premium, and must be paid within 60 days after termination of such **Agent's** contract with the **Sponsoring Company** because of disability, retirement or death.

**2.** Notwithstanding any other provision of this Policy, the Extended Reporting Period provided herein shall not apply if an individual **Insured** or the estate of a deceased **Insured** has other insurance that applies to a **Claim**, in whole or in part.

**3.** The Extended Reporting Period provided herein shall not reinstate, increase or otherwise affect the applicable Limits Of Liability nor extend the **Certificate Period**.

**4.** A **Claim** which is properly reported during this Extended Reporting Period will be deemed to have been first made on the last day of the **Certificate Period**.

**SECTION XV – TERMINATION OF COVERAGE**

**A.** **Applicable To Agent, Managing Agent Or Registered Representative**

**1.** The coverage afforded by this Policy shall terminate upon the earlier of:

**a.** The expiration date of the **Policy Period**;

**b.** Cancellation as provided by Paragraph **C.** below; or

**c.** The termination of an **Agent's**, **Managing Agent's** or **Registered Representative's** contract for cause with the **Sponsoring Company** or **Broker/Dealer** to render **Professional Services**.

**2.** An **Agent**, **Managing Agent** or **Registered Representative** may terminate participation in this Policy by sending written notice to the **Sponsoring Company** at the **Sponsoring Company's** address shown in the Certificate Of Insurance with the effective date of termination being not less than 30 days thereafter.

**B.** **Applicable To Sponsoring Company**

**1.** The coverage afforded by this Policy shall terminate upon the earlier of:

**a.** The expiration date of the **Policy Period**; or

    **b.** Cancellation as provided by Paragraph **C.** below.

  **2.** The **Sponsoring Company** may terminate the Policy by sending written notice to the **Insurer** with the effective date of termination being not less than 30 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice. If the **Sponsoring Company** terminates the Policy, the **Insurer** shall be deemed to have fully earned the premium for the Policy.

**C.** Applicable To Insurer

  **1.** This Policy may be terminated by the **Insurer**, for other than failure to pay a premium when due, by providing written notice to the **Sponsoring Company** at the **Sponsoring Company's** address shown in the Master Policy Declarations with the effective date of termination being not less than 60 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice. If the **Insurer** terminates the Policy, the **Sponsoring Company** shall receive a return of premium to be computed on a short rate basis proportional to the length of time from the inception date of the **Policy Period** to the termination date.

  **2.** This Policy may be cancelled by the **Insurer** because of failure to pay a premium when due by providing written notice to the **Sponsoring Company** at the **Sponsoring Company's** address shown in the Master Policy Declarations with the effective date of termination being not less than 10 days thereafter. Proof of mailing the notice of termination shall be sufficient proof of such notice.

Nothing contained herein shall limit, abrogate or negate the rights of the **Insurer** under law and equity to declare that the Policy is void based on material misrepresentations or omissions contained in the **Application**.

**SECTION XVI – OTHER INSURANCE**

**A.** If any **Insured** has other insurance for a **Claim** made and reported during the **Policy Period**, or as allowed by Section **X** – Notice Of Claim, or Extended Reporting Period, if applicable, then this Policy shall be excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**B.** The foregoing shall not apply if such other insurance is specifically intended to be excess over the coverage afforded by this Policy.

**C.** If a **Claim** is covered by this Policy and another policy issued by the **Insurer** or any company or entity affiliated with the **Insurer**, regardless of the **Insured** included in a **Claim**, then a single Limit Of Liability and single Deductible shall apply under both policies to the **Claim**. The single Limit Of Liability applicable to the **Claim** shall be the largest such Limit Of Liability under the policies. The Deductible applicable to the **Claim** shall likewise be the largest under the policies.

**SECTION XVII – SUBROGATION**

**A.** In the event that the **Insurer** pays **Damages** or **Claim Expenses** on behalf of any **Insured**, the **Insurer** shall be subrogated to all of the **Insured's** rights of recovery, contribution, indemnification and apportionment against any third party implicated in a **Claim**. The **Insured** shall do nothing before or after the **Insurer's** payment of **Damages** or **Claim Expenses** that would waive, prejudice or impair the **Insurer's** subrogated rights of recovery, contribution, indemnification or apportionment.

**B.** The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of recovery, contribution, indemnification or apportionment which the **Insured** may have, including the execution of such documents as are necessary to enable the **Insurer** to commence proceedings in any **Insured's** name. The **Insured** shall provide all other assistance and cooperation which the **Insurer** may reasonably require.

**SECTION XVIII – OTHER PROVISIONS**

**A. Entire Agreement**

The terms and provisions of this Policy shall not be waived, changed or modified, unless by endorsement. Notices to, by or from any agent, representative or servant of any **Insured** or the **Insurer** shall not affect a waiver, change or modification of the Policy and shall not prevent the **Insurer** from asserting any rights under the Policy.

**B. Assignment**

This Policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

**C. Authorization**

By acceptance of this Policy, the **Sponsoring Company** agrees to act on behalf of the **Insureds** for all purposes including but not limited to the negotiation of the terms of the Policy, payment of or return of premiums, receipt and acceptance of any endorsement issued to form a part of the Policy and giving and receiving notice of cancellation, termination or non-renewal of the Policy.

**D.  Action Against The Insurer**

    **1.**  No action shall be taken against the **Insurer** unless, as a condition precedent thereto, an **Insured** has fully complied with all the terms and provisions of this Policy. In addition, no action shall be taken against the **Insurer** until the amount of an **Insured's** obligation or liability to a third party has been finally determined by an award or judgment against an **Insured** in an actual adjudicatory proceeding.

    **2.**  No person, organization or entity shall have the right under this Policy to join any **Insured** in any action or proceeding against an **Insurer** to determine the **Insurer's** liability nor shall the **Insurer** be impleaded in an action or proceeding by any **Insured** or the legal representative of such **Insured**.

**E.  Bankruptcy**

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the **Insurer** of any of its obligations hereunder.

**F.  Conformance to Statute**

Terms of this Policy which are in conflict with the statutes of the State wherein this Policy is issued are hereby amended to conform to such statutes.

**G.  Headings**

The descriptions in the headings and any subheading of this Policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 1**

**MARKEL**®

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PROFESSIONAL SERVICES AMENDMENT ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that in consideration of the premium charged, and solely with respect to Non-Affiliated Horner, Townsend & Kent, Inc./"Life Only" Agents of the **Sponsoring Company**, Section **V**, Paragraph **U.** -- Definition of **Professional Services** -- is deleted in the entirety and replaced with the following:

**Professional Services** means:

1. The solicitation, sale or servicing of the following:

   a. Life insurance, accident and health insurance, workers' compensation insurance as part of a 24-Hour accident and health insurance product, managed care organization contracts, long term care products, disability income insurance and fixed annuities;

   b. Employee benefit plans, including, but not limited to, **Placement of Coverage with Multiple Employer Welfare Arrangements**, **Self-Funded Plans**, group plans, group or ordinary pension or profit sharing plans, retirement annuities, KEOGH retirement plans, life, accident and health and/or disability plans;

   However, coverage for **Claims** based upon, arising out of or in any way involving, in whole or in part, **Placement of Coverage with Multiple Employer Welfare Arrangements** is subject to the following Sub-Limits of Liability (which are part of an not in addition to the other Limits of Liability provided by the Policy) and Deductible, unless **Placement of Coverage with Multiple Employer Welfare Arrangements** is made in accordance with the **Sponsoring Company's** written procedures for such placement and same is funded.in whole or in part, by insurance products issued by the **Sponsoring Company**:

   | | |
   |---|---|
   | Each **Claim**: | $500,000 |
   | **Agent** Aggregate: | $500,000 |
   | Deductible (**Damages** only): | $5,000 |

   In addition, coverage for **Claims** based upon, arising out of or in any way involving **Self-Funded Plans** is applicable to **Claims Expenses** only, and not **Damages**; and

   c. Pharmacy benefit management plans either approved by the Centers for Medicare and Medicaid Services or that are sold in conjunction with a group or individual medical plan;

2. Providing advice, consultation, administration and/or services in connection with any of the products listed in Paragraph **1.**, above, whether or not a separate fee is charged;

3. Consultation with participants in an employee benefit plan in order to explain the provisions of such plan and the handling of day-to-day ministerial functions required by such plan including, but not limited to, enrollment, record keeping and filing reports with governmental agencies;

4. Provision of financial planning services including, but not limited to, the recommendation or preparation of a financial program for a client involving the client's present and anticipated assets and liabilities, and shall include recommendations regarding savings, investments, insurance, anticipated retirement, estate planning or other employee benefits, whether or not a separate fee is charged;

**Page 1 of 2**

5.  Notary Public Services; or

6.  The purchase, sale or giving advice regarding life settlements arranged through a provider approved by the **Sponsoring Company** provided:

   a.  On or before the life insurance policy is settled, the **Insured** obtained a signed and dated waiver from all beneficiaries of the life insurance policy acknowledging that the life settlement will occur;

   b.  On or before the life insurance policy is settled, the owner(s) of the life insurance policy has/have signed the provider's life settlement purchase and/or sale agreement;

   c.  The **Insured** was approved in writing by the **Sponsoring Company** or the **Broker/Dealer** to engage in life settlement transactions;

   d.  The life settlement transaction complies with the **Sponsoring Company's** or the **Broker/Dealer's** policies and procedures for life settlement transactions; and

   e.  The life settlement does not involve terminally ill clients in accordance with the definition of "terminally ill" by the relevant state.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 2**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CYBER MANAGEMENT WITH EXTORTION DEMAND, BUSINESS INTERRUPTION AND NETWORK RESTORATION COST COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

**CYBER MANAGEMENT EXPENSES, DAMAGES, CREDIT MONITORING COSTS, CLAIM EXPENSES, EXTORTION PAYMENT, BUSINESS INCOME AND EXTRA EXPENSES ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

### SCHEDULE

| | | |
|---|---|---|
| Cyber Management Limits Of Liability: | $250,000 | Each Claim |
| | $500,000 | Insured Aggregate |
| Cyber Management Retention: | $5,000 | Each Claim |
| Extortion Payment Limit Of Liability: | $250,000 | Each Extortion Demand |
| | $500,000 | Insured Aggregate |
| Extortion Payment Retention: | $5,000 | Each Extortion Demand |
| First Party Loss Limit Of Liability | $250,000 | Each Exploit or Network Impairment |
| | $500,000 | Insured Aggregate |
| First Party Loss Retention | $5,000 | Each Exploit or Network Impairment |
| Total Aggregate Limit Of Liability | $1,000,000 | As to All Claims, Extortion Demands, Exploits and Network Impairments |

**NOTE** – pursuant to the terms of this endorsement, as stated below, a single Limit of Liability and Retention shall apply to each Claims, Extortion Demands, Exploits and/or Network Impairments that are the result of Network Security Breaches, Privacy Violations, Extortion Demands, Exploits and/or Network Impairments, which are the same, similar, repeated or continuous; or connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies. Under no circumstances shall the Insurer's liability under this endorsement exceed the Total Aggregate Limit of Liability, regardless of the number of Claims, Extortion Demands, Exploits or Network Impairments hereunder.

**A.** The following are added to Section **I – Insuring Agreements:**

**Cyber Management**

**1.** The **Insurer** shall pay, on behalf of the **Insured**:

**Page 1 of 8**

a.   **Cyber Management Expenses** incurred by an **Insured** with the **Insurer's** prior written consent that are a direct result of a **Security Breach**, **Privacy Violation** or **Interrelated Breaches/Violations**, provided the **Cyber Management Expenses** are reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, or during an Extended Reporting Period, if applicable;

b.   **Damages** and **Claim Expenses** which an **Insured** shall become legally obligated to pay because of actual monetary loss by the **Insured's** client as the direct result of a **Security Breach, Privacy Violation** or **Interrelated Breaches/Violations**, provided a **Claim** is both made against the **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, or during an Extended Reporting Period, if applicable; and

c.   **Credit Monitoring Costs** incurred by an **Insured** with the **Insurer's** prior written consent that are the direct result of a **Security Breach** or **Privacy Violation** that directly results in theft or unauthorized copying of **Personal Information** and may reasonably be expected to result in **Identity Theft**, provided the **Credit Monitoring Costs** are reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, or during an Extended Reporting Period, if applicable.

2.   This **Cyber Management** coverage applies only if:

a.   Such **Security Breach**, **Privacy Violation** or any **Interrelated Breaches/Violations** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

b.   As of the inception date of this Policy as shown in the Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Security Breach**, **Privacy Violation** or any **Interrelated Breaches/Violations** could result in **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** or any loss that may be sustained by a client.

**Extortion Demand**

The **Insurer** shall reimburse the **Insured** for:

**Extortion Payment** resulting from an **Extortion Demand**, in excess of the **Extortion Payment** Retention and up to the **Extortion Payment** Limits of Liability, provided that:

a.   The **Extortion Demand** is first made against the **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim or during an Extended Reporting Period, if applicable, in accordance with the Section **XI**; and

b.   The **Extortion Payment** is incurred within 1 2 months after the date that the **Insured** reports the **Extortion Demand** in accordance with the Section **XI** – Notice of Claim, and such amounts are consented to in writing by the **Insurer**, such consent not to be unreasonably withheld.

**Business Interruption and Network Restoration Costs**

The **Insurer** shall pay on behalf of the **Insured** all **First Party Loss** in excess of the **First Party Loss** Retention and up to the **First Party Loss** Limits of Liability that the **Insured** incurs:

a.   **Business Interruption Coverage and Extra Expense**

for **Business Income and Extra Expense** resulting from an **Exploit** that first causes **Network Impairment** during the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**), provided that such **Exploit** is reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim, if applicable, in accordance with the Section **XI**.

b.   **Loss of or Damage to Insured's Network**

for the **Insured's** reasonable and necessary expenses resulting from an **Exploit** that first causes **Network Impairment** during the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker/Dealer**), provided that such **Exploit** is reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker-Dealer**), or as allowed by Section **XI** – Notice Of Claim or during an Extended Reporting Period, if applicable, in accordance with the Section **XI**, that are required to restore the **Network** or information residing on the **Network** to the form in which it existed immediately prior to such **Exploit**.

**B.**  For the purpose of this endorsement, the following definitions in Section **V** – Definitions are amended:

**G.**  **Claim Expenses** do not include **Cyber Management Expenses**, **Credit Monitoring Expenses**, **Extortion Payments** or **First Party Loss**.

**DD.Wrongful Act** also means **Network Security Breach**, **Privacy Violation**, or any **Interrelated Breaches/Violations**, but only with respect to **Cyber Management** coverage.

**C.**  For the purpose of this endorsement, the following definitions are added to Section **V** – Definitions:

**Business Income and Extra Expense** means:

**1.**  the amount of net income, before interest, tax, depreciation or amortization, that the **Insured** would have earned during the period of time when **Network Impairment** caused by an **Exploit** commences and ending when such **Network Impairment** is corrected, allowing the resumption of **Professional Services**; and

**2.**  **Extra Expense**;

however, **Business Income and Extra Expense** does not include:

**1.**  ordinary operating expenses incurred by the **Insured** during the period of time when **Network Impairment** commences and ending when such **Network Impairment** is corrected, allowing the resumption of **Professional Services**;

**2.**  costs or expenses to update, upgrade, enhance, or replace the **Insured's Network** beyond that which existed prior to the occurrence of the **Network Impairment**;

**3.**  costs or expenses the **Insured** incurs to prove or document **First Party Loss**;

**4.**  **Cyber Management Expenses**;

**5.**  **Damages** and **Claim Expenses**;

**6.**  **Credit Monitoring Expenses**; and/or

**7.**  **Extortion Payments**.

**Credit Monitoring Costs** means the costs for retaining a third party service provider approved by the **Insurer** and with the **Insured's** prior written consent to provide **Credit Monitoring Services** to those individuals who were victims of theft or unauthorized copying of **Personal Information**.

**Credit Monitoring Services** means the services that allow individuals to access and review their credit reports to determine if **Identity Theft** has occurred.

**Cyber Management Expenses** means necessary and reasonable expenses to hire an attorney, selected from the **Insurer's** panel counsel, to determine whether any breach notice laws apply and the obligations of any such applicable laws including the drafting of letters to satisfy the applicable law, including the cost to notify those effected by the **Network Security Breach** or **Privacy Violation**, or to provide **Credit Monitoring Services** to the **Insured's** clients. **Cyber Management Expenses** shall also include approved expenses to respond to a regulatory action commenced or pending solely against the **Insured**, and the hiring of a public relations firm to communicate with the **Insured's** clients

in order to mitigate the reputational damage of the **Insured** directly resulting from a **Network Security Breach** or **Privacy Violation**.

**Exploit** means **Network Impairment** or a series of related **Network Impairments** by a third party, and not any **Insured**.

**Extortion Demand** means an incident or series of related incidents occurring during the **Policy Period** where an **Insured** receives a threat to launch an attack on, to suspend, or to otherwise disrupt a **Network,** disrupt or deface the **Insured's** website or release or use **Personal Information** in the **Insured's** care, unless monies are paid or specified action is taken, and an **Insured** believes there is an imminent and probable danger of such action. An **Extortion Demand** does not include any demand seeking monies from the **Insured** that are allegedly due and owing pursuant to contract or operation of law.

**Extortion Payment** means all reasonable and necessary expenses incurred by the **Insured** with the **Insurer's** prior consent, in order to respond to an **Extortion Demand**, including payment of monies demanded by an extortionist. **Extortion Payments** do not include such expenses to the extent the **Insured** has recovered such expenses or been reimbursed for them from any other source. **Extortion Payments** do not include **Damages**, **Claim Expenses**, **Cyber Management Expenses**, **Credit Monitoring Expenses**, **Business Income and Extra Expense** and/or **First Party Losses**.

**Extra Expense** means any reasonable and necessary expenses, in excess of the **Insured's** normal operating expenses, that the **Insured** incurs during period of time when **Network Impairment** commences and ending with **Network Impairment** is corrected, allowing the resumption of **Professional Services**, including:

1. reasonable expense incurred to minimize the interruption of **Professional Services** not otherwise covered by this Policy;

2. reasonable expense incurred to resume **Professional Services** on a temporary basis, including those associated with securing temporary third party Internet service provider services, temporary website and/or e-mail hosting services, rental of temporary **Networks**, other temporary equipment or service contracts; and

3. reasonable expense incurred to engage a third party security expert to:

   a. investigate, minimize and stop damage to the **Network** caused by the **Exploit** while such **Exploit** is ongoing; and

   b. collect, analyze and preserve forensic evidence of an **Exploit** for use in identifying the perpetrator responsible for the disruption to **Professional Services**.

**First Party Loss** means amounts which the **Insurer** is obligated to pay as set forth in the **Business Interruption and Network Restoration Costs** Insuring Agreement.

**Identity Theft** means the theft or unauthorized copying of **Personal Information** of a client of the **Insured**, and use of such **Personal Information** to open new financial accounts for the purpose of fraudulently impersonating such individual, including without limitation, payment card accounts, bank accounts, loan accounts, health insurance accounts and insurance accounts.

**Insured's Computer System** means any computer hardware, software or firmware, and components thereof including data stored thereon, that is owned or leased by an **Insured** and is under the direct operational control of an **Insured.**

**Interrelated Breaches/Violations** means **Security Breaches** and/or **Privacy Violations** that are:

1. Similar, repeated or continuous; or

2. Connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies.

**Network** means a local or wide area network owned or operated by or on behalf of or for the benefit of the **Broker/Dealer**; provided, however, **Network** shall not include the internet, telephone company networks, or other public infrastructure network (collectively "public infrastructure network"), unless such public infrastructure network is operated and controlled exclusively by the **Broker/Dealer**.

**Network Impairment** means the disruption, modification, destruction or damage to the **Insured's Network** that results in the impairment of the **Insured's Network** to such an extent that the **Insured** is substantially unable to conduct **Professional Services**.

**Personal Information** means:

**1.** The name of an **Insured's** client in combination with any one or more of the following:

    **a.** Social security number;

    **b.** Driver's license number or any other state identification number;

    **c.** Medical or healthcare data including protected health information; or

    **d.** Any financial account number, credit or debit card number in combination with any required password, access code or other security code that would permit access to the financial account;

    not including any lawfully available data accessible by the general public; or

**2.** Non-public personal information as defined in any **Privacy Regulation**.

**Privacy Regulation** means those parts of the following statues or regulations regulating the use and protection of non-public personal information (as defined in such statutes or regulations):

**1.** Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the rules and regulations promulgated thereunder as amended;

**2.** Gramm-Leach Bliley Act of 1999 (GLBA) and the rules and regulations promulgated thereunder, as amended;

**3.** Consumer protection and unfair and deceptive trade practice laws enforced by state Attorneys General or the Federal Trade Commission, including but not limited to, Section 5(a) of the FTC Act 15;

**4.** Security breach notification laws that require notice to individuals of the actual or potential theft of their non-public personal information, including but not limited to, the California Security Breach Notification Act of 2003 (CA SB 1386); or

**5.** Other state, federal or foreign privacy laws requiring reasonable security for non-public personal information, or a privacy policy limiting the sale, disclosure or sharing of non-public personal information or providing individuals with the right to access or correct non-public personal information.

**Privacy Violation** means any:

**1.** Theft of **Personal Information** while in the care, custody or control of an **Insured**; or

**2.** Violation of a **Privacy Regulation**.

**Security Breach** means:

**1.** The actual failure and inability to prevent:

    **a.** Unauthorized access to or unauthorized use of **Personal Information** stored in the **Insured's Computer System**; or

    **b.** The theft or unauthorized copying of **Personal Information** on the **Insured's Computer System**; or

**2.** The actual failure and inability to prevent the theft of **Personal Information** as a result of the physical theft by a person other than an **Insured** of the **Insured's Computer System** from premises occupied and controlled by the **Insured**.

**D.** For the purposes of this endorsement, the following are added to Section **VI** – Exclusions:

This Policy shall not apply to, and the **Insurer** shall pay neither **Cyber Management Expenses**, **Credit Monitoring Costs, Damages**, **Claim Expenses**, **Extortion Payments** nor **First Party Loss**:

**1.** Arising out of, based upon or in consequence of, directly or indirectly resulting from of in any way involving any actual or alleged:

    **a.** Costs or expenses for the reprinting, reposting, recall, removal or disposal of any online content or any other information, content or media, including any media or products containing such online content, information, content or media;

    **b.** Wear and tear or gradual deterioration of any data saved on an **Insured's Computer System** or a **Network**;

    **c.**  Costs or expenses incurred by any **Insured** or others:

        **(1)**  To recall, repair, withdraw, replace, upgrade, supplement or remove the **Insured's** online content, products or services from the marketplace, including but not limited to products or services which incorporate the **Insured's** online content, products or services; or

        **(2)**  For any loss of use by any **Insured** or others that arises out of such recall, repair, withdrawal, replacement, upgrade, supplement or removal.

    **d.**  Failure to use best efforts to install commercially available software product updates and releases, or to apply security related software patches, to computers and other components of the **Insured's Computer System** or a **Network**;

    **e.**  Seizure, confiscation, destruction or nationalization of **Insured's Computer System** or a **Network**; or any data accessed by or on behalf of any governmental or public authority;

    **f.**  Interruption, suspension, failure or outage of any component of the Internet, including without limitation any hardware or software infrastructure supporting the Internet;

    **g.**  Fine or penalty arising out of any agreement by any **Insured** to comply with or follow the PCI Standard or any Payment Card Company rules, or to implement, maintain or comply with any security measure(s) or standards related to any payment card data;

    **h.**  Unsolicited electronic faxes, emails, telephone calls or unsolicited communications, including but not limited to unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, "pop-up" or "pop-under" Internet advertising or fax-blasting, direct mailing or telemarketing, or actual or alleged violations of the Telephone Consumer Protection Act, of 1991, as amended, the CAN-SPAM Act of 2003, as amended, and any other federal, foreign or state anti-spam statutes, or federal, foreign or state statue, law or regulation relating to a person's right to seclusion; or

    **i.**  Unauthorized or illegal collection of **Personal Information**, including but not limited to the collection of **Personal Information** using cookies, spyware, or other malicious code, or the failure to provide adequate notice that **Personal Information** is being collected;

  **2.**  Arising out of, based upon or in consequence of, directly or indirectly resulting from of in any way involving any section 605 (requirements relating to information contained in consumer reports) or Section 616 (civil liability for willful noncompliance) of the Fair Credit Reporting Act, or any other similar federal, state or local laws or regulations, including but not limited to any laws or regulations requiring truncation of payment card numbers on, or the removal of the expiration date from, payment card receipts; or

  **3.**  Covered in whole or in part under any other insurance.

**E.**  For purposes of this endorsement, the following is added to Section **VIII** – Limits Of Liability:

**Cyber Management Limits Of Liability**

The Cyber Management Limits Of Liability are subject to Paragraphs **A.** and **B.** of Section **VIII** – Limits Of Liability.

Subject to the Cyber Management Limits Of Liability Insured Aggregate, the limit of the **Insurer's** liability for **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** and **Claim Expenses** incurred in each **Network Security Breach** or **Privacy Violation** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Limit of Liability Each Claim shown in the Schedule of the endorsement. The inclusion of multiple **Insureds** or clients in **Interrelated Breaches/Violations** shall not increase the applicable Limit Of Liability Each Claim shown in the Schedule of this Endorsement.

The Limit of Liability for all **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** and **Claim Expenses** incurred in all **Network Security Breaches** or **Privacy Violations** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the Cyber Management Limit Of Liability Insured Aggregate shown in the Schedule of this Endorsement.

The Cyber Management Limit of Liability Each Claim and Cyber Management Limit Of Liability Insured Aggregate are part of, subject to and do not increase the Total Aggregate Limit Of Liability as shown in the Schedule of this Endorsement.

The **Insurer's** obligations under this Policy, including the duty to defend, shall cease after the applicable Limits Of Liability has been paid by the **Insurer** for **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs** or **Claim Expenses**.

The Cyber Management Limits of Liability shown in the Schedule of this Endorsement are part of, and not in addition to the Limits Of Liability shown in the Declaration.

**Extortion Payment and First Party Loss Limits Of Liability**

The Extortion Payments and First Party Loss Limits Of Liability are subject to Paragraphs **A.** and **B.** of Section **VIII** – Limits Of Liability.

Subject to the Extortion Payments and First Party Loss Limits Of Liability Insured Aggregates, the limit of the **Insurer's** liability for **Extortion Payments**, **Business Income and Extra Expenses** and **First Party Losses** incurred in each **Extortion Demand**, **Exploit** or **Network Impairment** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim, or Extended Reporting Period, if applicable, shall not exceed the Limit of Liability Each **Extortion Payment** or **First Party Loss** shown in the Schedule of the Endorsement. The inclusion of multiple **Insureds** or clients in an **Extortion Demand**, **Exploit** or **Network Impairment** shall not increase the applicable Limit of Liability Each **Extortion Payments** or **First Party Loss** shown in the Schedule of this Endorsement.

The Limit Of Liability for all **Extortion Payments**, **Business Income and Extra Expenses** and **First Party Losses** incurred in all **Extortion Demands**, **Exploits** or **Network Impairments** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the Extortion Payment and First Party Loss Limits Of Liability Insured Aggregates shown in the Schedule of this endorsement.

The Extortion Payment and First Party Loss Limits Of Liability Each Claim and Extortion Payment and First Party Loss Limits Of Liability Insured Aggregate are part of, subject to and do not increase the Total Aggregate Limit Of Liability as shown in the Schedule of this endorsement.

The **Insurer's** obligations under this Policy shall cease after the applicable Limits Of Liability has been paid by the **Insurer** for **Extortion Payments**, **Business Income and Extra Expense** and/or **First Party Losses**.

The Extortion Payment and First Party Loss Limits Of Liability shown in the Schedule of this endorsement are part of, and not in addition to the Limits of Liability shown in the Declaration.

**Single Limit of Liability**

In the event that **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs**, **Claim Expenses**, **Extortion Payments**, **Business Income and Extra Expenses** and/or **First Party Losses** are incurred as the result of **Network Security Breaches**, **Privacy Violations**, **Extortion Demands**, **Exploits** and/or **Network Impairments**, which are the same, similar, repeated or continuous; or connected by reason of any common fact, circumstance, situation, transaction, causality, event, decision or policy or one or more series of causally or logically related facts, circumstances, situations, transactions, causalities, events, decisions or policies, then only a single Limit of Liability shall apply, as shown in the Schedule of this endorsement, regardless of whether such **Network Security Breaches**, **Privacy Violations**, **Extortion Demands**, **Exploits** and/or **Network Impairments** implicate more than one Insuring Agreement stated in Section **A.**, above. Such single Limit of Liability shall be whichever applicable one stated in the Schedule of this endorsement that is the largest.

**Total Aggregate Limit of Liability**

The **Insurer's** liability for all **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs**, **Claim Expenses**, **Extortion Payments**, **Business Income and Extra Expenses** and/or **First Party Losses** incurred in all **Network Security Breaches**, **Privacy Violations**, **Extortion Demands**, **Exploits** or **Network Impairments** shall not exceed the Total Aggregate Limit Of Liability shown in the schedule of this endorsement. All of the **Insurer's** obligations under the Policy shall cease when the Total Aggregate Limit Of Liability has been paid, regardless of whether **Network Security Breaches**, **Privacy Violations**, **Extortion Demands**, **Exploits** or **Network Impairments** have been resolved.

The Total Aggregate Limits Of Liability shown in the Schedule of this endorsement is part of, and not in addition to the Limits Of Liability shown in the Declaration.

F.    Section **IX** – Retention is amended to include the following:

The Retentions, shown in the Schedule of this endorsement, apply to **Cyber Management Expenses**, **Damages**, **Credit Monitoring Costs**, **Claim Expenses**, **Extortion Payments**, **Business Income and Extra Expenses** or **First**

**Party Loss** incurred in each **Network Security Breach**, **Privacy Violation**, **Interrelated Breaches/Violations**, **Extortion Demand**, **Exploit** or **Network Impairment**. The Limits of Liability shown in the Schedule of this endorsement shall apply in excess of the Retentions, which are the sole responsibility of the **Insureds** and will remain uninsured.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 3**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SOCIAL ENGINEERING CLAIM COVERAGE ENDORSEMENT

**CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

**SCHEDULE**

| | |
|---|---|
| Social Engineering Claim Limits Of Liability: | $250,000 Each Claim |
| | $500,000 Insured Aggregate |
| | $1,000,000 Coverage Aggregate |
| Social Engineering Claim Deductible: | $5,000 |

**A.** The following is added to Section **I** – Insuring Agreements:

**Social Engineering Claim**

The **Insurer** shall pay, on behalf of an **Insured**, **Damages** which an **Insured** becomes legally obligated to pay because of a **Social Engineering Claim** that is both made against an **Insured** and reported to the **Insurer** in writing during the **Certificate Period** (as to an **Agent** or **Registered Representative**), the **Policy Period** (as to the **Broker/Dealer**), or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Professional Services** by an **Insured**, provided:

**1.** Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Certificate Period** (as to an **Agent** or **Registered Representative**) or the **Policy Period** (as to the **Broker-Dealer**); and

**2.** As of the inception date of this Policy as shown in the Master Policy Declarations, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Social Engineering Claim**.

**B.** For the purpose of this endorsement, the following definitions are added to Section **V** – Definitions:

**Deceptive Communication** means an electronic, facsimile or written document or telephone contact received by an **Agent** from a third-party which:

**1.** directly relates to a life insurance or other product referenced in the Definition **V.U** (**Professional Services**) that is serviced by an **Insured** on behalf of a client and in which a third party has no legal right or interest;

**2.** contains a misrepresentation of material fact concerning a client of an **Insured**, which is reasonably relied upon by an **Insured** in believing that the document or contact is from his or her client or the client's authorized representative; and

**Page 1 of 3**

3. requests the withdrawal, surrender or transfer of fund held in the client's life insurance or other product referenced in the Definition **V.U** (**Professional Services**).

**Social Engineering Claim** means a **Claim** arising from a third party misleading an **Insured** through a **Deceptive Communication**, which is reasonably relied upon by an **Insured** as genuine and results in an **Unauthorized Transfer**.

**Unauthorized Transfer** means theft, conversion or misappropriation of funds held in a client's life insurance or other products referenced in the Definition **V.U** (**Professional Services**) by a third party solely because of such party's **Deceptive Communication** with an **Insured** and without knowledge of and actual or implied consent by a client.

**C.** For the purposes of this endorsement, the following are added to Section **VI** – Exclusions:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for any **Social Engineering Claim**:

**1.** Arising out of, based upon or in consequence of, directly or indirectly resulting from o r in any way involving any actual or alleged:

    **a.** Costs or expenses for the reprinting, reposting, recall, removal or disposal of any online content or any other information, content or media, including any media or products containing such online content, information, content or media;

    **b.** Costs or expenses incurred by any **Insured** or others:

        **(1)** To recall, repair, withdraw, replace, upgrade, supplement or remove the **Insured's** online content, products or services from the marketplace, including but not limited to products or services which incorporate the **Insured's** online content, products or services; or

        **(2)** For any loss of use by any **Insured** or others that arises out of such recall, repair, withdrawal, replacement, upgrade, supplement or removal;

    **c.** Fine or penalty arising out of any agreement by any **Insured** to comply with or follow the PCI Standard or any Payment Card Company rules, or to implement, maintain or comply with any security measure(s) or standards related to any payment card data; or

    **d.** Unsolicited electronic faxes, emails, telephone calls or unsolicited communications, including but not limited to unsolicited electronic messages, chat room postings, bulletin board postings, newsgroup postings, pop-up or pop-under Internet advertising or fax-blasting, direct mailing or telemarketing, or actual or alleged violations of the Telephone Consumer Protection Act of 1991, as amended, the CAN-SPAM Act of 2003, as amended, and any other federal, foreign or state anti-spam statutes, or federal, foreign or state statute, law or regulation relating to a person's right to seclusion; or

    **e.** Unauthorized or illegal collection of any data or information, including but not limited to the collection of any data or information using cookies, spyware, or other malicious code, or the failure to provide adequate notice that data or information is being collected; or

    **f.** Liability of the **Sponsoring Company**. This exclusion does not apply to the **Broker/Dealer.**

**2.** Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any Section 605 (requirements relating to information contained in consumer reports) or Section 616 (civil liability for willful noncompliance) of the Fair Credit Reporting Act, or any other similar federal, state or local laws or regulations, including but not limited to any laws or regulations requiring truncation of payment card numbers on, or the removal of the expiration date from, payment card receipts; or

**3.** Covered in whole or in part under any other insurance.

**D.** For purposes of this endorsement, the following is added to Section **VIII** – Limits Of Liability:

**Social Engineering Claim Limits Of Liability**

The **Social Engineering Claim** Limits Of Liability are subject to Paragraphs **A.** and **B.** of Section **VII** – Limits Of Liability.

Subject to the **Social Engineering Claim** Limits Of Liability Aggregate and Coverage Aggregate, the limit of the **Insurer's** liability for **Damages** and **Claim Expenses** incurred in each **Social Engineering Claim** reported by an **Insured** to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice of Claim, or Extended Reporting Period, if applicable, shall not exceed the **Social Engineering Claim** Limit Of Liability Each Claim shown in the Schedule of the endorsement. The inclusion of multiple **Insureds** or clients in **Interrelated Wrongful Acts** shall not increase the **Social Engineering Claim** Limit Of Liability Each Claim shown in the Schedule of this endorsement.

The Limit Of Liability for all **Damages** and **Claim Expenses** incurred in all **Social Engineering Claims** submitted by an **Insured** in writing during the **Policy Period** shall not exceed the **Social Engineering Claim** Limit Of Liability Insured Aggregate shown in the Schedule of this endorsement.

The **Social Engineering Claim** Limit Of Liability Each Claim and **Social Engineering Claim** Limit Of Liability Insured Aggregate are part of, subject to and do not increase the **Social Engineering Claim** Limit Of Liability Coverage Aggregate as shown in the Schedule of this endorsement**.**

The **Insurer's** obligations under this Policy, including the duty to defend, shall cease after the applicable **Social Engineering Claim** Limits Of Liability has been paid by the **Insurer** for all **Damages** and/or **Claim Expenses**.

The **Social Engineering Claim** Limits Of Liability shown in the Schedule of this endorsement are part of, and not in addition to the Limits Of Liability shown in the Certificate Of Insurance.

**E.** The following is added to Section **IX** – Deductible:

The **Social Engineering Claim** Deductible shown in the Schedule of this endorsement applies to **Damages** and **Claim Expenses** incurred in each **Social Engineering Claim** or **Social Engineering Claim** arising from **Interrelated Wrongful Acts**.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 4**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LIBERALIZATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that:

**A.**  If there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of the Policy, the **Insurer** shall apply whichever term or condition is more favorable to the **Insured,** unless application of such term or condition is against public policy or applicable state law.

**B.**  For the purposes of this Endorsement, it is further understood that in the event the terms, conditions or exclusions of the **Expiring Policy** would grant coverage for a **Claim** that is not covered under the terms, conditions or exclusions of this Policy (including endorsements to this Policy), then the terms, conditions and exclusions of the **Expiring Policy** will apply to such **Claim**.  However, the coverage granted by this Endorsement will not apply if such **Claim** is not covered under this Policy by virtue of the **Policy Period**, Limit of Liability, Retention, Policy **Retroactive Date** or the name of the **Insured** shown in the Declarations of this Policy.

For the purposes of this Endorsement, the term **Expiring Policy**, whenever used in this endorsement, shall mean Policy Number LRA8KK919 issued by Aspen American Insurance Company.

All other terms and conditions remain unchanged.

**Page 1 of 1**



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 5**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BROKER/DEALER AND SPONSORING COMPANY CHOICE OF DEFENSE COUNSEL ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that Section **II** -- Defense and Claim Expenses – is amended to include the following:

E.  Notwithstanding the foregoing, the **Insurer** and **Broker/Dealer** and/or **Sponsoring Company** shall mutually agree to the appointment of counsel in a **Claim** that gives rise to the **Insurer's** right and duty to defend under the Policy.  The foregoing shall not apply to any other **Insureds** nor otherwise limit or abridge the **Insurer's** right and duty to defend any potentially covered **Claim** under the Policy.

Should the **Insurer** and **Broker/Dealer** and/or **Sponsoring Company** mutually agree to the appointment of counsel, the **Insurer** shall only pay the hourly rate that would have been charged under the **Insurer's** agreed upon panel counsel rates.

Moreover, for such **Claim**, counsel shall fully adhere and comply with the **Insurer's** billing, reporting and any other guidelines or requirements, and will otherwise fully cooperate with the **Insurer**, as a condition of the firm's representation of the **Broker/Dealer** and/or **Sponsoring Company**.

In the event appointment of counsel cannot be agreed upon in a **Claim** that gives rise to the **Insurer's** right and duty to defend under the Policy, then defense counsel for such **Claim** shall be selected in accordance with Section **II**, Subsections **A.** through **D**.

All other terms and conditions remain unchanged.

**Page 1 of 1**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 6**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BROKER/DEALER SELLING AWAY LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY

**CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

### SCHEDULE

| | |
|---|---|
| Name Of Broker/Dealer: | Horner, Townsend & Kent, Inc. |
| Selling Away Limits Of Liability: | $500,000  Broker/Dealer Each Claim<br>$500,000  Broker/Dealer Aggregate |
| Selling Away Deductible: | $100,000    Broker/Dealer Each Claim |

**A.** For the purposes of this Endorsement, Section **I** – Insuring Agreement -- is amended to include the following:

**Broker/Dealer Selling Away Liability**

The **Insurer** shall pay, on behalf of the **Broker/Dealer**, **Damages** which the **Broker/Dealer** becomes legally obligated to pay as a result of a **Selling Away Claim** that is both made against the **Broker/Dealer** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim below, or during an Extended Reporting Period, if applicable, for a **Wrongful Act** or **Interrelated Wrongful Act** committed solely in the rendering of or failing to render **Supervisory Services** by the **Broker/Dealer**, provided:

**1.** Such **Wrongful Act** or any **Interrelated Wrongful Act** occurred on or after the **Retroactive Date** and before the end of the **Policy Period**; and

**2.** As of the inception date of this Policy, no **Insured** had knowledge or reasonable basis upon which to anticipate that the **Wrongful Act** or any **Interrelated Wrongful Act** could result in a **Selling Away Claim**.

**B.** For purposes of this Endorsement, Section **V** – Definitions -- is amended to include the following:

**Selling Away Claim** means a **Claim** arising from the solicitation, sale or servicing of, or any activities whatsoever, in connection with **Securities** or **Private Placements** which were not approved and authorized by and actually distributed through the **Broker/Dealer** by a **Registered Representative**, who is or was contracted with the **Broker/Dealer** and who is or was the subject of the **Broker/Dealer's Supervisory Services**. Only the **Broker/Dealer** shall be afforded coverage hereunder for a **Selling Away Claim**. Such coverage shall not extend to any other **Insured**, including, but not limited to, a **Registered Representative**.

**C.** For the purposes of this Endorsement, Section **VI** – Exclusions, Paragraphs **R.** (selling away), **T.** (discretionary authority) and **U.** (certain investment products) shall not apply to a **Selling Away Claim** against the **Broker/Dealer**. These Exclusions, however, shall apply to all other **Claims** against all other **Insureds**.

**D.**  For purposes of this endorsement, Section **VIII** – Limits of Liability -- is replaced by the following:

**Limit Of Liability Each Selling Away Claim:**

Subject to Paragraph **D.** below, the limit of the **Insurer's** liability for **Damages** a n d **C l a i m  E x p e n s e s** for a **S e l l i n g  A w a y  Claim** made against a **Broker/Dealer** and reported to the **Insurer** in writing during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim below, or Extended Reporting Period, if applicable, shall not exceed the Limit Of Liability Each Selling Away Claim shown in the Schedule of this Endorsement.

**Limit Of Liability Selling Away Aggregate:**

The Limit Of Liability for **Damages** and **Claim Expenses** for all **Selling Away Claims** made against an **Insured** and reported to the **Insurer** in writing  during the **Policy Period**, or as allowed by Section **XI** – Notice Of Claim below, or Extended Reporting Period,  if applicable,  shall not exceed the Selling Away Limit Of Liability Aggregate shown in the Schedule of this endorsement.

The Selling Away Aggregate Limit of Liability shall be part of, and not in addition to, the Broker/Dealer Aggregate Limit of Liability stated in the Schedule to this Endorsement.

Any other terms or provisions of the Policy which state that the Limits Of Liability thereunder do not include **Claim Expenses** are deleted as to any **Claim** or **Selling Away Claim** against the **Broker/Dealer**. It is understood and agreed that the Limits Of Liability applicable to the **Broker/Dealer** include both **Damages** and **Claim Expenses**, and any of the **Insurer's** duties hereunder owed to the **Broker/Dealer** will be terminated when **Damages** and/or **Claim Expenses** when said Limits Of Liability are paid by the **Insurer**.

**H.**  With respect to the coverage provided by this Endorsement, Section **IX** – Deductible -- is replaced by the following:

The Selling Away Deductible shown in the Schedule of this Endorsement shall apply to shall apply to **Damages** and **Claim Expenses** that are incurred in  each **Claim**.

The Selling Away Limits Of Liability stated in this Endorsement apply in excess of the **Broker/Dealer's** Selling Away Deductible. The Selling Away Deductible shall be the sole responsibility of the **Broker/Dealer** and will remain uninsured.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 7**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that Section **XV.**, Subsection **C.** – Termination of Coverage Applicable to the Insurer - is amended to include the following:

**3. Nonrenewal**

If the **Insurer** elects not to renew this Policy, the **Insurer** will mail by registered, certified or other first class mail written notice of non-renewal to the **Sponsoring Company** at the address identified in the Declarations, at least 60 days before the expiration date of the Policy unless: (i) the reason for the nonrenewal is due to nonpayment of premium; or (ii)  the **Sponsoring Company** acting on behalf of all **Insured** has obtained replacement coverage with another insurer.

**4. Conditional Renewal**

If the **Insurer** increases the renewal premium, the **Insurer** will mail by registered, certified or other first class mail written notice of the **Insurer's** intent to increase the premium to the **Sponsoring Company** at the address identified in the Declarations, at least 30 days before the effective date of the premium increase.

**5. Right to Loss Information**

The **Insured** may request loss information from the **Insurer** within 10 days of receipt of a cancellation or nonrenewal notice. The **Insurer** shall have 30 days  from the date of receipt of the written request to provide the requested information.  Loss information on an **Insured** shall consist of the following:

**a.** Information on closed **Claims**, including date and description of occurrence, and any amount of payments, if any;

**b.** Information on open **Claims**, including date and description of occurrence, amount of payment, if any, and amount of reserves, if any; and

**c.** Information on notices of occurrence, including date and description of occurrence and amount of reserves, if any.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedent over any provisions of this Policy and any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the terms of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the state of Pennsylvania.

All other terms and conditions remain unchanged.

**Page 1 of 1**

**MARKEL**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 8**

# MARKEL  AMERICAN  INSURANCE  COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COVER OREGON INCREASED LIMITS OF LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMPANY SPONSORED INSURANCE AGENTS PROFESSIONAL LIABILITY INSURANCE POLICY ISSUED TO PENN MUTUAL LIFE INSURANCE COMPANY.

It is here by understood and agreed that Section **VIII** – Limits of Liability -- is amended to include the following:

1. Cover Oregon is the State of Oregon's public corporation which operates the Oregon Health Insurance Exchange (hereinafter "OHIE"), as provided by the laws of the State of Oregon.

2. The State of Oregon and Cover Oregon require that all insurance agents transacting business with OHIE maintain minimum errors and omissions insurance coverage of $1,000,000 each claim and $3,000,000 in the aggregate.

3. The Limits of Liability afforded to **Agents** and **Registered Representatives** insured under this Policy shall operate to comply with the OHIE (hereinafter "OHIE Limits of Liability"), but solely with respect to **Claims** arising out of business transactions involving **Professional Services** with OHIE.

4. Such OHIE Limits of Liability are part of, and not in addition to, the Limits of Liability otherwise provided by the Policy.

It is further understood and agreed that Section **V** – Exclusions -- is amended to include the following:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving activities of an **Insured**, or any other individual or entity, as a Navigator or Assister as defined under the Affordable Care Act, unless such Navigator or Assister is appropriately certified under the Affordable Care Act; and

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving transactions which, with regard to OHIE or Cover Oregon, do not include commercially reasonable written disclosures and signed acknowledgments from the client.

All other terms and conditions remain unchanged.

**Page 1 of 1**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLM7PLCA00065
**Endorsement No. 9**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CRYPTO CURRENCY AND NFT EXCLUSION ENDORSEMENT

**CLAIM EXPENSES, AS WELL AS DAMAGES, ARE INCLUDED WITHIN AND WILL REDUCE THE LIMITS OF LIABILITY.**

This endorsement modifies insurance provided under the following:

Section **V** – Exclusions, is amended to include the following:

This Policy shall not apply to, and the **Insurer** shall pay neither **Damages** nor **Claim Expenses** for, any **Claim**:

Arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving, in whole or in part, individually or in conjunction with other matters, **Crypto Currency** and/or **NFT**; however this Exclusion shall not apply to mutual funds or securities registered with the Securities and Exchange Commission that are publicly traded on a national exchange.

Section **IV** – Definitions, is amended to include the following:

**Crypto Currency** means digital, computerized or on-line medium of exchange, including, but not limited to, any kind of virtual or electronic currency, that: (i) is not issued or guaranteed by a government central bank, domestic or foreign government or other public authority; or (ii) not adopted or authorized by a domestic or foreign government as a part of its currency.

**NFT** means a non-fungible token, which is any digital or virtual asset or unit of data stored on blockchain or other digital or virtual ledger, which represents a tangible or intangible item, such as, without limitation, graphic art, GIF, music, video or collectible, and grants or certifies the holder's ownership rights to such item, in whole or in part.

All other terms and conditions remain unchanged.



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.