# UNREPORTED FEDERAL CASES



**User Name:** Joe Grady
**Date and Time:** Thursday, November 21, 2024 12:45:00 PM EST
**Job Number:** 239206376

## Document (1)

1. _Cont'l Cas. Co. v. Adams, 2003 U.S. Dist. LEXIS 16434_
   **Client/Matter:** 21047.24000
   **Search Terms:** Cont'l Cas. Co. v. Adams, 2003 U.S. Dist. LEXIS 16434 (M.D. Pa. Sept. 12, 2003)
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

⚠️ Caution
As of: November 21, 2024 5:45 PM Z

## *Cont'l Cas. Co. v. Adams*

United States District Court for the Middle District of Pennsylvania

September 12, 2003, Decided ; September 12, 2003, Filed

3: CV-02-1122

**Reporter**
2003 U.S. Dist. LEXIS 16434 *; 2003 WL 22162379

CONTINENTAL CASUALTY COMPANY, Plaintiff VS. RICHARD P. ADAMS, LINDA J. LEIGHTON, and JOHN SABOL, Defendants and NBT BANK, N.A., Intervenor; NBT BANK, N.A., Plaintiff VS. CNA INSURANCE COMPANY/CONTINENTAL CASUALTY COMPANY, Defendant

**Disposition: [*1]** Motion by plaintiff NBT Bank, N.A. for partial summary judgment denied. Motion by defendant CNA Insurance Company/Continental Casualty Company granted. Judgment entered in favor of defendant CNA, and against directors and officers of HSC as well as against plaintiff NBT.

## Core Terms

insured, entity, officers and directors, coverage, kiting, named insured, duty to defend, uninsured, malpractice claim, underlying action, checks, negligence claim, supervision, Tires, insurance company, prior action, directors and officers, deposited, alleges, legal malpractice claim, insurance policy, summary judgment, malpractice, indemnify, parties, partner

## Case Summary

### Procedural Posture
Plaintiff bank sued defendant insurer, alleging breach of its duty to defend two directors. In another action, plaintiff insurer sought a declaration that it had no duty to defend or indemnify defendants, two directors, and an employee. Before the court were cross-motions for summary judgment regarding the duty to defend.

### Overview
A bank had losses from a check-kiting scheme by an employee of an insured non-profit corporation, who also was chief financial officer of the uninsured for-profit corporation. The insurer eventually denied coverage to the non-profit corporation and its two directors on the

basis of an exclusion which applied to a loss arising from individual insureds who were discharging duties as directors of any entity other than the insured entity. The question was whether the exclusion relieved the insurer of the duty to defend, particularly as to negligence claims. The insurer claimed that the scheme necessarily involved actions on the part of both corporations such that negligence claims against the individuals as officers and directors of the non-profit corporation were inextricably connected to the discharge of their duties as officers and directors of the uninsured corporation. Applying the case law message that an otherwise covered claim of negligence of a named insured was excluded where that claim was closely connected to the named insured's activities as an agent of an entity other than the named insured, which was the case, the court held that coverage was plainly excluded.

### Outcome
The bank's motion for partial summary judgment was denied. The insurer's motion was granted. A motion to dismiss filed on behalf of the insurer in connection with the litigation initiated by the bank was dismissed as moot. The insurer had no duty to defend or indemnify the directors or employee.

## LexisNexis® Headnotes

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Construction Against Insurers

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > General Overview

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > General Overview

2003 U.S. Dist. LEXIS 16434, *1

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > Question of Law

Insurance Law > ... > Policy Interpretation > Reasonable Expectations > General Overview

Insurance Law > ... > Policy Interpretation > Reasonable Expectations > Reasonable Person

**HN1[↲]  Ambiguous Terms, Construction Against Insurers**

Under Pennsylvania law, the construction of an insurance policy is a question of law which must be resolved by the courts. When interpreting the insurance contract, the goal of the task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Additionally, where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. If the language is clear and unambiguous, however, a court is required to give effect to that language. In determining whether a provision in an insurance policy is ambiguous, the test is whether reasonably intelligent persons on considering it in the context of the entire policy would honestly differ as to its meaning. Thus, the fact that the parties do not agree upon the proper interpretation does not necessarily render the contract ambiguous. A court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them. As a result, the court should adopt the interpretation which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural intention of the parties, bearing in mind the objects manifestly to be accomplished.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Duty to Defend

Insurance Law > ... > Directors & Officers Liability Insurance > Insured & Insurer Obligations > Duty to Defend

**HN2[↲]  Good Faith & Fair Dealing, Duty to Defend**

An insurer's duty to provide a defense for the insured is broader than an insurer's duty to indemnify the insured. An insurer's duty to defend is determined by the

complaint giving rise to the claim against the insured; any claims which arguably could fall within a policy's coverage must be defended.

Insurance Law > ... > Directors & Officers Liability Insurance > Exclusions > General Overview

**HN3[↲]  Directors & Officers Liability Insurance, Exclusions**

The message of the Pepicelli, LaRocca, and Bartos decisions is that an otherwise covered claim of negligence of a named insured is excluded where that claim is closely connected to the named insured's activities as an agent of an entity other than the named insured.

**Counsel:** For Continental Casualty Company, PLAINTIFF: Eric A Fitzgerald, Marshall, Dennehey, Warner, Coleman & Goggin, Scranton, PA USA.

For NBT Bank, National Association, PLAINTIFF: Robert J Tribeck, Rhoads & Sinon LLP, Heather Z Kelly, Rhoads & Simon, LLP, Harrisburg, PA USA.

John Sabol, DEFENDANT, Pro se, Mountain Top, PA USA.

For CNA Insurance Company, Continental Casualty Company, DEFENDANTS: Eric A Fitzgerald, Marshall, Dennehey, Warner, Coleman & Goggin, Scranton, PA USA.

For NBT Bank, NA, INTERVENOR: Heather Z Kelly, Rhoads & Simon, LLP, Paul J Bruder, Jr, Robert J Tribeck, Rhoads & Sinon LLP, Harrisburg, PA USA.

**Judges:** Thomas I. Vanaskie, Chief Judge, Middle District of Pennsylvania.

**Opinion by:** Thomas I. Vanaskie

# Opinion

## [*2] MEMORANDUM

Pending before this Court are cross-motions for summary judgment raising the issue of whether CNA Insurance Company/Continental Insurance Company ("CNA") breached a duty to defend officers and directors of Human Services Consultants, Inc. ("HSC") in connection with negligence claims asserted against

2003 U.S. Dist. LEXIS 16434, *2

them arising out of a check kiting scheme involving an affiliate of HSC, Human Services Consultants Management, Inc. Because it is evident that the claims against the officers and directors of CNA's insured entity, HSC, are inextricably intertwined with their conduct in the discharge of duties as directors and officers of the uninsured Human Services Consultants Management, Inc., coverage for the negligence claims asserted against them by NBT Bank, N.A. ("NBT") is explicitly excluded under the CNA policy. Accordingly, judgment will be entered in favor of CNA, and against the directors and officers of HSC as well as against NBT.

## BACKGROUND

Human Services Consultants, Inc. ("HSC"), is a non-profit corporation. (NBT's Stmnt. of Undisputed Material Facts, Dkt. Entry 33, P 2.) [1] New Hope of Pennsylvania, Inc., formerly known as Human Services Consultants **[*3]** Management, Inc. ("HSCM"), is a for-profit corporation. (Id., P 3.) PA Health, Inc. ("PA Health") is also a for profit corporation. (Id., P 4.) At all relevant times, Richard Adams ("Adams") and Linda Leighton ("Leighton") served as officers and directors of HSC. (Id., P 5.) Adams and Leighton also served as officers and directors of HSCM and PA Health. (Id., P 6.) In 1982, Adams hired John Sabol ("Sabol") to work for HSC. (Id., P 7.) Sabol was initially employed in the fiscal department of HSC and was subsequently promoted to controller of HSC. (Id., PP 7-8.) From 1988 through 2000, Sabol was Chief Financial Officer of HSC, and from 2000 through his termination in March of 2001, he was Chief Operating Officer of HSC. (Id., P 9.) Sabol also served as Chief Financial Officer of HSCM during the pertinent time frame. HSC maintained a commercial checking account at First National Community Bank of Dunmore, PA (the "First National Account"). (Id., P 10.) HSCM and PA Health each maintained commercial checking accounts at NBT (the "NBT Accounts"). (Id., P 11.)

 **[*4]**   In the early months of 2000, HSC was experiencing cash flow problems. (Id., P 12.) At that time, Sabol undertook a check kiting scheme using the First National Account and the NBT Accounts. (Id., P 13.) This practice of floating checks, or "check kiting," involved writing a check of HSCM on the NBT Accounts, depositing that check into the HSC First National

Account, and then subsequently drawing on the HSC First National Account to deposit a check into the HSCM NBT Accounts. (Id., P 14.) For accounting purposes, the kited checks were treated by Sabol as inter-company loans between HSC and HSCM. (Id., P 15.) Neither company had sufficient funds to cover the checks that were being written to the other company under the guise of inter-company loans. (Id., P 16.) Although it is disputed when Adams actually became aware of the check kiting, the scheme collapsed in March of 2001. (Id., P 17.)

Initially, Sabol kited checks several times a month. (Id., P 18.) Toward the end of his employment, Sabol wrote checks for which there were insufficient funds every day. (Id., P 19.) Adams received monthly reports that would have captured the kited checks. (Id., **[*5]** P 20.) Adams did not review the daily or monthly reports produced by HSC that would have reflected the kited checks. (Id., P 21.) NBT alleges that if Adams had reviewed either the daily or monthly reports, the cash balances, or the internal balance sheets of HSC, he would have realized that there was a significant problem with regard to Sabol's performance of his duties. (Id., P 22.) [2] As a result of the check kiting scheme, NBT suffered actual losses in excess of $ 1,660,000. (Id., P 33.)

Following the collapse of the scheme, NBT filed a Complaint in this Court against HSC, HSCM, PA Health, Human Services Consultants, Inc. # 2, Adams, Leighton and Sabol, captioned as NBT Bank, N.A. v. New Hope of Pennsylvania, Inc., et al., No. 3: CV-01-0879 (the "Underlying Action"). (Id., P 34.) In the Underlying Action, NBT advanced multiple claims, including claims against Adams and Leighton, in their capacities **[*6]** as officers and directors of HSC, as well as in their capacities as officers and directors of HSCM. [3] In this regard, the Amended Complaint, filed on August 20, 2001, alleged that Adams was president and sole shareholder of both HSC and HSCM, and that Leighton was Chief Operating Officer of both corporations. (Amended Complaint, PP 6-7.) The Amended Complaint further alleges that Adams and Leighton "were acting in their capacity as officers of the Corporate Defendants [4]

---

[1] Citation to NBT's statements of material facts submitted in accordance with the Local Rules of Court signifies that the assertion has been admitted by CNA.

---

[2] Continental disputes NBT's assertion, claiming that Adams was aware of Sabol's activities.

[3] The Amended Complaint in the Underlying Action is attached as Exhibit "A" to the Brief in Support of CNA's Summary Judgment Motion, Dkt. Entry 36.

[4] Both HSC and HSCM were corporate defendants.

and in their personal capacities." (Id., P 10.) The Amended Complaint goes on to describe in great detail the check kiting scheme. The Amended Complaint specifically avers that the scheme was perpetrated by checks deposited in and drawn on an account held by HSC at First National Bank of Dunmore and checks deposited in and drawn on the account held by HSCM at NBT. (Id., P 29.) Paragraph 45 of the Amended Complaint avers that "all acts of Defendants in connection with the check kiting scheme were done with the participation of defendants Adams and Leighton, at the direction of Defendants Adams and Leighton, with the assent of Defendants Adams and Leighton, and/or with the cooperation of Defendants Adams and **[*7]** Leighton." The Amended Complaint further asserts that Adams, "in his capacity as sole shareholder and President, Treasurer and Secretary of the Corporate Defendants," used the corporate entities to perpetrate the check kiting scheme and to further his personal interests. (Id., P 52.)

Included among the 15 separate counts set forth in the Amended Complaint is a claim of negligent hiring and supervision against, inter alia, HSCM, HSC, Adams, and Leighton. (Amended Complaint, Count VII.) The gist of this count is that the defendants had failed to exercise ordinary care in supervising Sabol "as Chief Financial Officer and/or Chief Operating Officer" of, inter alia, HSC and HSCM. (Id., P 121.) The averments of Count VII do not distinguish between negligent conduct on the part of Adams and Leighton with **[*8]** respect to each of the corporate entities. Instead, the Amended Complaint merely alleges negligence in supervision generally. Count X of the Amended Complaint alleges negligent misrepresentation against all defendants, and does not distinguish between conduct committed on behalf of HSC as opposed to conduct committed on behalf of HSCM.

HSC was insured by CNA under a Health Care Executive Liability Insurance Policy (the "Policy"). (NBT's Stmnt. of Undisputed Material Facts, Dkt. Entry 33, P 36.) Adams, Leighton and Sabol were classified as "individual insureds" under the Policy in connection with their actions on behalf of HSC only. In this regard, the Policy defined "individual insureds" to include directors and officers of HSC. [5] An amendment to the

Policy specifically excluded any claim made against "policy insureds" by or on behalf of HSCM.

 **[*9]**  Upon institution of the Underlying Action, HSC, Adams, and Leighton each made claims under the Policy, seeking a defense to the Underlying Action. (Id., P 43.) Initially, CNA provided a defense to HSC, Adams, and Leighton under the Policy. (Id., P 44.) However, by letter dated October 25, 2001, CNA withdrew its defense of Adams and Leighton. (Id., P 45.) [6] CNA's denial of coverage is based on Exclusion L of the Policy, which reads:

> The insurer shall not be liable to pay any loss in connection with any claim: based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged conduct by the individual insureds in the discharge of their duties as directors, officers, trustees, employees or volunteers of any entity other than the [insured] Entity or [insured] Charitable Organization, even if directed or requested by the [insured] Entity to serve as directors, officers, trustees, employees or volunteers of such entity.

(Id., P 47.) The denial of coverage letter asserted:

> There is no longer any question that the named Individual Insureds, Richard P. Adams, Linda Leighton and John **[*10]** Sabol, acted in the discharge of their duties as directors and/or officers for HSCM (a separate entity and not an Insured under the Policy), when they opened and maintained the HSCM account … into which the kited checks were deposited, thereby giving rise to the instant Claim. As such, Exclusion L applies to bar further coverage.

Ex. "D" to NBT's Stmnt. of Undisputed Facts.

Adams and Leighton thereafter retained separate counsel, and the prior action progressed. (Id., P 48.) Adams and Leighton subsequently reached a settlement agreement with NBT in the prior action. (Id., P 49.) The terms of the Settlement Agreement included (1) payment of $ 50,000; (2) judgment against Adams in the amount of $ 1,200,000 in his capacity as an officer and director of HSC on Counts VII (Negligent Hiring and Supervision) and X (Negligent Misrepresentation); and (3) the assignment by Adams and Leighton of any and all claims each has or may have **[*11]** against CNA arising from or under the Policy, in exchange for an

---

[5] A copy of the pertinent policy is found at Exhibit "B" to the Brief in Support of CNA's summary judgment motion. The definition in question appears under that part of the Policy captioned "Health Care Executive Liability Insurance Policy - Organization Liability Coverage Part With Duty to Defend."

[6] CNA continued to defend HSC in the Prior Action. (Id., P 46.)

2003 U.S. Dist. LEXIS 16434, *11

agreement by NBT not to execute, record or collect on the judgment against Adams in his capacity as an officer and director of HSC. (Id., P 50.)

On June 12, 2002, NBT, as assignee of the rights of Adams and Leighton, instituted an action in the Lackawanna County Court of Common Pleas, alleging that CNA breached its duty to defend Adams and Leighton, breached its duty to indemnify Adams, and acted in bad faith in denying coverage under the Policy. On June 28, 2002, CNA instituted a declaratory judgment action in this Court (docket number 3: CV-02-1122) seeking a declaration that it had neither a duty to defend nor a duty to indemnify Adams, Leighton and Sabol in the Underlying Action. On July 26, 2002, CNA removed the NBT action to this Court, where it was assigned docket number 3: CV-02-1290. [7] On August 27, 2002, this Court consolidated the two cases under docket number 3: CV-02-1122. (Id.)

[*12] Presently before the Court are cross-motions for summary judgment on the duty to defend issue. Oral argument was conducted on June 26, 2003, and post-argument briefs were filed. The material facts are not disputed and the matter is ripe for disposition.

## DISCUSSION

HN1[↑] Under Pennsylvania law, [8] "the construction of an insurance policy is a question of law which must be resolved by the courts." *Hunyady v. Aetna Life & Cas., 396 Pa. Super. 476, 478, 578 A.2d 1312, 1313 (1990)*, aff'd, *530 Pa. 25, 606 A.2d 897 (1992)*(citing *Loomer v. M.R.T. Flying Service Inc., 384 Pa. Super. 244, 246, 558 A.2d 103, 105 (1989))*. When interpreting the insurance contract, "the goal of [the] task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument." *Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C., 821 F.2d 216, 220 (3d Cir. 1987)*(citing *Mohn v. American Cas. Co. of Reading, 458 Pa. 576, 326 A.2d 346 (1974))*. Additionally, "where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and [*13] against the insurer, the

drafter of the agreement." Id. If the language is clear and unambiguous, however, a court is required to give effect to that language. *Pennsylvania Mfrs'. Ass'n Ins. Co. v. Aetna Ca. & Sur. Ins. Co., 426 Pa. 453, 457, 233 A.2d 548, 551 (1967)*. In determining whether a provision in an insurance policy is ambiguous, the test is whether "reasonably intelligent persons on considering it in the context of the entire policy would honestly differ as to its meaning." *Celley v. Mutual Benefit Health & Accident Ass'n, 229 Pa. Super. 475, 481-482, 324 A.2d 430, 434 (1974)*. Thus, "the fact that the parties do not agree upon the proper interpretation does not necessarily render the contract ambiguous." *Vogel v. Berkley, 354 Pa. Super. 291, 297, 511 A.2d 878, 881 (1986)*. Additionally, in *St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981)*, the court stated that "[a] court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." As a result, "the Court [should] adopt the interpretation which, under all the circumstances [*14] of the case, ascribes the most reasonable, probable and natural intention of the parties, bearing in mind the objects manifestly to be accomplished." *Galvin v. Occidental Life Ins. Co. of Cal., 206 Pa. Super. 61, 65, 211 A.2d 120, 122 (1965)*.

The issue in the present case is whether CNA had a duty to defend and/or indemnify Adams and Leighton in the Underlying Action. [9] HN2[↑] An insurer's duty to provide a defense for the insured is broader than an insurer's duty to indemnify the insured. See *J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 43, 626 A.2d 502, 510 (1993)*; *Lebanon Coach Co. v. Carolina Cas. Ins. Co., 450 Pa. Super. 1, 14, 675 A.2d 279, 286 (1996)* ("An insurer's duty to defend is a distinct obligation, different from and broader than its duty to provide [*15] coverage."), app. denied, *546 Pa. 695, 687 A.2d 378 (1997)*. An insurer's duty to defend is determined by the complaint giving rise to the claim against the insured; any claims which arguably could fall within a policy's coverage must be defended. See *Erie Ins. Exch. V. Transamerica Ins. Co., 516 Pa. 574, 583, 533 A.2d 1363, 1368 (1987)*.

There is no question that Adams and Leighton are named insureds under the Policy and that NBT's negligence claims against them fall within the Policy's coverage. The penultimate question presented here is

---

[7] CNA filed a motion to dismiss the action brought by NBT. In light of the determination that CNA was not obligated to defend Adams, Leighton or Sabol, the motion to dismiss appears to be moot.

[8] Pennsylvania law governs the interpretation of the insurance policy at issue here. *Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 371 (3d Cir. 1982)*.

---

[9] There appears to be no real dispute that CNA did not have a duty to defend Sabol. In any event, the conclusion that there exists no duty to defend Adams and Leighton necessarily extends to Sabol.

whether Exclusion L, as amended by the Policy endorsement concerning "Outside Directorship -- Charitable Organizations," relieves CNA of the duty to defend Adams and Leighton, particularly with respect to the negligence claims asserted in Counts VII **[\*16]** and X of the Amended Complaint filed in the Prior Action. CNA claims that the check kiting scheme necessarily involved actions on the part of both HSC and HSCM such that negligence claims against Adams and Leighton as officers and directors of HSC are inextricably connected to the discharge of their duties as officers and directors of HSCM.

On the other hand, NBT, at page 9 of its supporting brief (Dkt. Entry 34), argues:

> It is simply beyond dispute that the claims in the Prior Action fell within the coverage provisions of the Policy. Adams and Leighton were "Individual Insureds" against whom NBT made claims for Wrongful Acts in the Prior Action that fell within the scope of coverage under the Policy (i.e. negligence). Specifically, the Prior Action alleged that Adams and Leighton were negligent in their capacity as officers and directors of HSC, and that such negligence was the cause of the damages suffered by NBT as a result of Sabol's scheme. [10]

**[\*17]** In support of its position, NBT primarily relies on *Bowie v. The Home Ins. Co., 923 F.2d 705 (9th Cir. 1991)*. In Bowie, the Plaintiffs, Bowie and Gregory, were former officers and directors of Transit Casualty Company ("Transit"). They were also directors of DMT Financial Group ("DMT"). DMT, its officers and directors were insured under an errors and omissions policy (the "policy") issued by The Home Insurance Company (the "insurer"). After the collapse of a risk management plan involving Bowie and Gregory in their capacities as officers and directors of Transit and DMT, both individuals were named as defendants in a California suit to recover damages. Bowie and Gregory, however, were named as defendants only in their capacities as former officers and directors of Transit, the uninsured entity. They were not named in their capacities as officials of DMT. *Id. at 706*.

Bowie and Gregory sought defense and indemnification

---

[10] It bears noting that the Amended Complaint did not allege that Adams and Leighton were negligent solely in their capacities as officers and directors of HSC. Instead, the Amended Complaint averred that they were negligent officers and directors of all pertinent entities.

from the insurer, seeking coverage under the DMT policy. After the insurer denied coverage, Bowie and Gregory filed a declaratory judgment action. The district court dismissed the suit, finding Bowie and Gregory not insureds in **[\*18]** their capacities as Transit directors. The dismissal, however, was without prejudice to the filing of a new suit in the event that they were named as defendants in their role as DMT directors and the insurers persisted in refusing to defend.*Id.*

On appeal, Bowie and Gregory contended that, in dismissing their action for failure to state a claim, the district court erred in concluding that they were not insureds under the DMT policy. *Id. at 706-07*. The policy in Bowie provided:

> The unqualified word "insured" whenever used means:
>
> 1) The named Insured herein defined as the individual, partnership, or corporation designated as such in the Declarations.
>
> 2) *any* partner, officer, *director,* stockholder or employee *while acting within the scope of their duties as such ….*

*Id. at 707*. Bowie and Gregory claimed coverage because, while sued only in their capacity as officers and directors of Transit, the underlying claims implicated actions they took on behalf of the insured entity, DMT, and the complaint could be amended to sue them for conduct undertaken on behalf of DMT. The court declined to accept this argument, explaining: **[\*19]**

> In this diversity suit we are bound by the principles of *Gray [v. Zurich Ins. Co., 65 Cal.2d 263, 275, 54 Cal.Rptr. 104, 112, 419 P.2d 168, 176 (1966)]*, but we cannot agree with the attempted extension of these principles, as urged by Bowie and Gregory. They rely on *dicta* in *Gray* to the effect that the insurer was alternatively liable because, although the complaint sought relief only on the basis of uninsured conduct, it was subject to amendment to add insured (negligent) conduct. *Gray, 65 Cal.2d at 277, 54 Cal. Rptr. at 113, 419 P.2d at 177*. Thus, they imply that, even though the complaint in the California action does not name any parties in their insured capacities, it could be amended to do so.
>
> The phrase "duty to defend" presupposes the existence of a lawsuit against an "insured," requiring a defense under the policy. Here, that

2003 U.S. Dist. LEXIS 16434, *19

supposition simply does not apply. The insurers have not unqualifiedly covered Bowie and Gregory, but rather only have secured them in their capacities as DMT officials. The California action names them as defendants only in their capacities as Transit officials. The mere fact that Bowie and Gregory [*20] are named in the California action is not controlling. The directors of Transit and the directors of DMT may as well have been completely different people. What is important is not their identities but their capacities. Here the insured capacities are not implicated in the California action. Because there is no lawsuit against an insured party, there is no one to whom a duty to defend is owed.

***

While the courts have found a "potential for liability" (for purposes of the duty to defend) where a complaint could be theoretically amended to allege, against an insured already named as a defendant in the suit, claims covered under the policy, no California court has extended that rule to one not sued in an insured capacity. In other words, no court has said that an insurer must defend an insured *not yet named* in an insured capacity as a defendant in a suit, even though a complaint could be so amended.

*Id. at 708,709*. The Ninth Circuit concluded:

Bowie and Gregory have not been named in the California action as officials of DMT. The Bowie and Gregory who are DMT officials have nothing to do with the Bowie and Gregory named (as Transit directors) in that action. [*21] Nonetheless, they attempt to parlay their dual capacities into a free defense of claims for astronomical damages against officials of a company not insured by their insurers. California law neither requires such a result, nor permits it.

*Id. at 709*.

*Bowie* is not applicable here, where Adams and Leighton have been sued in their capacities as officers and directors of both an insured and uninsured entity. NBT relies on a footnote in Bowie, which stated that "there would, of course, be a duty to defend if Bowie and Gregory were sued in their capacities as officials of DMT." *Id. at 709 n.4*. NBT argues that "the Bowie Court unequivocally interpreted its policy exclusion precisely as NBT does here: a duty to defend exists any time an

insured is sued in their capacity as an officer or director of the insured entity (here HSC, there DMT), even if they are also sued in a separate capacity as an officer or director of another, uninsured entity (here HSCM, there Transit), for different wrongful acts." (NBT Supp. Brief at 13.)

NBT stretches the *Bowie* dicta too far. The *Bowie* court never addressed the applicability of the policy exclusion in that case because [*22] it was not required to do so. As CNA points out, "because the Bowie Court found that the officers were not insureds in the first instance, it never reached the issue of whether the exclusion would apply." (CNA Supp. Brief at 6.) Furthermore, *Bowie* did not involve an exclusion worded as broadly as CNA's Exclusion L.

Exclusion L provides that CNA "shall not be liable to pay any loss in connection with any claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged conduct by the individual insureds in the discharge of their duties as directors, officers, trustees, employees or volunteers of any entity other than the entity or charitable organization, even if directed or requested by the entity to serve as directors, officers, employees or volunteers of such entities." (Emphasis added.) The check kiting scheme could only be effectuated by actions taken by individual insureds in the discharge of their duties as directors and officers of both the insured entity, HSC, and the uninsured entity, HSCM. As CNA observes, a checking account in the name of HSCM in a bank other than the financial institution [*23] at which HSC maintained its demand deposit account was required. Moreover, the Amended Complaint alleges actions taken by Adams and Leighton in their capacities as officers and directors of HSCM to facilitate the scheme. (See Amended Complaint, PP51-54.) The claims of negligence against Adams and Leighton in their capacities as officers and directors of HSC, at a minimum, "indirectly result from," are "in consequence of," or "in some way involved" conduct of Adams and Leighton in the discharge of their duties as directors and officers of HSCM. Adams and Leighton owed the same duty to supervise Sabol as an officer of HSCM as they did with respect to his status as an officer of HSC. Adams and Leighton could have discovered the check kiting scheme in their capacities as officers and directors of HSCM, just as it is alleged that they should have discovered it when wearing their HSC hats. The point is that they wore the hats of both companies at the same time.

NBT asserts that Counts VII and X of the Amended Complaint include claims based solely upon the negligence of Adams and Leighton in their capacity as officers and directors of HSC. This assertion is inaccurate, as the Amended **[*24]** Complaint does not distinguish among the roles played by Adams and Leighton in the corporate defendants. Moreover, NBT's argument ignores the fact that coverage is excluded where the claim is not only based upon conduct undertaken on behalf of an insured entity, but also "results indirectly from," "in consequence of," or "in any way involves" conduct by the individual insureds in discharge of their duties as directors and officers of an uninsured entity. The policy provision could hardly be more clear in excluding coverage to officers and directors participating in a check kiting scheme involving both an insured and an uninsured entity. Indeed, to hold otherwise would give officers and directors of closely held entities a "blank check" to engage in check kiting while having an insurance company ultimately holding the bag.

The parties have not cited, and research has failed to disclose, any case applying an exclusion as broadly worded as "Exclusion L." The Third Circuit's consideration of a more limited exclusion in professional liability policies issued to attorneys, and the application of the Third Circuit's analysis of the professional liability exclusion by District Courts in the **[*25]** Third Circuit, however, confirm that coverage in this case is indeed excluded.

In *Niagra Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C., 821 F.2d 216 (3d Cir. 1987)*, the court assessed the scope of "other business" exclusions analogous to the exclusion at issue here. Attorney Pepicelli was both a lawyer and business person. A company he owned, World of Tires, agreed to purchase a tire recapping plant from Perma Tread, and obtained a fire insurance policy on the plant. A fire destroyed the plant before World of Tires completed its payments. Pepicelli's law firm undertook to represent World Tires, as well as Perma Tread, in pursuing a claim on the fire insurance policy. Perma Tread subsequently sued Pepicelli's law firm for negligence in handling the fire loss claim. The malpractice insurer for the law firm refused coverage on the basis of exclusions for "any claim arising out of any insured's activities as an officer or director of any … company or business other than that of the Named Insured," and "any claim made by or against or in connection with any business enterprise … not named in the Declarations, which is owned by any insured …." *Id. at 218.* **[*26]** Applying principles of

interpretation of insurance contracts established by Pennsylvania law, our Court of Appeals concluded that the malpractice claim did not fall within the scope of the exclusions. Writing for the unanimous panel, Judge Stapleton explained:

> The exclusions speak of excluded claims, and thus the character of the specific legal claims, rather than the malpractice suit's general factual background, must be analyzed to determine the exclusion at issue. The claims made by Perma Tread deal only with negligence and breach of contract in the Law Firm's representation of Perma Tread, and resolution of the claims will affect only the interests of Perma Tread and the Law Firm. Neither the actions nor the interests of Pepicelli in his business venture, World of Tires, are at issue in the malpractice suit ….
>
> Perma Tread's malpractice claims do not "arise out of any insured's activities as an officer or director of any … corporation … other than that of the Named Insured." As Niagara explains in its brief, an attorney may simultaneously act as a lawyer and as an officer or a director of a business, and [the other business] exclusion is designed to prevent **[*27]** coverage for a claim based upon such actions. Although Pepicelli is an officer and director of World of Tires, Perma Tread's malpractice suit is based solely on Pepicelli's and the Law Firm's legal representation. The allegedly negligent legal representation did not simultaneously involve business decisions by Pepicelli.

*Id. at 220-21* (emphasis added).

Unlike the factual matrix presented in *Pepicelli,* the allegations of the Amended Complaint in the Underlying Action plainly show Adams and Leighton acting simultaneously in dual capacities: as officers and directors of both the insured and the uninsured corporations. Their alleged negligent supervision of Sabol applies both in their capacities as officers and directors of HSC, as well as in their capacities as officers and directors of HSCM. Indeed, the Amended Complaint does not purport to distinguish between actions taken on behalf of one corporation and actions taken on behalf of the other. Moreover, while World of Tires was merely "a player in the factual background" of the *Pepicelli* decision, HSCM is an integral actor in the check kiting scheme. While World of Tires had no interest in the litigation **[*28]** underlying the malpractice claim in *Pepicelli,* HSCM had a vital interest in the

Underlying Action. While Perma Tread's malpractice claims did not "'arise out of any insured's activities as an officer or director of any corporation … other than that of the Named Insured," NBT's negligence claims plainly have the requisite nexus to the activities of Adams and Leighton on behalf of HSCM to fall within the scope of Exclusion L. Indeed, under NBT's own theory, had Adams and Leighton not been negligent in supervising Sabol as an officer of HSCM, NBT would not have sustained substantial losses.

The Pepicelli analysis has been applied to sustain an insurer's denial of coverage where a named insured acted simultaneously on behalf of the interests of an insured and uninsured entity. For example, in *Coregis Ins. Co. v. LaRocca, 80 F. Supp. 2d 452 (E.D. Pa. 1999)*, Attorney LaRocca had been sued for his role in a failed real estate investment scheme. It was claimed that LaRocca was negligent in his conduct as an attorney as well as in his capacity as a partner and trustee of the New Gretna Realty Trust. LaRocca sought coverage for the legal malpractice claims from his **[*29]** malpractice insurer, Coregis Insurance Company. *Id. at 453*. Coregis disclaimed coverage on the basis of exclusions for "any CLAIM arising out of an INSURED's activities as an officer … of any company … other than the NAMED INSURED," as well as for "any CLAIM arising out of or in connection with the conduct of any business enterprise other than the NAMED INSURED … which is owned by an INSURED or in which any INSURED is a partner …." *Id. at 454*. After finding that the underlying legal malpractice claims fell within the coverage of the Coregis policy and that the pertinent exclusions were expressed in clear and unambiguous language, the court applied the Pepicelli analysis to determine whether the malpractice claims were excluded from coverage. After finding that, unlike Pepicelli, the named insured's interests in his business (New Gretna) were at issue in the underlying litigation, the court concluded that Attorney LaRocca's legal representation was so closely intertwined with his role as a partner and trustee in New Gretna that coverage of the malpractice claim was excluded. The court explained:

> The allegations [in the underlying **[*30]** action] involve overlap between LaRocca's role as legal counsel and partner/trustee to New Gretna, because his knowledge of [wrongful] conduct and supervision of transactions could have arisen from or related to both roles. Thus, the underlying legal malpractice claims 'simultaneously involved business decisions by [LaRocca],' which is the

precise scenario under which the Court of Appeals for the Third Circuit suggested that such an exclusion would apply.

*Id. at 457*. Rejecting an argument similar to that advanced by NBT here - that the claims of negligence could be isolated and segregated such that the claims against a named insured for actions taken on behalf of the named insured were not excluded from coverage, the court stated:

> The underlying legal malpractice claims … focus on events that took place during a time when LaRocca wore two hats: one as legal counsel to New Gretna, and another as trustee and part owner of New Gretna. Distinguishing with certainty between the roles LaRocca was playing at different moments in his dealings with New Gretna … could prove impossible. The broad, inclusive language of the exclusions, however, makes the **[*31]** drawing of such distinctions unnecessary. The exclusions apply to any claims that 'arise out of' situations in which the insured was both a lawyer to a business and an officer in that same business, and because LaRocca played both roles in New Gretna and the malpractice claims arise out of those roles, the exclusions apply to the suits against him.

*Id. at 459*.

The LaRocca court cited with approval *Coregis Ins. Co. v. Bartos, Broughal & DeVito, LLP, 37 F. Supp. 2d 391 (E.D. Pa. 1999)*. That case also involved legal malpractice claims brought against an attorney who functioned both as a lawyer and as a promoter of an investment scheme. In finding that the malpractice claims were excluded under the same policy language at issue in LaRocca, the court held that the malpractice claims plainly arose out of, or were in connection with, a business entity other than the named insured which was owned by a named insured. *Id. at 394*. The court further ruled that the malpractice claims could not be segregated where the conduct of the named insured "forms part of an 'ongoing scheme of deception and misappropriations' …." *Id. at 394 n. 4*. **[*32]**

**HN3**[⬆️] The message of *Pepicelli, LaRocca,* and *Bartos* is that an otherwise covered claim of negligence of a named insured is excluded where that claim is closely connected to the named insured's activities as an agent of an entity other than the named insured. In this case, the language of Exclusion L is more capacious than that at issue in *Pepicelli* and its progeny. The averments of

the Amended Complaint in the Prior Action make clear that Adams and Leighton simultaneously acted as officers and directors of HSC and HSCM. The claims against them in their capacities as officers and directors of HSC are inextricably intertwined with their actions on behalf of HSCM. Were the entities in this case separate and distinct, without overlapping officers and directors, there undoubtedly would be cross-claims, with HSCM claiming the losses were caused by the officers and directors of HSC, and HSC making the same assertion against HSCM officers and directors. An endorsement to the Policy excludes claims made against any policy insured by or on behalf of HSCM. This exclusion is consistent with the intent expressed in Exclusion L, which is to avoid coverage where a claim against a named insured **[*33]** in any way involves actual or alleged conduct of individual insureds as agents of an uninsured entity. Under the analysis employed in *Pepicelli*, *LaRocca* and *Bartos,* coverage in this case is plainly excluded. [11]

_____

[11] The two cases cited in NBT's post-argument brief for the proposition that the Pepicelli analysis compels a finding of coverage here are plainly distinguishable. In *Smith Kandal Real Estate v. Continental Casualty Co., 67 Cal. App. 4th 406, 79 Cal. Rptr. 2d 52 (1998)*, the court addressed an exclusion for "'any claim arising from the … sale of property, developed, constructed or owned by … you or … any entity in which you have a financial interest.'" *Id. at 410-11*. This exclusion is much narrower than that at issue here. The underlying claim in Smith Kandal concerned alleged negligence in acting as a broker for a purchaser and the structuring of the transaction to effect a tax-deferred exchange. The court found that claim did not fall within the policy exclusion because, although Smith Kandal had an ownership interest in the property sold, its alleged negligence concerned the structuring of the transaction for tax purposes. The court further reasoned that the exclusion was inapplicable because the plaintiffs in the underlying action "could recover against *Smith Kandal* by proving that the acts performed on [plaintiffs'] behalf were negligent without proof that negligent conduct was also designed or intended to benefit or be on behalf of [the uninsured entity]." Here, by way of contrast, NBT could not recover without showing that the alleged negligence of Adams and Leighton benefited the uninsured entity.

The other case cited by NBT, *Fireman's Fund Ins. Co. v. Puget Sound Escrow Closers, Inc., 96 Wash. App. 227, 979 P.2d 872 (1999)*, is also distinguishable because the policy exclusion was more limited than that presented here, covering only claims "arising out of or connected with the performance or failure to perform services for any person or organization … owned or controlled by any Insured …." *Id. at 237, 979 P.2d at 877-78*. Moreover, the claim of negligence was limited to the

**[*34] III. CONCLUSION**

For the reasons set forth above, NBT's Motion for Partial Summary Judgment (Dkt. Entry 32) will be denied, and CNA's Motion for Summary Judgment (Dkt. Entry 35) will be granted. An appropriate Order follows.

**s/** Thomas I. Vanaskie

Chief Judge

Middle District of Pennsylvania

DATED: September 12, 2003

**ORDER**

NOW, THIS 12th DAY OF SEPTEMBER, 2003, IT IS HEREBY ORDERED THAT:

1. The motion by NBT Bank, N.A. for partial summary judgment (Dkt. Entry 32) is **DENIED.**

2. The motion by CNA Insurance Company/Continental Casualty Company (Dkt. Entry 35) is **GRANTED.**

3. The motion to dismiss filed on behalf of CNA Insurance Company/Continental Casualty Company in connection with the litigation initiated by NBT and removed to this Court (Dkt. Entry 19) is **DISMISSED AS MOOT.**

**IT IS FURTHER ORDERED AND DECREED THAT** CNA Insurance Company/Continental Casualty Company has no duty to defend or indemnify Richard Adams, Linda Leighton or John Sabol in the underlying action captioned as NBT Bank, N.A. v. New Hope of Pennsylvania, et al., and docketed in this Court to No. 3: CV-01-879.

**IT IS FURTHER ORDERED THAT** the Clerk of **[*35]** Court shall mark this consolidated action **CLOSED.**

**s/** Thomas I. Vanaskie

_____

failure to remove senior liens on the title to certain property, action that would be required by the named insured as the escrow agent for the plaintiffs in the underlying action. This claim did not implicate the named insured's actions on behalf of the uninsured entity. Furthermore, unlike the Prior Action in this case, there is no indication that the underlying litigation in the Washington case involved the uninsured entity.

2003 U.S. Dist. LEXIS 16434, *35

Chief Judge

Middle District of Pennsylvania

FILED: 9/12/03

---

**End of Document**



**User Name:** Joe Grady
**Date and Time:** Thursday, November 21, 2024 12:48:00 PM EST
**Job Number:** 239206743

## Document (1)

1. *Harleysville Worcester Ins. Co. v. Gateway Petroleum Tech., Inc., 2021 U.S. Dist. LEXIS 189424*
   **Client/Matter:** 21047.24000
   **Search Terms:** Harleysville Worcester Ins. Co. v. Gateway Petroleum Tech., Inc., 2021 U.S. Dist. LEXIS 189424
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

No *Shepard's* Signal™
As of: November 21, 2024 5:48 PM Z

# *Harleysville Worcester Ins. Co. v. Gateway Petroleum Tech., Inc.*

United States District Court for the Eastern District of Pennsylvania

September 30, 2021, Decided; September 30, 2021, Filed

CIVIL ACTION NO. 20-4863

**Reporter**
2021 U.S. Dist. LEXIS 189424 *; 2021 WL 4477149

HARLEYSVILLE WORCESTER INSURANCE
COMPANY v. GATEWAY PETROLEUM
TECHNOLOGY INC., ET AL.

## Core Terms

insurer, Pleadings, coverage, installed, duty to defend,
damages, occurrence, argues, motion for judgment,
electronic data, fuel system, bad faith, malfunction,
faulty workmanship, no duty, insurance policy, work
product, alleges, denial of coverage, original complaint,
underlying action, property damage, faulty, tangible
property, physical injury, loss of use, counterclaim,
declaratory, impaired, asserts

**Counsel:** **[\*1]** For HARLEYSVILLE WORCESTER
INSURANCE COMPANY, Plaintiff: BRADLEY J.
VANCE, REGER RIZZO & DARNALL LLP, CIRA
CENTER 13TH FL, PHILADELPHIA, PA; ROBERT J.
FOSTER, REGER RIZZO KAVULICH & DARNALL,
LLP, CIRA CENTRE 13TH FL, PHILADELPHIA, PA.

For GATEWAY PETROLEUM TECHNOLOGY, INC.,
Defendant: THOMAS N. GANIARIS, LEAD ATTORNEY,
THOMAS N. GANIARIS, LAW OFFICES, Voorhees, NJ.

For WATSON SERVICE STATION, INC., Defendant:
GERALD S. BERKOWITZ, BERKOWITZ AND KLEIN
LLP, SWEDSFORD CORPORATE CENTER,
MALVERN, PA.

For GATEWAY PETROLEUM TECHNOLOGY, INC.,
Counter Claimant: THOMAS N. GANIARIS, LEAD
ATTORNEY, THOMAS N. GANIARIS, LAW OFFICES,
Voorhees, NJ.

For HARLEYSVILLE WORCESTER INSURANCE
COMPANY, Counter Defendant: BRADLEY J. VANCE,
REGER RIZZO & DARNALL LLP, CIRA CENTER 13TH
FL, PHILADELPHIA, PA.

**Judges:** R. BARCLAY SURRICK, J.

**Opinion by:** R. BARCLAY SURRICK

## Opinion

**MEMORANDUM**

**SURRICK, J.**

Plaintiff Harleysville seeks a determination that it has no
duty to defend or indemnify Defendant Gateway
Petroleum Technology in a civil action brought by
Watson Service Station. In the underlying action,
Watson alleges that Defendants Gilbarco, NCR, and
Gateway supplied and installed a malfunctioning fuel
system at Watson Service Station (hereafter
"Watson") **[\*2]** which caused Watson to suffer
economic losses. Harleysville, the insurer of Gateway, a
defendant in the underlying action, now contends that
they have no duty to defend Gateway in that action.
Gateway asserts a counterclaim against Harleysville for
bad faith. Harleysville has filed a Motion for Judgment
on the Pleadings arguing that: (1) it has no duty to
defend Gateway in the underlying action, and (2)
Gateway's counterclaim for bad faith against
Harleysville should be dismissed. For the following
reasons the Motion for Judgment on the Pleadings will
be denied since genuine issues of material fact still
exist.

### I. BACKGROUND

The underlying action forming the basis of this
declaratory judgment action stems from the installation
of fuel system components which failed to work and
allegedly caused Watson to suffer damages. Watson,
plaintiff in the underlying action, was a franchisee of
Sunoco gas station in Bensalem, Pennsylvania. Watson
purchased, among other things, a Gilbarco Fuel System
and an NCR Panther Fuel Control Box, which were
required to operate as a franchisee of Sunoco. (Compl.

2021 U.S. Dist. LEXIS 189424, *2

¶ 14, ECF No. 1.) Watson hired Gateway to install the NCR Control Box into the Gilbarco Fuel System. **[*3]** On September 12, 2017 after it was installed, Gateway started up the Fuel System and tested the Systems for proper operation. *Id.* at ¶ 15.

On September 13, 2017, Watson noticed the Gilbarco Fuel System and the Fuel Control Box were not properly operating. *Id.* at ¶ 17. After being notified of the problem, Gilbarco hired Gateway to repair and correct the defects. In December of 2017, Watson noticed a continuing defect with the operation of the Fuel System and Control Box, as they were dispensing fuel into vehicles but failing to charge the credit cards of the customers. *Id.* at ¶ 36. Gilbarco then attempted to remediate the problem by installing resisters in the NCR Control Box, but this also was not successful, and it then began refunding customers after they pumped their fuel. *Id.* at ¶ 23. On May 10, 2018, Sunoco notified NCR of the problems and requested a new NCR Control Box. NCR sent a new Control Box on September 13, 2018.

Watson filed a complaint against Gilbarco, NCR, and Gateway seeking recovery of economic losses in connection with the malfunctioning equipment and alleging counts for Breach of Contract. (Underlying Compl., Mot. Judgment on Pleadings Ex. B, EFC No. 42.) Watson **[*4]** specifically alleges that defendants Gilbarco, NCR, and Gateway knew that the NCR Control Box and the Gilbarco Fuel System were incompatible before they were delivered and installed at Watson Service Station. *Id.* at ¶ 24.

Gateway held a Commercial General Liability insurance policy with Harleysville Insurance Company at all relevant times. (*Watson* Compl. at ¶ 28). Upon being served with the underlying complaint, Gateway turned it over to Harleysville. (Answ. ¶ 103, ECF No. 7.) On July 6, 2020, Harleysville issued a Denial of Defense and Indemnity Letter to Gateway. In its denial letter, Harleysville cited the boilerplate language of "Occurrence." However, in Gateway's specific policy, Endorsement CG-7427 offered Gateway broadened coverage and an expanded definition of an "Occurrence." *Id.* at ¶ 103, 107-10. Gateway alleges that Harleysville's denial of defense was premature and in error. Harleysville later rescinded its denial and agreed to defend Gateway under a reservation of rights. Harleysville then filed this Complaint, requesting a declaratory judgment that it is not required to defend and/or indemnify Gateway in the underlying Watson action. In its Answer, Gateway asserts a counterclaim **[*5]** against Harleysville alleging bad faith.

*Id.* at ¶ 178.

Harleysville now brings this Motion for Judgment on the Pleadings on both its affirmative claim for a declaratory judgment that it has no duty to defend Gateway, and on Gateway's counterclaim of bad faith against Harleysville.

## II. LEGAL STANDARD

*Rule 12(c) of the Federal Rules of Civil Procedure* provides that a motion for judgment on the pleadings may be made "after the pleadings are closed but within such time as not to delay the trial." *Fed. R. Civ. P. 12(c)*. To succeed on a motion under *Rule 12(c)*, the movant must clearly establish that no genuine issues of material fact remain and that "he is entitled to judgment as a matter of law." *Damron v. Smith, 616 F. Supp. 424, 425 (E.D. Pa. 1985)* (citing *Flora v. Home Federal Savings and Loan Association, 685 F.2d 209, 211 (7th Cir. 1982)*). When deciding a motion for judgment on the pleadings, the court must view the pleadings in the light most favorable to the non-moving party and grant the motion only if it is beyond doubt that the non-movant can plead and prove no facts that would support his claim for relief. *Constitution Bank v. DiMarco, 815 F. Supp. 154, 157 (E.D. Pa. 1993)* (citing *U.S. v. Wood, 925 F.2d 1580, 1581 (7th Cir. 1991)*). As in a *Rule 12(b)(6)* motion, the court must not look beyond the pleadings. *Fed. R. Civ. P. 12(d)*.

Under Pennsylvania law, the interpretation of an insurance contract is a question of law. *401 Fourth St., Inc. v. Investors Ins. Group, 583 Pa. 445, 879 A.2d 166, 170 (Pa. 2005)*. The task of interpreting an insurance contract is generally performed by the court rather than a jury, and "[t]he purpose of **[*6]** that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Id. at 171*.

## III. DISCUSSION

Harleysville moves for Judgment on the Pleadings on both their affirmative claim for a declaratory judgment on their duty to defend, and on Gateway's counterclaim alleging bad faith against Harleysville.

## A. Count I: Harleysville's Affirmative Claim and Duty to Defend

Harleysville presents various arguments contending that

2021 U.S. Dist. LEXIS 189424, *6

this Court should grant its Motion and rule that Harleysville has no duty to defend Gateway in the underlying action. These arguments will be addressed below in turn.

*i. Applicable Law*

In determining whether an insurance carrier has a duty to defend its insured, Pennsylvania Courts apply the four-corners rule. Under the four-corners rule, the question of whether the insurance company must defend a claim against an insured is answered by comparing the four corners of the insurance contract to the four corners of the complaint. *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co., 939 F.3d 243, 252 (3d Cir. 2019)*. Courts may not look to any outside evidence in making this determination. *Id.* Said another way, a duty to defend arises whenever the underlying complaint may potentially come within the insurance coverage afforded **[*7]** in the policy. *Penn Nat'l Ins. v. HNI Corp., 482 F. Supp. 2d 568, 607 (M.D. Pa. 2007)* (citing *Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999)*). In addition, if even a single claim in a multiclaim lawsuit could be covered by the policy, the insurer has the duty to defend all claims "until there is no possibility that the underlying plaintiff could recover on a covered claim." *Id.*

Generally, insurance policies should be read as a whole and construed in accordance with their plain meaning. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999)* (citing *Atlantic Mut. Ins. Co. v. Brotech Corp., 857 F. Supp. 423, 427 (E.D. Pa. 1994)*). However, in interpreting Pennsylvania insurance policies, a court should "consider [the] policy from the point of view of the insured and construe [the] policy most strongly against the insurer." *Erie Ins. Exch. v. Transamerica Ins. Co., 516 Pa. 574, 580, 533 A.2d 1363 (1987)*. Where an ambiguity is found in a provision of an insurance policy, the provision should be construed against the insurer as the drafter of the instrument. *Frog, Switch & Mfg. Co, 857 F. Supp. at 746*. In contrast, where the language of a contract of insurance is clear and unambiguous, a court is required to give effect to that language. *Stump v. State Farm Mutual Automobile Insurance Co., 387 Pa. Super. 310, 564 A.2d 194, 196 (Pa. Super Ct.1989)*. A provision of an insurance policy is ambiguous if reasonable people considering it in the context of the entire policy could fairly and honestly differ as to its meaning. *Frog, Switch & Mfg. Co, 857 F. Supp. at 746*.

When an insurer contends that coverage under its policy is precluded by a policy exclusion, it bears the burden of proving that the exclusion applies. **[*8]** *Erie Ins. Exch., 516 Pa. at 580*.

*ii. Scope of the Harleysville Policy*

The policy between Harleysville and Gateway includes Commercial General Liability (hereinafter "CGL") coverage. With regard to such coverage, the policy states in relevant part:

b. This insurance applies to... "property damage" only if: (1) The "bodily injury" ... is caused by an "occurrence" that takes place in the "coverage territory" ...

(Harleysville Policy § I(A)(1)(a).) The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Harleysville Policy § V(13).) Under the policy, an "accident" includes:

b. "Property Damage" to: (1) the property of others; or (2) "Your work," if "your work" was (a) Damaged by the work of a subcontractor who performed work on your behalf in the construction, alteration, renovation, repair or maintenance of a building, structure, highway, road, bridge, water line, sewer line, oil line, gas line, appurtenance or other improvement to real property, including any moving, demolition or excavation; and (b) The resulting "property damage" is included in the "products-completed operations hazard".

(Harleysville Policy § V(13).) Therefore, **[*9]** whether Harleysville has a duty to defend Gateway in the underlying suit depends upon whether there was an "occurrence" triggering coverage. When an "occurrence" is defined as an "accident" under a CGL policy, as it is here, courts look to the ordinary definition of the word "accident" to examine "whether the damage that is the impetus of [the] suit was caused by an accident, so as to constitute an occurrence under the policy." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 589 Pa. 317, 908 A.2d 888, 897-98 (Pa. 2006)*.

*iii. "Occurrence" Under Gateway's Policy*

Under Pennsylvania law, when, in an insurance contract, an "occurrence" is defined as an "accident," claims based in a theory of "faulty workmanship" or "faulty construction" are not considered an "occurrence" which would trigger an insurer's duty to defend.

*Kvaerner, 908 A.2d at 899*. In applying this law, the *Kvaerner* Court reasoned that "such claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident.'" *Id. at 897-99* (defining "accident" as "[a]n unexpected and undesirable event," or "something that occurs unexpectedly or unintentionally." (quoting Webster's II New College Dictionary 6 (2001))). Therefore, if a claim is based upon the insured's faulty workmanship that caused damage to the insured's work product, **[*10]** the insurer has no duty to defend. *Id. at 899*.

One exception to the *Kaverner* rule was established in the case of *Indalex Inc. v. Nat'l Union Fire Ins. Co., 2013 PA Super 311, 83 A.3d 418, 421 (Pa. Super. Ct. 2013)*. In *Indalex*, homeowners sued Indalex, alleging it had defectively designed and manufactured windows and doors installed in their house, which caused a water leak that damaged their home and property. *Id. at 419-20*. Indalex, in the declaratory action, argued that their insurer had a duty to defend them because the claims were based upon claims of a "faulty product" or a malfunction of the product, rather than faulty workmanship of the insured. *Id. at 424*. The Superior Court of Pennsylvania agreed and held that the insurer had a duty to defend because the underlying products liability claims alleged a "bad product" and "active malfunction," not merely faulty workmanship. *Id. at 424-25*.

Many cases have since been brought attempting to expand the "faulty workmanship" exception to include all cases where the alleged damages are to "another's property" rather than to the subject of the insured's work (i.e., their work product). This is essentially what Defendant advocates here. Defendant argues that Harleysville has a duty to defend because the alleged damages were to property other than Gateway's work product (i.e., Watson's **[*11]** revenue suffered the damages, rather than the installed products themselves). However, the Third Circuit has, in two separate cases, found that *Kvaerner* and its progeny have foreclosed the possibility that there could be an "occurrence" where faulty workmanship causes damage to property other than the insured's work product. *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591, 597 (3d Cir. 2009)* (citing *Millers Capital Ins. Co v. Gambone Bros. Dev. Co., 2007 PA Super 403, 941 A.2d 706 (Pa. Super. Ct. 2007)*; *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 239 (3d Cir. 2010)*; *Hagel v. Falcone, 116 A.3d 698 (Pa. Super. Ct. 2014)*. Pennsylvania courts and district courts in the Third Circuit have consistently come to this same conclusion in cases where the faulty workmanship caused foreseeable damage to property other than the insured's work product. *Erie Ins. Exch. v. Abbott Furnace Co., 2009 PA Super 88, 972 A.2d 1232, 1237 (Pa. Super. Ct. 2009)* (holding that, although damage caused by the malfunctioning furnace was done to property other than the insured's work product, the insurer had no duty to defend because the claims were for poor workmanship); *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 238-39 (3d Cir. 2010)* (finding no duty to defend where the damage was caused by water leaks resulting from faulty workmanship because those damages were a foreseeable result of faulty workmanship); *Quality Stone Veneer, Inc. v. Selective Ins. Co. of Am., 229 F. Supp. 3d 351, 360 (E.D. Pa. 2017)* (finding that allegations of damage to more than the insured's work product did not constitute an "occurrence" under the policy). Contrary to the arguments made, and rejected, in these cases, in *Indalex* the claims were framed in terms of a "bad product" **[*12]** which was construed as an "active malfunction," not merely faulty workmanship. *Indalex Inc., 83 A.3d at 421*. The most critical element in *Indalex* which distinguished it from *Kvaerner* was that the claims were for products liability torts, based on damages to persons or property other than the insured's work product. *Id.*; *Northridge Vill., L.P. Travelers Indem. Co., 2017 U.S. Dist. LEXIS 140541, at *23 (E.D. Pa. Aug. 31, 2017)*.

*Kvaerner* and its progeny created a framework for commercial liability insurance policies that distributes the risks in a project. As such, if damages occur because of the failure of the insured in the work process, the risk and liability fall on the insured. However, if the product itself fails and causes injury or damage to third parties, the insurer is responsible for defense of the insured and indemnification of the loss. *Kvaerner, 908 A.2d at 897-99* (citing *Redevelopment Auth. of Cambria County v. International Ins. Co., 454 Pa. Super. 374, 685 A.2d 581 (Pa. Super. 1996)*); *Indalex Inc., 83 A.3d at 421*.

Here, Watson, in the underlying action, is suing Gateway, the insured, for recovery of economic losses in connection with the malfunctioning Gilbarco Fuel System and NCR Control Box, which Gateway installed and attempted to fix. However, in its complaint, Watson specifically alleges that Gateway knew the Systems were incompatible before they were installed and installed them anyway, without informing Watson. (Underlying Compl. ¶ 22-25.) In Harleysville's Complaint, **[*13]** it alleges that Watson is seeking recovery in connection with the "defective and/or

incorrectly installed equipment" which caused its damages. (Compl. ¶ 13). Therefore, it is not clear from the pleadings whether a defective system caused the damage or whether the insured's faulty installation of the NCR Control Box caused the damage to Watson's property. If the damage was caused by the system's defect (i.e. because the NCR Control Box and the Gilbarco System were inherently incompatible), then this case is similar to *Indalex*, where the damage was caused by a "faulty product" and could be described as an "active malfunction." If that is the case, Harleysville would have a duty to defend Gateway under the applicable case law. If, however, Gateway committed a "faulty installation" of the system that caused it to not work correctly, producing damages, then Harleysville would have no duty to defend Gateway, under *Kvaerner*.

At this juncture, there is a genuine question of material fact that precludes granting the Motion for Judgment on the Pleading. Harleysville must clearly establish that no genuine issues of material fact remain and that it is entitled to judgment as a matter of law. *Damron, 616 F. Supp. at 425*. **[*14]** There is a question of fact as to what caused the damages Watson is claiming: either the malfunction of the Systems working together or faulty installation by Gateway. Therefore, the Motion for Judgment on the Pleadings as to this count must be denied.

### iv. "Electronic Data" Exclusion

Alternatively, Harleysville argues that Watson's alleged losses stem from "electronic data" which is not considered "tangible property" under the policy. In the policy at issue, "property damage" is defined as:

(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

(b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-

ROMS, tapes, drives, cells, data processing **[*15]** devices or any other media which are used with electronically controlled equipment.

(Harleysville Policy § IV(17).) Further, the policy also includes the following exclusion:

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CDROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Harleysville Policy § I(A)(2)(p).) Plaintiff argues the damages at issue in this matter fall under this "electronic data" exclusion, and, thus, they have no duty to defend. Specifically, Harleysville asserts that Watson's claims arise out of its inability to bill customers due to lost credit card data — i.e., electronic data. In response, Gateway argues that this exclusion does not apply, as Gateway's work had nothing to do with any "electronic data" and they never programmed any electronic equipment or data in conjunction **[*16]** with this work.

A Motion for Judgment on the Pleadings may only be granted if it is beyond doubt that the non-moving party can plead and prove no facts that would support his claim for relief. *U.S. v. Wood, 925 F.2d at 1581*. The damages stemming from Gateway here stem from their alleged negligent installation of the NCR Control Box to the Gilbarco Fuel System. The relevant allegations are that the fuel pumps did not work properly with the NCR Control Box system — specifically that the system could not read the credit cards and dispensed fuel too slowly or not at all. The basis of these claims is not damage to, loss of, or inability to access electronic data. The basis is the failure of the NCR Control Box and Gilbarco System to work together to perform their intended function. Accordingly, these claims do not fall under the "electronic data" exclusion to the policy.

### v. "Impaired Property" Exclusion

Finally, Harleysville argues that it does not have a duty to defend Gateway for any claims by Watson related to the loss of revenue, sales, customers, goodwill, and future sales due to the inoperable or malfunctioning pumps under the "impaired property" exclusion to the

policy. That exclusion states:

> "Property damage" to **[*17]** "impaired property" or property that has not been physically injured, arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(Harleysville Policy § I(A)(2)(m).) Further, the policy defines "impaired property" as:

> "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because: (a) It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or (b) You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

(Harleysville Policy § V(8).) Harleysville argues that, based upon these policy provisions, while **[*18]** the policy does provide coverage for the loss of use of tangible property that is not physically injured, as occurred here, it excludes coverage when the reason the property can no longer be used is due to work performed by the insured.

In response, Defendant argues that the NCR Control Box and Gilbarco Fuel systems were not Gateway's product, nor did the system incorporate any of Gateway's work. Gateway argues that even if "impaired property" was involved, no evidence exists that "such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement." Most importantly, Gateway points out that at this juncture it is unknown what, how, and who caused the problems with the Systems at Watson's. This is true and is the lynchpin issue that requires denial of this motion under the analysis in Section (III)(A)(iii). We agree and find that there are genuine issues of material fact as to who and what caused the malfunction, and it cannot be definitely said that Gateway was the reason the Systems could not be effectively used. Therefore, this argument must be

rejected, and the Motion for **[*19]** Judgment on the Pleadings must be denied.

### B. Count II: Gateway's Bad Faith Counter Claim

Harleysville also moves for Judgment on the Pleadings on Gateway's counterclaim against them for Bad Faith.

### i. Applicable Law

Under Pennsylvania law "to prevail in a bad faith insurance claim pursuant to *Section 8371*, a plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a reasonable basis for denying benefits under policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Rancosky v. Wash. Nat'l Ins. Co., 642 Pa. 153, 170 A.3d 364, 377 (2017)* (citing *Terletsky v. Prudential Property & Cas. Ins. Co., 437 Pa. Super. 108, 649 A.2d 680 (Pa. Super. Ct. 1994)*).

### ii. Application

In support of their motion, Harleysville argues that Gateway's claim for bad faith should be dismissed because there was a reasonable basis on which to initially deny coverage and to then proceed on the more conservative approach of reserving rights, while proceeding to determine duties in a declaratory judgment action. Harleysville asserts its conduct was reasonable in initially denying the claim and then proceeding under a reservation of rights, in accordance with the recommended course of action established by the Pennsylvania Supreme Court in *Babcock & Wilcox Co. v. Am. Nuclear Insurers, 635 Pa. 1, 131 A.3d 445, 456-57 (Pa. 2015)*. Harleysville argues there are no policy terms, nor language in the **[*20]** Amended and Second Amended Complaint, which clearly identify a covered loss under the policy and, even if the Court finds ambiguity which triggers the duty to defend, its coverage position was still reasonable.

In response, Defendant asserts its bad faith claim must survive this motion because Harleysville failed to offer a defense to Gateway from the inception of this litigation, which was unreasonable. Specifically, Harleysville purported to base its denial of coverage on Watson's Amended Complaint. However, Gateway points out that the denial of coverage letter predates Watson's First Amended Complaint. Gateway argues that this indicates

the Original Complaint, rather than Watson's First Amended Complaint, was the basis for Harleysville's denial of coverage. Gateway goes on to explain that the differences between Watson's Original Complaint and its Second Amended Complaint are night-and-day: the original complaint included negligence-related claims and issues that were deleted in Watson's Second Amended Complaint. After Gateway challenged Harleysville about the denial of coverage, Harleysville rescinded its original denial of coverage and agreed to defend Gateway under a reservation **[*21]** of rights. Gateway contends this represented a concession on Harleysville's behalf that they erred in initially denying coverage, which supports its bad faith claim. Gateway also argues that the investigation conducted by Harleysville into the allegations and facts surrounding Watson's litigation was rushed, incomplete, half-hearted, and faulty, which also supports its claim for bad faith.

Harleysville's Motion for Judgment on the Pleadings on Gateway's bad faith claim simply does not meet the required standard. Viewing the pleadings in the light most favorable to Gateway, it is not "beyond doubt" that it can plead and prove "no facts" which would support its claim for bad faith. *Wood, 925 F.2d at 1581*. There are genuine questions as to whether Harleysville had a reasonable basis to deny coverage at the outset based on the original complaint.

Harleysville claims the First Amended Complaint compares to the Second Amended Complaint, and the First Amended Complaint was their reasonable basis for denying coverage initially. However, the denial of coverage letter was dated July 6, 2020, which preceded the First Amended Complaint by 25 days. Therefore, Watson's Original Complaint was the Complaint on which Harleysville **[*22]** must have based their denial of coverage (filed June 1, 2020). The Original Complaint, unlike the First or Second Amended Complaints, included various counts and allegations of negligence and gross negligence against NCR, Gilbarco, and Gateway. When the complaint asserts an injury which may be within the policy, the insurer is required to defend. *Cadwallader v. New Amsterdam Casualty Co., 396 Pa. 582, 152 A.2d 484, 488 (Pa. 1959)*. Therefore, where a claim is potentially within the scope of an insurance policy, the insurer who refuses to defend at the outset does so at its peril. *Id.* If coverage and/or indemnification depends upon the existence or nonexistence of undetermined facts outside the complaint, the insurer has a duty to defend until those facts are determined and the claim is determined to be one outside of coverage. *C. Raymond Davis & Sons,*

*Inc. v. Liberty Mutual Ins. Co., 467 F.Supp. 17, 19 (E.D.Pa.1979)*.

Therefore, viewing the pleadings in the light most favorable to Gateway and drawing all inferences in its favor, it is not "beyond doubt" that Gateway has pled facts to support a potential bad faith claim. *Wood, 925 F.2d at 1581*. It is possible that Watson's Original Complaint comprehended "an injury which may be within the policy" at the time of the denial. *Id.* Moreover, coverage and/or indemnification in this matter depend on the existence of undetermined facts **[*23]** outside the complaint, as discussed above. Therefore, Plaintiff has not demonstrated that the motion for judgment on the pleadings standard has been met for this claim and therefore the motion is also denied as to this claim.

## IV. CONCLUSION

For the foregoing reasons, Harleysville's Motion for Judgment on the Pleadings will be denied on both counts. An appropriate Order follows.

**BY THE COURT**:

*/s/ R. Barclay Surrick*

**R. BARCLAY SURRICK, J.**

## ORDER

**AND NOW**, this 30th day of September, 2021, upon consideration Harleysville Worcester Insurance Company's Motion for Judgment on the Pleadings (ECF No. 42), and all documents submitted in support thereof and in opposition thereto, it is **ORDERED** that the Motion is **DENIED**.

**IT IS SO ORDERED**.

**BY THE COURT**:

*/s/ R. Barclay Surrick*

**R. BARCLAY SURRICK, J.**

**End of Document**



**User Name:** Joe Grady
**Date and Time:** Thursday, November 21, 2024 12:51:00 PM EST
**Job Number:** 239207096

## Document (1)

1. *Yocum v. St. Paul Mercury Ins. Co., 2010 U.S. Dist. LEXIS 52814*

   **Client/Matter:** 21047.24000

   **Search Terms:** Yocum v. St. Paul Mercury Ins. Co., 2010 U.S. Dist. LEXIS 52814 (E.D. Ark. May 27, 2010)

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | US Cases | -None- |

🛈 Cited
As of: November 21, 2024 5:51 PM Z

## *Yocum v. St. Paul Mercury Ins. Co.*

United States District Court for the Eastern District of Arkansas, Pine Bluff Division

May 27, 2010, Decided; May 27, 2010, Filed

5:09-CV-00123-WRW

**Reporter**
2010 U.S. Dist. LEXIS 52814 *; 2010 WL 2179137

DAVID YOCUM, IV, et al., PLAINTIFFS v. ST. PAUL
MERCURY INSURANCE COMPANY, DEFENDANT

## Core Terms

Catfish, insured, coverage, Farm, summary judgment,
dual capacity, no duty, Lawsuit, allegations, insurance
company, duty to defend, delivery, genuine, entity,
rights, covered claim, defense costs, uncovered

**Counsel:** **[*1]** For David Yocum, IV, Plaintiff: Dylan
Hugh Potts, John Purifoy Gill, Kelly Wayne McNulty,
LEAD ATTORNEYS, Gill Elrod Ragon Owen &
Sherman, P.A., Little Rock, AR; Gregory M. Hopkins,
LEAD ATTORNEY, Frank Stewart Headlee, Hopkins
Law Firm, P.A., Little Rock, AR.

For Jeff Baxter, Plaintiff: John Mason Jewell, LEAD
ATTORNEY, Baxter & Jewell, Little Rock, AR.

For Tom Pugh, Frank Pugh, Farm Bureau Mutual
Insurance Company of Arkansas Inc, Plaintiffs: Richard
N. Watts, LEAD ATTORNEY, Staci Dumas Carson,
Thomas J. Diaz, Watts, Donovan & Tilley, P.A., Little
Rock, AR.

For St Paul Mercury Insurance Company, Defendant:
Cathlynn Cannon, James Price Collins, LEAD
ATTORNEYS, Wilson, Elser, Moskowitz, Edelman &
Dicker, LLP - Dallas, Dallas, TX; Stuart P. Miller, LEAD
ATTORNEY, Mitchell, Williams, Selig, Gates &
Woodyard, PLLC - LR, Little Rock, AR.

**Judges:** Wm. R. Wilson, Jr., UNITED STATES
DISTRICT JUDGE.

**Opinion by:** Wm. R. Wilson, Jr.

## Opinion

**ORDER**

Pending are a Motion for Partial Summary Judgment
(Doc. No. 27) by Separate Plaintiffs David Yocum, IV
and Jeff Baxter; a Motion for Partial Summary Judgment
(Doc. No. 29) by Separate Plaintiffs Tom Pugh, Frank
Pugh, and Farm Bureau Mutual Insurance Company of
Arkansas, Inc.; and Defendant's **[*2]** Motion for
Summary Judgment (Doc. No. 51). The parties have
responded and replied. [1] For the reasons set out below,
David Yocum, IV and Jeff Baxter's Motion for Partial
Summary Judgment is DENIED; the Pugh / Farm
Bureau Motion for Partial Summary Judgment is
DENIED; and Defendant's Motion for Summary
Judgment is GRANTED.

Also pending is Defendant's Motion to Strike Plaintiffs'
Summary Judgment Evidence (Doc. No. 33). Plaintiffs
have responded, and Defendant has replied. [2]
Defendant's Motion is DENIED.

**I. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when there is no
genuine issue of material fact, so that the dispute may
be decided on purely legal grounds. [3] The Supreme
Court has established guidelines to assist trial courts in
determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of
> determining whether there is the need for a trial --
> whether, in other words, there are any genuine
> factual issues that properly can be resolved only by
> a finder of fact because they may reasonably be

---

[1] Doc. Nos. 35, 44, 47, 55, 57.

[2] Doc. No. 40, 41.

[3] *Holloway v. Lockhart, 813 F.2d 874 (8th Cir. 1987)*; *Fed. R. Civ. P. 56*.

2010 U.S. Dist. LEXIS 52814, *2

resolved in favor of either party. [4]

The **[*3]** Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should be granted only when the movant has established a right to the judgment beyond controversy. [5] Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains. [6] I must view the facts in the light most favorable to the party opposing the motion. [7] The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.,* "[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that **[*4]** burden, summary judgment should be granted. [8]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. [9]

## II. BACKGROUND [10]

---

[4] *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

[5] *Inland Oil & Transport Co. v. United States, 600 F.2d 725, 727 (8th Cir. 1979).*

[6] *Id. at 728.*

[7] *Id. at 727-28.*

[8] *Counts v. MK-Ferguson Co., 862 F.2d 1338, 1339 (8th Cir. 1988)* (quoting *City of Mt. Pleasant v. Associated Elec. Coop., 838 F.2d 268, 273-74 (8th Cir. 1988)* (citations omitted)).

[9] *Anderson, 477 U.S. at 248.*

[10] Unless otherwise noted, the facts in the Background section were taken from the parties' statements of material fact. Doc. Nos. 28, Exhibit 2; 29, Exhibit B; 35, Exhibit L; 51, Exhibit L;

Plaintiffs David Yocum, IV, Jeff Baxter, Tom Pugh, and Frank Pugh [11] ("Yocum, Baxter, and the Pughs" or "Plaintiffs") were sued in an earlier lawsuit (the "Underlying Lawsuit") --Plaintiffs were defendants in the Underlying Lawsuit. Plaintiffs maintain that Defendant St. Paul Mercury Insurance Company had a duty to defend them in the Underlying Lawsuit, even though they were not sued in their insured capacities. Defendant disagrees, so we have this action.

### A. Plaintiffs' Involvement in Various Companies

Plaintiffs participated in numerous companies involved in catfish farming. All four men were officers and directors of Catfish Producers, LLC ("Catfish Producers"), [12] and each held an ownership interest in that company. [13]

At the same time, Plaintiffs were also officers and directors of Farm Fresh Catfish Company, Inc. ("Farm Fresh Catfish"), which was owned by Catfish Producers.

Plaintiffs formed another company, Farm Fresh Producers, LLC ("FFP").

In August, 2001, Farm Fresh Catfish made a private offering for the sale of stock and delivery rights to FFP, which then offered the sale of stock and delivery rights [14] to various Arkansas catfish farmers. **[*6]** The plaintiffs in the Underlying Lawsuit, and others, bought the securities and delivery rights offered in the August, 2001, private offering.

On August 7, 2002, Catfish Producers, FFP, and Southeast Arkansas Catfish Producers, LLC, formed Arkansas Catfish Growers, LLC d/b/a Seacat ("Seacat").

---

and 55, Exhibit B.

[11] Plaintiff Farm **[*5]** Bureau Mutual Insurance Company of Arkansas, Inc. provided Tom Pugh and Frank Pugh a defense in the Underlying Lawsuit, and seeks equitable subrogation here.

[12] Jeff Baxter was also an officer of Baxter Land Company.

[13] David Yocum, IV held an ownership interest in Catfish Producers through Alice Sidney Farms. Jeff Baxter held an ownership interest in Catfish Producers through Baxter Land Company. Tom Pugh and Frank Pugh held an ownership interest in Catfish Producers through Top Cat Fisheries.

[14] The delivery rights gave the holder the opportunity to sell specified quantities of fish to a processor.

[15] Seacat's managing board was made up of three people plus an alternate from each of its three members. Plaintiffs were Catfish Producers's representatives on Seacat's Managing Board.

Around September 1, 2002, Farm Fresh Catfish sold its assets to Seacat and ceased operations. [16] In connection with the sale, Seacat assumed a $ 3,000,000 ADFA note executed by Farm Fresh Catfish. [17] Additionally, each Seacat member holding Farm Fresh Catfish delivery rights executed an Acceptance of Delivery Rights in Seacat. [18]

## B. The Underlying Lawsuit

On August 13, 2004, the complaint in the Underlying Lawsuit (the "Underlying Complaint") was filed, [19] naming Yocum, Baxter, the Pughs, Catfish Producers, LLC, and Baxter Land Company (among others) as defendants. The Underlying Complaint alleges that Yocum, Baxter, and the Pughs were acting at all times in their own personal interest or in the interest of Catfish Producers or Baxter Land Company. The Underlying Complaint does not make allegations against Yocum, Baxter, or the Pughs as directors of Seacat, nor does it name Seacat as a defendant. It is undisputed that the Underlying Complaint intentionally omitted references to Seacat, thereby avoiding the jurisdiction of the bankruptcy court.

The Underlying Complaint focuses on the period around 2001 and alleged misrepresentations in connection with the private offering of stocks and delivery rights. The causes of action alleged in the Underlying Complaint are intentional misrepresentation; violation of the Arkansas Securities Act; intentional interference [*8] with contract and economic expectations; promissory estoppel; breach of contract and third party beneficiary; negligence; and breach of duty of good faith

fair and dealing. [20] There was a defendants' verdict in the Underlying Lawsuit.

## C. Relevant Policy Terms and Provisions

In December, 2003, Defendant in this action, St. Paul, issued a management liability insurance policy (the "Policy") to Seacat. The Policy included Directors and Officers ("D&O") Individual Coverage, Company Indemnification Coverage, and Company Liability Coverage. The Policy was a claims made policy, and covered claims made against an insured during the policy period -- from November 3, 2003, to November 4, 2004. Around September 13, 2004, Seacat bought an extended discovery period tail policy that covered claims made during the policy period of November 3, 2004, to November 3, 2005. Defendant had the duty to defend all covered claims.

The Management Liability Insuring Agreement ("Insuring Agreement") provides that the "Insurer will pay on behalf of the Insured Persons Loss . . . which the Insured Persons become legally obligated to pay on account [*9] of any Claim first made against them . . . for a Management Practices Act." [21] The Insuring Agreement also provides that when it is the duty of the Insurer to defend, the Insurer has the right and duty to defend any claim covered by the Insuring Agreement. [22]

The definition of Claim under the Policy includes "a civil proceeding against any Insured commenced by the service of a complaint or similar pleading" on account of a Wrongful Act. [23] Wrongful Act is defined as "Management Practices Act, Employment Practices Act, Fiduciary Act and Third-Party Discrimination Act, but only to the extent that coverage is granted for such acts pursuant to an Insuring Agreement made part of this Policy." [24]

Management Practices Act means:

(a) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or

---

[15] Doc. No. 27, Exhibits A, A-1, A-2. On September 18, 2002, Arkansas Catfish Growers registered the fictitious name "Seacat." Doc. No. 27, Exhibit A -1.

[16] Doc. Nos. 27, Exhibit A; 42, Exhibit A.

[17] On February 28, 2002, the Arkansas Development Finance Authority ("ADFA") loaned Farm Fresh [*7] Catfish Company $ 3,000,000. Plaintiffs personally guaranteed the loan.

[18] Id.

[19] The Underlying Complaint was filed in the Pulaski County, Arkansas, Circuit Court.

---

[20] Doc. No. 51, Exhibit A-40. Not all claims were submitted to the jury.

[21] Doc. No. 16, Exhibit 2. Insuring Agreement, page 1.

[22] Id. Insuring Agreement, page 1.

[23] Id. General Terms, Conditions and Limitations, page 2.

[24] Id. General Terms, Conditions and Limitations, page 7.

attempted by any Insured Person in their capacity as such, or in an Outside Position or, with respect to the Company Liability Coverage, by the Company; or

(b) any matter claimed against the Insured Persons solely by reason of their serving in such capacity **[*10]** or in an Outside Position.

Management Practices Act does not include any conduct actually or allegedly committed or attempted by any Insured Person in their capacity as a director, officer, trustee, governor, member of the board of managers, or any equivalent position, or employee of any entity other than the Company, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by the Company, except in their capacity in an Outside Position. [25]

Outside Position means:

the position of director, officer, manager, trustee or other equivalent executive position held by any Director or Officer of the Company in:

(a) any Non-Profit Entity not included in the definition of Company; or

(b) any other entity, if such coverage is specifically granted by endorsement to the Policy,

if service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Director or Officer by, the Company. [26]

Insured Persons means "Directors or Officers, and only to the extent that coverage is granted as set forth in the Declarations, Employees, Leased Employees, and Independent Contractors." [27] Insured Persons here are Yocum, Baxter, and the Pughs.

Director or Officer means: "any natural person who was, now is or shall be a duly elected or appointed director, officer, member of the board of managers, or management committee member of any Company incorporated or chartered in the United States of America." [28] Company means "any entity named in the Declarations and its Subsidiaries . . . ." [29] The Company here is Seacat.

The Policy includes an Allocation Clause, which reads in part:

If on account of any Claim the Insureds who are covered for such Claim under this Policy incur Loss jointly with others, including any Insureds who are not covered for such Claim under this Policy, or the Insureds incur an amount consisting of both Loss **[*12]** covered by this Policy and loss not covered by this Policy because the Claim includes both covered and uncovered matters, the Insureds and the Insurer shall allocate such amount between covered Loss and uncovered loss as follows:

(a) all Defense Costs incurred by covered Insureds for such claims shall be paid as Loss; and

(b) all loss, other than Defense costs, arising from such Claims shall be allocated between covered Loss and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters. [30]

Loss means: "the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims made against them during the Policy Period . . . for Wrongful Acts for which coverage applies, including . . . Defense Costs." [31]

Defense Costs means: "that part of Loss consisting of reasonable costs, charges, fees (including attorneys' fees, experts' fees, and mediators' or arbitrators' fees) . . . incurred in defending or investigating a Claim . . . ." [32]

## III. DISCUSSION

Plaintiffs **[*13]** are not identified in the Underlying Complaint in their insured capacity. Plaintiffs ask the Court to infer from extrinsic evidence that the Underlying Complaint contains allegations against Yocum, Baxter,

---

[25] *Id.* General Terms, Conditions **[*11]** and Limitations, page 5.

[26] *Id.* General Terms, Conditions and Limitations, page 6.

[27] Doc. No. 16, Exhibit 2. General Terms, Conditions and Limitations, page 6.

[28] *Id.* General Terms, Conditions and Limitations, page 3.

[29] *Id.* General Terms, Conditions and Limitations, page 3.

[30] *Id.* General Terms, Conditions and Limitations, page 13.

[31] *Id.* General Terms, Conditions and Limitations, page 5.

[32] *Id.* General Terms, Conditions and Limitations, page 3.

and the Pughs in their capacity as Seacat directors. Plaintiff's assert that Defendant had a duty to defend, based on what Defendant knew in addition to the allegations in the Underlying Complaint. Defendant, of course, disagrees.

Under Arkansas law, the allegations in the pleadings against the insured determine the insurer's duty to defend. [33] Although there may be situations in which the insurer's duty to defend cannot be determined from the pleadings alone, [34] generally "it is the allegations made against the insured -- however groundless, false, or fraudulent such allegations may be -- that determine the duty of the insurer to defend the litigation against its insured." [35] The insurer's duty to defend may be broader than its duty to indemnify, and the duty to defend "arises when there is a possibility that the injury or damage may fall within the policy coverage." [36] Any doubt as to whether the pleadings state a claim that falls within the policy coverage must be resolved in favor **[*14]** or the insured. [37]

The language in an insurance policy must be construed in its "plain, ordinary, and popular sense." [38] Where the policy language is unambiguous, and there is only one reasonable interpretation of the language, the courts "give effect to the plain language of the policy without resorting to the rules of construction." [39] If policy language is ambiguous, the language of the policy is construed strictly against the insurer. [40] Once it is determined that there is coverage under a policy, then the court analyzes whether any exclusion precludes

---

[33] *Murphy Oil United States v. Unigard Sec. Ins. Co., 347 Ark. 167, 175-76, 61 S.W.3d 807 (2001).*

[34] *Mattson v. St. Paul Title Co. of the South, 277 Ark. 290, 292, 641 S.W.2d 16 (1982).*

[35] *Proctor Seed & Feed Co. v. Hartford Acci. & Indem. Co., 253 Ark. 1105, 1108, 491 S.W.2d 62 (1973).*

[36] *Murphy Oil, 347 Ark. at 176.*

[37] *Id. at 178.*

[38] *Deschner v. State Farm Mut. Auto. Ins. Co., 375 Ark. 281, 284, 290 S.W.3d 6 (2008).*

[39] *Id.*

[40] *Id.*

coverage. [41]

## A. Management Practices Act

Defendant had no duty to defend in the Underlying Lawsuit because, based on the definition of a Management Practices Act, the Policy does not cover dual capacity claims.

The definition of a Management Practices Act is unambiguous. First, **[*15]** the definition sets out what a Management Practices Act is. Then the definition describes what a Management Practices Act is not. As set out above, a Management Practices Act does not include conduct allegedly committed by an Insured Person in his capacity as a director "of any entity other than the Company" -- even when the conduct as a director of the other entity is "part of the duties regularly assigned to the Insured Person by the Company. . . ." [42]

The following example illustrates why a dual capacity claim does not fall under the definition of a Management Practices Act.

An insurance company issues a policy identical to the one in this case to Company A. John Doe is a director in Company A. As part of his duties as director in Company A, John Doe is also a director in Company B. John Doe is sued in his capacity as a director in Company B. Because John Doe is a director in Company B as required by his duties as director in Company A, John Doe is necessarily acting in his capacity as a director in Company A -- and thus, he is acting as an Insured Person, but the Policy precludes coverage in this dual capacity scenario. Under the definition of a Management **[*16]** Practices Act, a Claim against John Doe as director of Company B would not be a covered Claim, and the Insurance Company would have no duty to defend. The Allocation Clause, which addresses Loss with respect to covered and uncovered matters within a covered Claim, would not come into play because the Claim against John Doe as director of Company B does not trigger coverage. The definition of a Management Practices Act, Claim, and the Allocation Clause, are consistent.

If actions taken in a dual capacity mandated by an insured company are not a Management Practices Act,

---

[41] *Id.*

[42] Policy at page 5 of 17.

it would be inconsistent with the terms of the Policy to find that actions taken in a voluntary dual capacity are a Management Practices Act. Because Yocum, Baxter, and the Pughs were acting in a dual capacity, their actions did not qualify as a Management Practices Act and Defendant had no duty to defend.

## B. Capacity in Which the Directors Were Sued

Defendant had no duty to defend because there was no possibility of liability under the Policy. In *Allstate Insurance Company v. Continental Casualty Company,* [43] an unpublished case, no allegation identified any party in his insured capacity. [44] The Arkansas Court of Appeals **[*17]** noted that "from the allegations in the complaints it is difficult to ascertain with any certainty whether they give rise to a possibility of coverage, due in part to the conspicuous absence in the complaints of any facts concerning the employment relationships of the parties." [45] The court found that even considering what the insurance companies knew about the employment relationships, exclusions applied that negated the possibility of coverage. [46]

In *Bowie v. Home Ins. Co.,* [47] the Ninth Circuit Court **[*18]** of Appeals found an insurance company had no duty to defend where the defendant was not sued in his insured capacity. The Ninth Circuit pointed out that "no court has said that an insurer must defend an insured *not yet named* in an insured capacity as a defendant in a suit, even though a complaint could be so amended,"

while noting that "if the facts discovered indicate that the complaint was really intended to sue the defendants in their insured capacities, but by inadvertence referred to them in uninsured capacities, a different result might ensue." [49] Other courts that have reached the same result. [50]

In the Underlying Complaint, Seacat is not named as a defendant, and neither Yocum, Baxter, nor the Pughs are identified as directors of Seacat. Because the Underlying Complaint was drafted to omit reference to Seacat, there is no chance that the omission was inadvertent. Coverage was not triggered under the Policy because there was no possibility for coverage under the Policy.

Because there was no duty to defend, Defendant has no duty to reimburse Plaintiff Farm Bureau Mutual Insurance Company of Arkansas, Inc. for any defense costs.

## C. Dual Capacity and the Alleged Wrongful Conduct

Defendant's duty to defend was not triggered in the Underlying Lawsuit because Plaintiffs' actions as directors of Catfish Producers and Seacat were inextricably intertwined. In *Continental Casualty Company v Adams,* [51] a dual capacity case in which the court found no duty to defend, the court analyzed the nature of the allegations in the complaint, and found that "[t]he claim against [the defendants] in their capacities as officers and directors of [two companies] are inextricably intertwined . . . ." [52] Because the actions of

---

[43] *No 92-652, 1993 Ark. App. LEXIS 276 (Ark. App. May 5, 1993).*

[44] *1993 Ark. App. LEXIS 276 at *9.*

[45] *1993 Ark. App. LEXIS 276 at *9.*

[46] *Id.* But see *Homebank of Arkansas v. Kansas Bankers Surety Company, No. 4:06-CV-01670-SWW, 2008 U.S. Dist. LEXIS 51767 (E.D. Ark. July 7, 2008).* In *Homebank,* a defendant in an underlying lawsuit was not sued in his insured capacity. But ,the court found that the underlying counterclaim made allegations against the defendant as an insured because, among other reasons, the underlying counterclaim contained references to the defendant in his insured capacity and the insured company was named as a defendant in the underlying action. The *Homebank* court found that the insurance company had a duty to defend.

[47] *923 F.2d 705 (9th Cir. 1991).*

[48] *Id. at 709* (emphasis in original).

[49] *Id. at n.3.*

[50] See *United States Fidelity and Guaranty Company v. Frosty Bites, Inc. 350 F. Supp. 2d 508 (S.D.N.Y. 2004)* (Because there were no allegations that suggested potential liability on the part of the defendant arising out of his duties as an insured director, the insurance company had no duty to defend.); *Goerner v. Axis Reinsurance Company, No. CV 07-0166-GHW(MLGx), 2009 U.S. Dist. LEXIS 14067 (C.D. Cal. Feb. 23, 2009)* (no duty to defend because the underlying plaintiff did not seek to impose liability on **[*19]** the defendant in his capacity as an officer or director of the insured company).

[51] *No. 3: CV-02-1122, 2003 U.S. Dist. LEXIS 16434 (M.D. Pa. Sept. 12, 2003).*

[52] *Id. at *32.*

2010 U.S. Dist. LEXIS 52814, *19

[*20] the defendants as directors or officers in two companies were inextricably intertwined, the court found there was no duty to defend.

In *FSLIC v. Mmahat,* [53] a dual capacity case, the district court found that "Mmahat's dishonesty as director was an integral part of his dishonesty as a lawyer." [54] The court found that Mmahat would not have been able to accomplish his wrongful conduct but for his capacity as both a corporate director and a corporate lawyer, and found that the insurance company had no duty to defend.

In *McAninch v. Wintermute,* [55] the Eighth Circuit Court of Appeals discussed *Mmahat.* Wintermute was indicted for actions allegedly taken as a "director, owner, and otherwise in any capacity" in an insured company. The insurer argued it had no duty to defend Wintermute because she was acting in multiple capacities, but offered no explanation as to how Wintermute's dual status facilitated any wrongdoing. The Eighth Circuit concluded that "an insurer may not avoid its duty to indemnify for alleged wrongful conduct merely [*21] by arguing the director was also an owner, shareholder, etc., without some explanation as to how this dual capacity related to or facilitated the wrongful conduct alleged." [56] The Eighth Circuit distinguished *McAninch* from *Mmahat* based on the "but for the dual role" aspect, because there was no explanation in *McAninch* as to how Wintermute's dual capacity facilitated wrongdoing.

If the Underlying Complaint alleges fraudulent actions by Plaintiffs as directors of Seacat, Plaintiffs could not have taken the alleged fraudulent actions but for their positions as directors of Catfish Producers. Even if the Policy does allow for dual capacity claims, Defendant had no duty to defend because Plaintiffs' actions as directors of Catfish Producers and as directors of Seacat were inextricably intertwined.

In 2001, Plaintiffs were directors of both Catfish Producers and Farm Fresh Catfish, and they owned membership interests in both companies. Farm Fresh

Catfish was allegedly in financial dire straights when Plaintiffs caused FFP to be formed. Yocum, Baxter, and the Pughs allegedly made misrepresentations to entice investment through FFP. The Underlying [*22] Complaint cited the combined minutes of the boards of directors of Catfish Producers and Farm Fresh Catfish extensively to show that Yocum, Baxter, and the Pughs knew Farm Fresh Catfish's financial status was grim.

In 2002, Farm Fresh Catfish sold its assets to Seacat, and Seacat assumed Farm Fresh Catfish's debt (which had been personally guaranteed by Plaintiffs.) Allegedly, Yocum, Baxter, and the Pughs continued to prevent the plaintiffs in the Underlying Lawsuit from learning of Farm Fresh Catfish's actual financial situation. Under these specific circumstances, Plaintiffs could not have engaged in misconduct as Seacat directors without acting as directors for and in the interest of Catfish Producers.

## CONCLUSION

Based on the findings of fact and conclusions of law above, Defendant's Motion for Summary Judgment (Doc. No. 51) is GRANTED. Plaintiffs' Motions for Partial Summary Judgment (Doc. Nos. 27, 29) are DENIED, and Defendant's Motion to Strike (Doc. No. 33) is DENIED.

IT IS SO ORDERED this 27th day of May, 2010.

/s/ Wm. R. Wilson, Jr.

UNITED STATES DISTRICT JUDGE

---

---

[53] *No. 86-5160, 97 B.R. 293, 1988 U.S. Dist. LEXIS 15740 (E.D. La. Dec. 1988)*.

[54] *Id. at *9*.

[55] *491 F.3d 759 (8th Cir. 2007)*.

[56] *Id. at 772*.



**User Name:** Joe Grady
**Date and Time:** Thursday, November 21, 2024 12:52:00□ PM EST
**Job Number:** 239207246

## Document (1)

1. *Maui Land & Pineapple Co. v. Liberty Ins. Underwriters Inc., 2018 U.S. Dist. LEXIS 56949*
   **Client/Matter:** 21047.24000
   **Search Terms:** Maui Land & Pineapple Co. v. Liberty Ins. Underwriters Inc., 2018 U.S. Dist. LEXIS 56949 (D. Haw. April 3, 2018)
   **Search Type:** Natural Language
   **Narrowed by:**

| Content Type | Narrowed by |
| --- | --- |
| Cases | -None- |

 Neutral
As of: November 21, 2024 5:52 PM Z

## *Maui Land & Pineapple Co. v. Liberty Ins. Underwriters Inc.*

United States District Court for the District of Hawaii

April 3, 2018, Decided; April 3, 2018, Filed

CIV. NO. 16-00271 DKW-KJM

**Reporter**
2018 U.S. Dist. LEXIS 56949 *; 2018 WL 1613777

MAUI LAND & PINEAPPLE CO., INC., Plaintiff, vs. LIBERTY INSURANCE UNDERWRITERS INC., A NEW YORK CORPORATION; JOHN DOES 1-20, JANE DOES 1-20, DOE ENTITIES 1-20, DOE INSURANCE ENTITIES 1-20, Defendants.

**Prior History:** *Maui Land & Pineapple Co. v. Liberty Ins. Underwriters Inc., 2016 U.S. Dist. LEXIS 156631 (D. Haw., Aug. 17, 2016)*

## Core Terms

Insured, Lawsuit, coverage, defense costs, Developer, omissions, entity, Subsidiary, duty to defend, Purchaser, fiduciary duty, allegations, obligations, triggering, summary judgment, misrepresentations, Indemnification, condominium, Holdings, ownership, holder, summary judgment motion, indemnify, nonmoving, qualifies, insurance policy, material fact, policy period, expenses, asserts

**Counsel: [*1]** For Maui Land & Pineapple Co., Inc., Plaintiff: Aaron L. Loeser, Alan Van Etten, Tristan S.D. Andres, LEAD ATTORNEYS, Deeley King Pang & Van Etten, LLLP, Honolulu, HI.

For Liberty Insurance Underwriters Inc., a New York Corporation, Defendant: James Michael Young, Michael R. Goodstein, Sabrina Haurin, LEAD ATTORNEY, PRO HAC VICE, Bailey Cavalieri LLC, Columbus, OH; Joseph F. Kotowski, III, Patricia K. Wall, Richard B. Miller, LEAD ATTORNEY, Tom Petrus & Miller LLLC, Honolulu, HI.

**Judges:** Derrick K. Watson, United States District Judge.

**Opinion by:** Derrick K. Watson

## Opinion

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT LIBERTY INSURANCE UNDERWRITERS' MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF MAUI LAND & PINEAPPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This insurance coverage dispute arises out of a residential development project located in West Maui, funded and controlled, in part, by Plaintiff Maui Land & Pineapple Company ("MLP"). Before the Court are (1) MLP's Motion for Partial Summary Judgment ("MPSJ") on both its Complaint for Declaratory Judgment and on Defendant Liberty Insurance Underwriter's Counterclaim for the same; and (2) Liberty's Motion for Summary Judgment ("MSJ") on its Counterclaim for the **[*2]** same (collectively "Cross-MSJs"). For the reasons set forth below, Liberty's MSJ (Dkt. No. 62) and MLP's MPSJ (Dkt. No. 64) are GRANTED IN PART AND DENIED IN PART.

### BACKGROUND

#### I. Underlying Lawsuit

On June 7, 2012, a group of litigants ("Underlying Plaintiffs") commenced an action against twenty-two defendants—including MLP and Ryan L. Churchill—in the Circuit Court of the Second Circuit, State of Hawai'i, *Narayan, et. al. v. Marriott Int'l, Inc., et al.*, Civil No. 12-1-0586(3) ("Underlying Lawsuit"). The Underlying Lawsuit concerns a residential development project formerly known as The Ritz-Carlton Club & Residences in Kapalua Bay, Maui, Hawaii (the "Project"). *See* Esaki Decl., Ex. A [Second Am. Compl. in Underlying Lawsuit] ¶ 1, Dkt. No. 65-2 [hereinafter Underlying SAC].

According to the Underlying Plaintiffs, MLP "directly or

2018 U.S. Dist. LEXIS 56949, *2

indirectly through wholly owned subsidiaries exerts control" over defendant in the Underlying Lawsuit, Kapalua Bay, LLC (Underlying SAC ¶ 26(d)), which is a "Delaware limited liability company" ("LLC") that was "created by a joint venture between Marriott International, Inc. ([which has a] 34% [joint-venture interest]), MLP (51%), and Exclusive Resorts, LLC (15%)" **[*3]** (Underlying SAC ¶ 20). "Kapalua Bay is 'member driven' in that no major decision can be made without both Marriott and [MLP]'s agreement and/or consent." Underlying SAC ¶ 20, Dkt. No. 65-2. MLP "exerts control" in a variety of ways, including via Churchill, who is "a senior executive officer of [MLP], President of Kapalua Bay, an officer of Kapalua Bay Holdings, the 'point person' for the Joint Venture, and an executive officer of Kapalua Realty" who " participated in all aspects of the Project, including financing, development, construction, pricing, marketing and sales and was one of [MLP]'s two representatives" on the Association of Apartment Owners of Kapalua Bay Condominium ("AOAO") Board. Underlying SAC ¶¶ 26(d), 38.

In their Second Amended Complaint filed June 13, 2013, Underlying Plaintiffs bring nine Counts against the defendants in the Underlying Lawsuit, including: (i) "Breach of Fiduciary Duty (Against All Defendants)" (Underlying SAC ¶¶ 96-99, Dkt. No. 65-2); (ii) "Access to Books and Records of the Association (Against All Defendants)" (*id.* ¶¶ 100-01); (iii) "Injunctive/Declaratory Relief (Against All Defendants)" (*id.* ¶¶ 102-03); (iv) "Unfair and Deceptive Acts and Practices **[*4]** (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 104-07); (v) "Intentional Misrepresentation and/or Concealment (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 108-14); (vi) "Negligent Misrepresentation and/or Concealment (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 115-21); (vii) for "Violations of Hawaii Condominium Statute—[Hawai'i Revised Statutes ('HRS')] Chapter 514B, or, to the extent applicable, HRS Chapter 514A (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 122-24); (viii) "Unjust Enrichment (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 125-30); and (ix) "Civil Conspiracy (By All Purchaser Plaintiffs, Against All Developer Defendants)" (*id.* ¶¶ 131-33). The "Developer Defendants" include MLP, Kapalua Bay, and other entities, but do not include individuals like Churchill. *See* Underlying SAC ¶ 32, Dkt. No. 65-2.

In the allegations supporting the claim for breach of fiduciary duty, the Underlying Plaintiffs assert the following:

92. Inasmuch as every past and present director on the AOAO Board is employed by and/or is an agent for the joint venture entities **[*5]** that control and hold the beneficial interests in Kapalua Bay, each has conflicts of interest. Consequently, these directors have not reasonably exercised the fiduciary duties that they owe to Plaintiffs and other owners, and must be precluded from taking any action regarding the management of the Project or the expenditure of Association funds except to the specific extent agreed to by Plaintiffs. The Plaintiffs and other independent owners must be allowed to access the information held by the Board to meaningfully participate in the Board's deliberations and actions.

93. The conflicted directors and managing Agent have already breached their fiduciary duties to the Association and to the owners by, *inter alia*, failing to timely inform Plaintiffs or to otherwise take action regarding the dire financial condition of the Project, failing to take any action to compel the joint venture to make the payments owed by Kapalua Bay, failing to stop MVW/MORI and/or Marriott from stripping funds out of the Association's accounts, intentionally keeping the owners in the dark regarding the current situation, failing to adequately respond to the owners' requests for information, and failing to exercise **[*6]** oversight duties with respect to the operation of the Project and the cost thereof, particularly since Marriott's management fee was 10% of the total cost to run the Project thereby incentivizing Marriott *et al* to make the Project operations as expensive as possible.

. . . .

97. Defendants owe fiduciary duties, including duties of utmost good faith, loyalty, full disclosure, and care to Plaintiffs. By their acts and omissions, both directly, through their respective affiliated entities, and through the representatives that served as directors on the Board, Defendants have breached these duties, consistently failing to act in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that one would reasonably believe to be in the best interests of the Association and Plaintiffs.

Underlying SAC ¶¶ 92, 93, 97, Dkt. No. 65-2. Several allegations in the Underlying SAC also name Churchill individually and describe his alleged material

misrepresentations to Underlying Plaintiffs regarding the Project's financing. *E.g.*, Underlying SAC ¶¶ 62 ("Churchill . . . misrepresented to prospective purchasers that Ritz-Carlton [*7] and Marriott were fully committed to the Project."); 65 ("The Statements made by Mr. Churchill . . . regarding the strength of the Developer and the commitment of the [joint venture] partners were false and deceptive."); 66 (discussing Churchill's specific misrepresentations to, and material omissions from, an Underlying Plaintiff in 2009); 67 (describing Churchill's misrepresentations, as part of the "Ritz-Carlton sales staff," in connection with an Underlying Plaintiff's purchase of a unit at the Project); 68 (alleging misrepresentations and material omissions based on conversations with Churchill and another "between the end of 2010 and the close of [the Underlying Plaintiff's] purchase in August of 2011"); 69 (describing alleged misrepresentations stemming from discussions with Churchill and others prior to the closing of an Underlying Plaintiff's unit in May 2010). Underlying Plaintiffs also allege that the AOAO Board was itself wrongful in failing to engage in effective financial oversight of the Project. Underlying SAC ¶ 82, Dkt. No. 65-2.

After years of litigation—including appeals reaching the Supreme Court of the United States—the Hawai'i Supreme Court affirmed the denial [*8] of a motion to compel arbitration by defendants in the Underlying Lawsuit and "remand[ed] the case to the circuit court for further proceedings" on July 14, 2017. *Narayan v. The Ritz-Carlton Dev. Co., Inc., 140 Haw. 343, 400 P.3d 544, 547*, *recon. denied*, 140 Haw. 380, 400 P.3d 581 (Haw. 2017), and *cert. denied*, 138 S. Ct. 982, 200 L. Ed. 2d 248 (2018).

## II. Contracts & Insurance Documents

The Cross-MSJs before the Court implicate the parties' various insurance and other agreements, the relevant portions of which are described below.

### MLP-Churchill Indemnification Agreement

On August 3, 2009, MLP entered into an Indemnification Agreement (Dkt. No. 65-8) with its then-"officer and/or director" Churchill. Section 2 of the Indemnification Agreement obligates MLP to indemnify Churchill for costs "actually and reasonably incurred by [Churchill] in connection with a Proceeding . . . if [Churchill] acted in good faith and in a manner [Churchill] reasonably

believed to be in or not opposed to the best interests of [MLP][.]" Indemnification Agreement § 2(a), Dkt. No. 65-8 at 2. "[MLP] shall not be obliged" under the agreement, however, "[t]o indemnify [Churchill] for Expenses or liabilities of any type whatsoever . . . which have been paid directly to or on behalf of [Churchill] by an insurance carrier under a policy of directors' and officers' liability insurance [*9] maintained by [MLP] . . . ." Indemnification Agreement § 3(d), Dkt. No. 65-8 at 3. MLP is also obligated to "use its best efforts to obtain and maintain, or have an affiliate obtain and maintain, in full force and effect directors' and officers' liability insurance . . . which provides [Churchill] the same rights and benefits as are accorded to the most favorably insured of [MLP]'s directors." Indemnification Agreement § 8(a), Dkt. No. 65-8 at 3. The insurance policy described below is MLP's effort to fulfill this obligation.

### Liberty-MLP Executive Advantage Policy

Liberty issued an Executive Advantage insurance policy to Churchill and MLP, Policy No. DOSF-190257-210 (the "Policy"), that spans the policy period from September 1, 2011 to September 1, 2012. *See* Policy, Dkt. Nos. 10-4 at 1-21 (Part 1), 10-5 at 1-21 (Part 2). The Policy generally obligates Liberty to provide coverage to "Insured Persons" for "all Loss which they shall become legally obligated to pay as a result of a Claim" and to "Insured Organizations" for "all Loss which it is permitted or required by law to indemnify the Insured Persons as a result of a Claim" so long as the claim is "first made during the Policy Period . . . against [*10] the Insured Persons for a Wrongful Act which takes place before or during the Policy Period[.]" Policy §§ 1.1 (Insured Persons), 1.2 (Insured Organizations), *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 2. The Policy also provides MLP with coverage for its own wrongful conduct occurring "as a result of a Securities Action." Policy § 1.3, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 2-3.

With respect to the costs of defending against a legal action, the Policy provides both that "[i]t shall be the duty of the Insureds, not [Liberty], to defend any Claim" (Policy § 3.1, Dkt. No. 10-5 at 3), and that Liberty "shall not be liable for any Defense Costs incurred or any admissions, obligations, agreements, or settlements made by the Insureds without [Liberty]'s prior written consent" (Policy § 3.2, Dkt. No. 10-5 at 3). Moreover, "[Liberty] shall . . . advance on a current basis covered Defense Costs incurred by the Insureds" (Policy § 3.3, Dkt. No. 10-5 at 3), and "Insured Organizations agree to

indemnify the Insured Persons and/or advance Defense costs to the fullest extent permitted or required by law" (Policy § 11.2, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 7 (stating further that "If [Liberty] pays **[*11]** under this Policy any indemnification or advancement owed to any Insured Person by an Insured Organization within the applicable Retention, then that Insured Organization shall reimburse [Liberty] for such amounts and such amounts shall become immediately due and payable as a direct obligation of the Insured Organization to the Insurer")). *Defense Costs* are "reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a Claim and cost of attachment or similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers, or employees of the Insured Organization[.]" Policy § 25.4(a), *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 9.

Under "Exclusions," the Policy specifies that coverage does not include "any error, misstatement, misleading statement, act, omission, neglect or breach of duty by any Subsidiary or such Subsidiary's Insured Persons if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a Subsidiary." Policy § 5.2, Dkt. No. 10-4 at 5. The Policy also excludes coverage for any Loss **[*12]** "based upon, arising from, or in any way related to an Insured Person serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the Insured Organization[.]" Policy § 5.8, Dkt. No. 10-4 at 6 [hereinafter Outside Service Exclusion]. Coverage for losses "based upon, arising from, or in any way related to any deliberately fraudulent act or omission or any willful violation of law by any Insured if a final judgment or other final adjudication in the underlying action against Insured establishes such an act, omission, or willful violation" is also excluded. Policy § 5.10, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 5.

And with regard to "Allocation," the Policy specifies that where "a Claim gives rise to Loss covered under this Policy and loss not covered under this Policy, either because a Claim includes both covered and uncovered matters or both covered and uncovered parties," Liberty and the Insureds will "use their best efforts to determine a fair and appropriate allocation" of funds. Policy § 13.1, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 7. "If there can be no agreement between [Liberty] and the Insured as to the amount **[*13]** of Defense Costs to be advanced in connection with any such Claim, [Liberty] shall advance Defense Costs which it reasonably believes to be covered under this Policy until a different allocation is negotiated or determined." Policy § 13.2, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 7.

### III. Procedural Background

MLP initiated the instant lawsuit in the Circuit Court of the Second Circuit, State of Hawai'i, on May 6, 2016. *See* Notice of Removal, Ex. 1 [Compl. for Declaratory J.] at 2-6, Dkt. No. 1-1. Liberty removed the case to this Court on May 31, 2016 (Dkt. No. 1) and filed its Answer to MLP's claims on June 7, 2016 (Dkt. No. 6).[1]

The parties filed their Cross-MSJs on October 11, 2017. Liberty MSJ, Dkt. No. 62; MLP MPSJ, Dkt. No. 64. Liberty seeks summary judgment against MLP arguing that the Policy does not entitle MLP to coverage in the Underlying Lawsuit. Liberty MSJ, Dkt. No. 62. Liberty principally asserts that because the Underlying Plaintiffs have sued Churchill for breaching duties owed *in Churchill's capacity as director of the AOAO*, rather than in his capacity as an officer of MLP, the Outside Service Exclusion is triggered. *See* Liberty Mem. in Supp. of MSJ at 10-13, 17-23, **[*14]** Dkt. No. 62-3. Liberty additionally contends that because Underlying Plaintiffs are condominium owners/purchasers, rather than shareholders to whom certain securities-based fiduciary duties would be owed, the Underlying Lawsuit is not a "Securities Action" for which the Policy provides coverage to MLP. *See* Liberty Mem. in Supp. at 16-17, Dkt. No. 62-3. In MLP's MPSJ (Dkt. No. 64), MLP seeks advanced defense costs and a declaration of indemnity regarding the Underlying Lawsuit. In support, MLP asserts that it has "a prima facie claim that the Underlying Lawsuit is covered by the Policy" and "leaves Liberty to its proof as to any policy exclusions" that may apply. MLP Mem. in Supp. of MPSJ at 14, Dkt. No. 64-1.

This Court heard oral argument on the Cross-MSJs on December 15, 2017 (*see* EP, Dkt. No. 75) and took matters under advisement. The instant disposition follows.

---

[1] MLP moved to remand the case on June 29, 2016. Mot. to Remand, Dkt. No. 10. But on August 17, 2016, the Magistrate Judge issued its Findings and Recommendation to Deny Plaintiff's Motion to Remand ("F&R"; Dkt. No. 18), which this Court adopted over MLP's objection (Dkt. No. 22) on November 10, 2016 (Order Adopting F&R, Dkt. No. 25).

2018 U.S. Dist. LEXIS 56949, *14

## LEGAL STANDARDS

### I. Summary Judgment

Pursuant to *Federal Rule of Civil Procedure ("FRCP") 56(a)*, a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is entitled to judgment as a matter **[*15]** of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000)* (citing *High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990)).*

Once the moving party has satisfied its initial burden of production, the burden shifts to the party opposing summary judgment "to demonstrate the existence of a genuine dispute."[2]*Kowalski v. Mommy Gina Tuna Res., 574 F. Supp. 2d 1160, 1162 (D. Haw. 2008)* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).* To meet this burden, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts" and instead must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec., 475 U.S. at 586-87* (citations and internal quotation marks omitted). At least some "significant probative evidence tending to support the complaint" must be produced. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)* (quoting *First Nat'l*

---

[2] "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins., 210 F.3d at 1102-03* (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 160, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*; *High Tech Gays, 895 F.2d at 574*; A. Friedenthal, A. Miller, & M. Kane, Civil Procedure 460 (3d ed. 1999)).

*Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968))*; *see also Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000)* ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). **[*16]** For, if no evidence can be mustered to sustain the nonmoving party's position, a trial would be useless. *See Kahumoku v. Titan Mar., LLC, 486 F. Supp. 2d 1144, 1150 (D. Haw. 2007)* (explaining that one of the primary purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses") (quoting *Celotex, 477 U.S. at 323-24 (1986))*; *see also Addisu, 198 F.3d at 1134* ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

Furthermore, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)* (quoting *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)* (per curiam)). Nevertheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id. at 380*.

### II. Insurance Contracts

Insurance policies are a form of contract and subject to the general rules of contract construction. As such, their terms must be interpreted according to their ordinary, commonly accepted meaning, unless it appears from the language of the policies that a different meaning is intended. *C. Brewer & Co. v. Marine Indem. Ins. Co. of Am., 135 Haw. 190, 347 P.3d 163, 169 (Haw. 2015)* (quoting *Dairy Rd. Partners v. Island Ins. Co., 92 Haw. 398, 992 P.2d 93, 106 (Haw. 2000))*; *accord* **[*17]** *Dawes v. First Ins. Co. of Haw., 77 Haw. 117, 883 P.2d 38, 42 (Haw. 1994)*.

Courts in Hawai'i construe insurance policies "liberally in favor of the insured and the ambiguities [are] resolved against the insurer." *Fortune v. Wong, 68 Haw. 1, 702 P.2d 299, 305 (Haw. 1985)* (quoting *Masaki v. Columbia Cas. Co., 48 Haw. 136, 395 P.2d 927, 929 (Haw. 1964))* (additional citations omitted). Moreover, "any ambiguity in an exclusionary clause is construed in favor of the insured and 'strictly construed against the insurer.'" *C.*

*Brewer & Co., 347 P.3d at 169* (quoting *Retherford v. Kama, 52 Haw. 91, 470 P.2d 517 (1970))*. Nonetheless, the Hawai'i Supreme Court has clearly explained that the construction of ambiguities against an insurer does not come into play merely because the insured party alleges ambiguity, nor does it come into play simply because the parties to the dispute disagree about the underlying policy's terms. *See Oahu Transit Servs., Inc. v. Northfield Ins. Co., 107 Haw. 231, 112 P.3d 717, 722 n.7 (Haw. 2005)* (citing *Hawaiian Ins. & Guar. Co., Ltd. v. Chief Clerk, 68 Haw. 336, 713 P.2d 427, 431 (Haw. 1986))*. Rather, "[a]mbiguity exists and the rule is followed only when the [underlying insurance policy], taken as a whole, is reasonably subject to differing interpretation." *Id.*

With these basic principles in mind, the Court turns first to the merits of Liberty's MSJ (Dkt. No. 62) and then to MLP's MPSJ (Dkt. No. 64).

## DISCUSSION

### I. Churchill Coverage

The Court first ascertains whether the Policy provides for the defense of claims against Churchill in the Underlying Lawsuit. It does.

#### A. Standard for the Duty to Advance Defense Costs Under the Policy

According **[*18]** to Liberty, its duty to advance defense costs under the Policy "requires that the insured 'establish that the underlying claims are within the basic scope of coverage,'" and because MLP has not established such coverage, the defense-costs duty has not been triggered. *See* Liberty Reply at 10, Dkt. No. 73-1 (quoting *Jeff Tracy, Inc v. United States Specialty Ins. Co., 636 F. Supp. 2d 995, 1004 (C.D. Cal. 2009))*. MLP, on the other hand, asserts that the general standard for triggering the legal duty to defend is the same as the standard to trigger the duty to advance costs under the Policy—potentiality. MLP Mem. in Supp. at 12-14, Dkt. No. 64-1; MLP Reply at 1-8, Dkt. No. 72. And potentiality is evident from the Underlying SAC.

A "duty to defend" under an insurance contract "rests primarily on the *possibility* that coverage exists." *Dairy Rd., 992 P.2d at 107* (emphasis added) (quoting *Sentinel Ins. Co., Ltd. v. First Ins. of Haw., Ltd., 76 Haw. 277, 875 P.2d 894, 904 (Haw. 1994))*. "When an insurer has a duty to defend, the 'insurer must defend its

insured against claims that create a *potential* for indemnity under the policy." *Legacy Partners, Inc. v. Clarendon Am. Ins. Co., 2010 U.S. Dist. LEXIS 36966, 2010 WL 1495198, *4 (S.D. Cal. Apr. 14, 2010)* (quoting *Scottsdale Ins. Co. v. MV Transp., 36 Cal. 4th 643, 31 Cal. Rptr. 3d 147, 115 P.3d 460, 466 (Cal. 2005))*; *see also Standard Oil Co. of Cal. v. Hawaiian Ins. & Guar. Co., Ltd., 65 Haw. 521, 654 P.2d 1345, 1349 (Haw. 1982)* ("The possibility may be remote[,] but if it exists[,] the [insurer] owes the insured a defense." (quoting another source)). An insurer's duty to defend thus extends beyond claims where liability within the scope of the policy is ultimately found. *See Finley v. Home Ins. Co., 90 Haw. 25, 975 P.2d 1145, 1149-50 (Haw. 1998)* ("Where **[*19]** a complaint alleges grounds that are both within and without the scope of insurance coverage, the insurer is required to defend the entire action.") (citing *First Ins. Co. of Haw., Inc. v. State of Haw., 66 Haw. 413, 665 P.2d 648, 652 (1983))*.[3] *Cf. Nautilus Ins. Co. v. Lexington Ins. Co., 132 Haw. 283, 321 P.3d 634, 644 (Haw. 2014)* ("When it comes to the duty to defend, a heavy burden is placed on the insurer if that insurer wishes to disclaim its duty.").

Contrary to Liberty's contention, the Court finds that Ninth Circuit precedent supports application of the potentiality standard for the duty to defend to similar insurance policies that impose a duty to reimburse defense costs on insurers. *See, e.g., Braden Partners, LP v. Twin City Fire Ins. Co., 2016 U.S. Dist. LEXIS 180958, 2017 WL 63019, *9-10 (N.D. Cal. Jan. 5, 2017)* (collecting cases in support). Indeed, "[a]n insurer may have a duty to advance defense costs even if it does not have a duty to defend the insured against an underlying claim." *2016 U.S. Dist. LEXIS 180958, 2017 WL 63019 at *10* (citing *Gon v. First State Ins. Co., 871 F.2d 863, 867-68 (9th Cir. 1989)* (explaining that, although the insurer did not have a duty to defend under the policy, it nonetheless had a "duty . . . to pay defense expenses as incurred" under the policy's general indemnification provision, which "cover[ed] legal expenses as a loss item"); and *Okada v. MGIC Indem. Corp., 823 F.2d 276,*

---

[3] The policy rationale for this rule is simple—an insurer who will not defend the entire action would have a conflict of interest with the insured in the underlying action "because the insurer may be more concerned with developing facts showing non-coverage than facts defeating liability." *Finley, 975 P.2d at 1150* (quoting Douglas Richmond, *Lost in the Eternal Triangle of Ins. Defense Ethics*, 9 Geo. J. Legal Ethics 475, 486 (1996)) (citing *Rockwell Internat. Corp. v. Superior Court, 26 Cal. App. 4th 1255, 32 Cal. Rptr. 2d 153, 158 (Ct. App. 1994))*.

2018 U.S. Dist. LEXIS 56949, *19

279-82 (9th Cir. 1986) (holding that the insurer had a duty to pay defense costs as they were incurred because "[t]he costs of the 'defense of legal actions' [were] included in [*20] the definition of 'Loss' [in the policy]")). Indeed, "the duty to advance defense costs would be illusory if the insured had to wait for a determination of actual coverage to obtain the necessary funding for its defense." Braden Partners, 2016 U.S. Dist. LEXIS 180958, 2017 WL 63019 at *11 (citing Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 54 Cal. Rptr. 104, 419 P.2d 168, 173 (Cal. 1966)).

Courts have held that "the duty to advance defense costs, like the duty to defend, extend[s] to potentially covered claims" where the policy at issue includes "the word 'alleged' when defining the scope of the insurer's duty to advance defense costs[.]" Braden Partners, 2016 U.S. Dist. LEXIS 180958, 2017 WL 63019 at *9-10 (explaining that where "the policy require[d] [the insurer] to advance costs incurred defending against 'alleged' wrongdoing," a mere "potential [for] coverage" is sufficient to trigger the duty"); see also, e.g., Legacy Partners, 2010 U.S. Dist. LEXIS 36966, 2010 WL 1495198 at *4-5 (explaining that "[t]he [p]olicy's use of the word 'alleged'. . . [was] critical" to the court's analysis because "[a]llegations, by their nature, are not facts," but they "have the potential to become facts")); cf., Petersen v. Columbia Cas. Co., 2012 U.S. Dist. LEXIS 120033, 2012 WL 5316352, *10 (C.D. Cal. Aug. 21, 2012) (finding no duty to advance defense costs where the policy at issue did "not compel unconditioned payment of expenses in the manner of those in Legacy Partners and Olympic Club [v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497 (9th Cir. 1993)] (not directly addressing the duty-to-advance issue)] and does not reference 'alleged' damages").[4]

Here, [*21] the Policy does just that.

The Policy generally obligates Liberty to provide coverage to "Insured Persons" for "all Loss which they shall become legally obligated to pay as a result of a Claim," and to "Insured Organizations" for "all Loss which it is permitted or required by law to indemnify the Insured Persons as a result of a Claim" so long as the claim is "first made during the Policy Period . . . against the Insured Persons for a Wrongful Act which takes place before or during the Policy Period[.]" Policy §§ 1.1 (Insured Persons) & 1.2 (Insured Organizations), as amended by Endorsement No. 9, Dkt. No. 10-5 at 2. A Wrongful Act is defined under the Policy as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, actually or allegedly committed or attempted by the Insured Persons in their capacities as such or in an Outside Position . . . ." Policy § 25.20(a), as amended by Endorsement No. 4, Dkt. No. 10-4 at 18.

Particularly in light of the liberal public policy resolving doubts regarding the duty to defend against insurers like Liberty, Sentinel, 875 P.2d at 904 (citing Trizec Props., Inc. v. Biltmore Constr. Co., 767 F.2d 810, 812 (11th Cir. 1985)), the Court holds that the standard for triggering the duty to defend under [*22] the Policy is the same as the standard for triggering the duty to advance costs—potentiality.[5]

B. The Underlying Lawsuit Raises the "Potentiality" of Coverage for Churchill Under the Policy

_____

general liability policy, D & O policies are not written on a 'duty to defend' basis" but rather "are indemnity-only policies whereby the insurer reimburses defense expenditures only after the insured selects counsel, controls the defense, and submits the defense bill")).

_____

[4] But see Millennium Labs., Inc. v. Allied World Assur. Co. (U.S.), Inc., 2013 U.S. Dist. LEXIS 201847, 2013 WL 12072536, *5 (S.D. Cal. July 22, 2013) (rejecting arguments focused on provisions in the policy stating that certain "alleged" acts are covered, noting that "the policies in Jeff Tracy[, 636 F. Supp. 2d 995,] and Impac [Mortg. Holdings, Inc. v. Houston Cas. Co., 634 Fed. Appx. 614 (9th Cir. 2016),] also covered 'alleged' acts," and holding that the "potential for coverage" standard did not apply to the standard-type Directors and Officers ("D & O") Liability Policy at issue, which was an "indemnity-only polic[y] whereby the insurer reimburses defense expenditures only after the insured selects counsel, controls the defense, and submits the defense bill") (citing, inter alia, Exec. Risk Indemnity, Inc. v. Jones, 171 Cal. App. 4th 319, 89 Cal. Rptr. 3d 747, 751 n.4 (Ct. App. 2009) (explaining that "[u]nlike a comprehensive

[5] MLP says that in opposing MLP's Motion to Remand this case to state court (see Mot. to Remand, Dkt. No. 10; Opp'n to Mot. to Remand, Dkt. No. 16 at 13), Liberty acknowledged "that the duty to advance defense costs is determined in the same manner that the Hawaii courts determine the duty to defend." See MLP Mem. in Supp. at 13 n.3, Dkt. No. 64-1. MLP alleges that Liberty did so in an effort to show that there were no unresolved issues of state law that this Court could be required to determine and therefore no reason to remand. As such, MLP asserts that "Liberty is judicially estopped from arguing that the traditional duty to defend standard followed by Hawaii courts does not apply in this case[.]" MLP Mem. in Supp. at 13 n.3, Dkt. No. 64-1 (citing Helfand v. Gerson, 105 F.3d 530, 534 (9th Cir. 1997)). The Court need not reach MLP's estoppel contention because its finds for MLP on the merits of the potentiality issue.

2018 U.S. Dist. LEXIS 56949, *22

In the Underlying Lawsuit, Churchill is sued both "in his capacity as an officer of MLP" and "in his capacity as a director of the defendant AOAO." *See* MLP Mem. in Supp. at 2 n.2, Dkt. No. 64-1. Accordingly, the allegations in the Underlying Lawsuit raise the possibility of coverage, triggering MLP's duty to advance defense costs.

Liberty has "acknowledged" that it provides excess coverage to Churchill in his capacity as an AOAO director. Liberty, however, declines "to advance[] defense costs to indemnify Churchill and MLP against claims arising from Churchill's conduct in his . . . capacity" as an MLP officer. MLP Mem. in Supp. at 2 n.2, Dkt. No. 64-1. Liberty does so because it argues that no claims have been directed at Churchill in the Underlying Lawsuit in his capacity as an MLP officer. Liberty Mem. in Supp. at 7, 11, Dkt. No. 62-3 (asserting that "[t]he only legal relationship between Mr. Churchill and the Underlying Plaintiffs arose solely from his seat on the condominium association board"; **[*23]** because he was sued as a director of the board, and the Underlying Plaintiffs "assert no claims against him as an officer or director of MLP," Churchill has no coverage under the Policy); *id.* at 17-18 ("There are no allegations of wrongdoing relating to Mr. Churchill's role as an officer of MLP[.]"); *id.* at 22-23 ("As there can be no dispute that the Underlying [SAC] seeks relief based on Mr. Churchill's conduct as an AOAO

Director . . ., there also can be no dispute that Mr. Churchill is not entitled to coverage under the Liberty policy[.]"). While Liberty *might* be correct, the Underlying SAC is not so clear. The Underlying Plaintiffs' breach of fiduciary duty claim, for instance, is asserted against *all* defendants. Underlying SAC ¶¶ 32-33, Dkt. No. 65-2. That is consistent with the broad allegations asserted elsewhere in the Underlying SAC. For example, Underlying Plaintiffs allege:

41. Each and all of the Defendants (directly and/or indirectly through individual agents, representatives, employees, principals, officers, directors and members) (a) actively or passively participating in the conduct, acts, and omissions alleged herein, (b) materially assisted, aided, abetted and/or conspired with one or more **[*24]** other Defendants in committing the conduct, acts, and omissions alleged herein, (c) purposely, knowingly, recklessly, or negligently planned, directed, implemented, furthered, and/or consented to the conduct, acts, and omissions alleged herein, and/or (d) is directly, vicariously, jointly, and/or

severally liable for the conduct, acts, and omissions alleged herein.

Underlying SAC ¶ 41, Dkt. No. 65-2. "[A]ll of the Defendants" certainly includes Churchill. That much is clear.

While Liberty wishes to limit these allegations to Churchill in his capacity *as an AOAO Board Member* and not Churchill in his capacity *as an MLP officer and director* by, among other things, arguing that Churchill did not owe a duty to Plaintiffs as an MLP officer or director (*see, e.g.*, Liberty Mem. in Supp. at 17-19, Dkt. No. 62-3), the State court presiding over the Underlying Lawsuit has made no such finding, nor is it evident in the voluminous materials submitted by the parties that the issue has even been presented to the State court. All this Court has, then, are the allegations of the Underlying SAC, none of which limit the Underlying Plaintiffs' claims against Churchill in the manner urged by Liberty (*compare* **[*25]** Underlying SAC ¶¶ 96-99 ("Against All Defendants"); *with* Underlying SAC ¶¶ 104-32 ("Against All Developer Defendants")), and the other State court litigation statements made by the Underlying Plaintiffs, which offer similarly muted, if any, support (*cf.* Liberty Mem. in Supp. at 17-18, Dkt. No. 62-3; MLP Mem. in Opp'n to Liberty MSJ at 21, Dkt. No. 69).

Indeed, during the December 15, 2017 hearing in this matter, counsel for Liberty argued the allegations in the Underlying Lawsuit "clearly" differentiated between claims against the developers and those claims brought against the AOAO, as evidenced by pages 18 through 21 of the Draft-Conclusions of Law ("Draft-COLs") written by the Underlying Plaintiffs themselves. Tr. of Hr'g at 37, Dkt. No. 76. In relevant part, those Draft-COLs read:

6. The developer of a condominium association owes the association a basic fiduciary duty . . . [that] extends to individual homeowners, not just the homeowners' association[.]

7. . . . [A] developer-controlled association creates a conflict of interest which imposes a fiduciary duty upon the developer . . . when the developer and its employees control the association. Where, as here, the JV Partners in **[*26]** the developer entity have appointed their agents and/or employees as members of the AOAO . . ., and the JV Partners thereby control the AOAO and all other aspects of the development, a basic fiduciary obligation must be imposed on the JV Partners . . . .

. . . .

14. From the inception of the Project, [MLP] has

owed every owner of a unit at the Project a basic fiduciary duty . . . .

15. The Court finds and concludes that [Underlying] Plaintiffs have demonstrated a likelihood of success on the merits of their claim that [MLP] breached its fiduciary obligations by demonstrating, among other things, that [MLP] . . . . failed to inform its Board appointees that[:] it had written off its investment in the Project by 2009; . . . [and] that the Developer entity would likely be out of money . . . by . . . early 2010 . . . .

16. . . . [T]he fact that [MLP] had written off its investment in the Project is a material fact that [MLP] and/or its agents were required to disclose to purchasers, owners, and the members of the AOAO Board at the Project.

17. . . . [T]he fact that the Developer entity was reliant or soon would be reliant on discretionary prospective advances from lenders is a material fact that **[*27]** [MLP] and/or its agents were required to disclose to purchasers, owners and members of the AOAO Board at the Project.

Esaki Decl., Ex. G [Underlying Draft-COLs] at 19-22, Dkt. No. 65-7 at 74-77. These Draft-COLs offer little in the way of "clarity" with respect to the scope of liability the Underlying Plaintiffs intended to impose on Churchill in the Underlying Lawsuit.

Liberty also argues that Churchill has essentially conceded that the Underlying Lawsuit does not impose liability on Churchill for his acts or omissions made in any capacity other than as an AOAO director. *See* Liberty Mem. in Supp. at 11-13, 18-19, 22, Dkt. No. 62-3. For example, in response to an interrogatory in the instant matter, MLP stated: "It is MLP's understanding that Mr. Churchill is receiving a defense in the Underlying Lawsuit under [the National Union Fire Ins. Co. of Pittsburgh, Pa. policy number 01-189-15-54] with respect to Mr. Churchill's capacity as director or officer of the [AOAO]." Liberty Concise Statement in Supp., Ex. A [MLP Interrogatory Response] at 10, Dkt. No. 63-1. Moreover, in response to a discovery request in the Underlying Lawsuit, Churchill filed a document in Circuit Court on November 26, 2012, entitled "Defendant Ryan Churchill's, *in his Capacity as Director of the [AOAO]*, Response to Pls.' First Request for **[*28]** Production of Docs. & Things to Def. Ryan Churchill Dated Sept. 7, 2012." Liberty Concise Statement in Supp., Ex. B-1 [Churchill Response to Production Request] at 1, Dkt. No. 63-3 at 1 (emphasis added). These statements from the defendants in the Underlying Lawsuit are a better indication of what those defendants wish, rather than

indications of what the Underlying Plaintiffs intend. The same is true of MLP's statements in its 2015 Form 10-K. *See* Mem. in Opp'n to Mot. to Remand, Ex. C [U.S. Secs. & Exch. Comm'n Form 10-K], Dkt. No. 16-4 [hereinafter MLP Form 10-K].[6]

Thus, viewing these facts, and in light of the "potentiality" standard for triggering Liberty's duty to advance defense costs under the Policy, *Braden Partners, 2016 U.S. Dist. LEXIS 180958, 2017 WL 63019 at *10*, the Court finds in favor of coverage, *Sentinel, 875 P.2d at 904* ("All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured[.]"(quoting *Trizec Props., 767 F.2d at 812*)).

C. The "Outside Service Exclusion" (Exclusion 5.8) Does Not Apply

---

[6] Liberty argues that "MLP implicitly confirmed that Mr. Churchill was not sued in his capacity as an officer or director of MLP in the Underlying Lawsuit when it stated in its 2015 Form 10-K that '[MLP] has been named along with multiple parties in lawsuits filed by owners of units and fractional interest in the project . . . .'" Liberty Mem. in Supp. at 13, Dkt. No. 62-3 (quoting MLP Form 10-K at 10, Dkt. No. 16-4). Liberty also asserts that "the 10-K does not state that Mr. Churchill is a defendant[,] [n]or, correspondingly, does it reference any indemnification or advancement of fees and costs by MLP to Mr. Churchill in his defense of the Underlying Lawsuit." Liberty Mem. in Supp. at 13, Dkt. No. 62-3. The rest of Item 3 of the MLP Form 10-K (entitled "Legal Proceedings") reads:

> The lawsuits allege deceptive acts, intentional misrepresentation, concealment, and negligent misrepresentation, among other allegations and seek unspecified damages, treble damages and other relief. [MLP] disagrees with the allegations and is defending itself. [MLP] is presently unable to estimate the amount, or range of amounts, of any probable liability, if any, related to this matter and no provision has been made in the accompanying financial statements.

> We are a party to various claims, complaints, and other legal actions that have arisen in the normal course of business from time to time. We believe the outcome of **[*29]** these pending legal proceedings, in the aggregate, is not likely to have a material adverse effect on our operations, financial position or cash flows.

MLP Form 10-K at 10, Dkt. No. 16-4. The language of the MLP Form 10-K might be suggestive of the defendants in the Underlying Lawsuit's interpretation of the Underlying SAC, but says nothing of the Underlying Plaintiffs' intention to pursue Churchill only in his capacity as an AOAO Director.

2018 U.S. Dist. LEXIS 56949, *29

There are a number of exclusions from Liberty's coverage obligations under the Policy. Under the Policy's Outside Service Exclusion, for instance, Liberty "shall not be liable to make any payment for Loss in connection with any Claim" that is:

> based upon, arising from, or in any way related to an Insured Person serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the Insured Organization; provided that this exclusion shall not apply with respect to any coverage afforded under Section 2, Outside Position Liability.

Policy § 5.8, Dkt. No. 10-4 at 6. Thus, the Outside Service Exclusion broadly bars coverage for **[*30]** conduct when an MLP individual insured serves as a director or officer of another, uninsured entity. *See* Liberty Mem. in Supp. at 20, Dkt. No. 62-3. Liberty argues that this exclusion applies in the instant context both because the AOAO qualifies as a "board outside MLP" and because broad-form exclusions from insurance coverage are generally acceptable in the State of Hawai'i. Liberty Mem. in Supp. at 22, Dkt. No. 62-3 (citing, *inter alia*, *Trenches, Inc. v. Hanover Ins. Co., 575 Fed. Appx. 741 (9th Cir. 2014)* (enforcing broadly worded exclusion containing "arising out of" language); *Cont'l Cas. Co. v. Adams, 2003 U.S. Dist. LEXIS 16434, 2003 WL 22162379, \*9, \*32-33 (M.D. Pa. Sept. 12, 2003))*.

MLP advances a single reason why the Outside Service Exclusion should not apply—because the AOAO is MLP's "Subsidiary" under the terms of the Policy and is therefore itself an "Insured Organization" (like MLP).[7] MLP Opp'n at 27-31, Dkt. No. 69 (referring to Policy § 25.9, Dkt. No. 10-4 at 11). Indeed, during the December 15, 2017 hearing on the Cross-MSJs, counsel for MLP agreed that if MLP does not "prevail on" its "subsidiary argument," then "[the AOAO is] an outside entity," as argued by Liberty, "so [Churchill is] covered[,] but only for indemnity at the end of the case." Tr. of Hr'g at 16, Dkt. No. 76.

The Policy defines *Subsidiary*, in relevant part, as "any

entity in which **[*31]** more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors or equivalent positions are owned, in any combination, by one or more Insured Organization[.]" Policy § 25.19, Dkt. No. 10-4 at 12. MLP offers the evidentiary support linking MLP to the "ownership" of the AOAO within the meaning of the Policy (*see* Esaki Decl., Ex. K [Kapalua Bay Dev. Org. Chart], Dkt. No. 70-2; Esaki Decl., Ex. L [Decl. of Condo. Prop. Regime of Kapalua Bay Condo.] § I(B)(44), Dkt. No. 70-3 at 5; Van Etten Decl., Ex. M [AOAO Bylaws (Part 1)] Art. II, § 1, Dkt. No. 70-5 at 3), which is challenged by Liberty in only one respect: Liberty claims that MLP's 51% ownership interest in Kapalua Bay Holdings, LLC does not qualify Kapalua Bay Holdings as an MLP *Subsidiary* and therefore breaks the ownership link between MLP and the AOAO (Liberty Reply at 17, Dkt. No. 73-1). The reasons cited by Liberty, however, cannot withstand scrutiny.

First, Liberty argues that because Kapalua Bay Holdings is a "member driven" LLC formed under the laws of the State of Delaware (Liberty Reply at 17, Dkt. No. 73-1 (citing Young Decl., Ex. G [MLP Ans. in Underlying Lawsuit] at ¶ **[*32]** 20, Dkt. No. 71-10 at 4)), MLP's 51% ownership does not represent a "controlling interest." In fact, Liberty admits that MLP has admitted in an SEC filing that it "does not have a controlling interest in [Kapalua] Bay Holdings." Liberty Reply at 18 (quoting Young Decl., Ex. H [U.S. Secs. & Exch. Comm'n Form 10-Q] § 9, Dkt. No. 71-11 at 10). While that may be true, Liberty does not explain how "control" of Kapalua Bay Holdings is relevant in the instant context. The Policy defines *Subsidiary* in terms of percentage ownership, not control.[8] If Liberty wanted *Subsidiary* to depend on control or on any other factors not mentioned in the Policy, it presumably could have drafted its own contract in that manner. But it did not.

Second, Liberty contends that MLP's ownership interest in Kapalua Bay Holdings cannot constitute ownership of at least 50% of its "outstanding securities" because "[t]he membership interests of member driven LLCs are not securities." Liberty Reply at 17, Dkt. No. 73-1. The only direct authority, however, that Liberty cites in support of this proposition is a 2010 law firm blog that itself offers no authority in support of its conclusory statements. *See* Arina Shulga, *Are LP,* **[*33]** *GP, LLP, and LLC Interests Securities*?, Business Law Post (June

---

[7] MLP succinctly explains that the AOAO qualifies as a Subsidiary of an Insured Organization under the Policy because "MLP owns 100% of MLP KB Partner, LLC, which owns 51% of Kapalua Bay Holdings, LLC, which in turn owns 100% of Kapalua Bay, LLC[,]" and "Kapalua Bay, LLC owns more than 50% of the voting rights in the AOAO" due to its retention of voting rights for unsold condominiums. MLP Opp'n at 29, Dkt. No. 69.

---

[8] Liberty does not contest MLP's percentage ownership of Kapalua Bay Holdings.

2018 U.S. Dist. LEXIS 56949, *33

28, 2010), *available at* http://www.businesslawpost.com/2010/06/are-lp-gp-llpand-llc-interests.html. The Court finds this far from sufficient to satisfy Liberty's burden of establishing application of the Outside Service Exclusion. *See C. Brewer & Co., 347 P.3d at 169* (citing *Retherford, 52 Haw. 91, 470 P.2d 517*).

Because Liberty's limited contentions do little to contravene MLP's submissions evidencing the AOAO's status as an MLP *Subsidiary* under the Policy (*see* Policy § 25.19, Dkt. No. 10-4 at 12), the Outside Service Exclusion does not protect Liberty from the contractual defense obligations it owes to Churchill.

### III. MLP Coverage

The Policy provides MLP with coverage for its own wrongful conduct occurring "as a result of a Securities Action." Policy § 1.3, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 2-3. An action qualifies as a *Securities Action* under the Policy where it:

> (a) arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Insured Organization, whether such purchase, sale, or offer involves a transaction with the Insured Organization or occurs in the open market;
>
> (b) is brought by a securities holder of the Insured Organization other than a natural [*34] person who was, now is, or shall hereafter be a duly elected or appointed director or officer of the Insured Organization based upon such securities holder's interest in such securities, whether directly or by class action; or
>
> (c) is brought as a securities holder derivative action on behalf of the Insured Organization.

Policy § 25.18, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 10. Liberty asserts that MLP is not entitled to *any* coverage in the Underlying Lawsuit because that lawsuit does not qualify as a *Securities Action* under the terms of the Policy. *See* Liberty Mem. in Supp. at 16-17, Dkt. No. 62-3. In response, MLP argues that the Underlying Lawsuit qualifies as a *Securities Action* because it has been "brought by a securities holder of AOAO, against the subsidiary AOAO, and its Parent, MLP, both of which are Insured Organizations." MLP Opp'n at 33, Dkt. No. 69. In other words, MLP relies on Section 25.18(b) of the Policy. MLP's assertion is unpersuasive.

Because "[t]he Policy does not provide any definition of 'securities holder,'" MLP encourages the Court to include the Underlying Plaintiffs in that definition because "Courts and other authorities have recognized that the nature of the relationship between a condominium [*35] owner and its Association is that of a corporation and shareholder or security holder[.]" MLP Opp'n at 33-34, Dkt. No. 69 (citing Rohan & Reskin, 42 Real Estate Transactions: Condominium Law & Practice—Forms, § 42.01; *Sargis v. Seventy Grove Hill Condo. Ass'n, 1990 Conn. Super. LEXIS 2197, 1990 WL 289578, *7-8 (Conn. Super. Ct. July 19, 1990)*; *Carlandia Corp. v. Rogers & Rod Constr. Corp., 605 So.2d 1014, 1015 (Fla. Ct. App. 1992))*. Yet MLP provides no binding authority in support of this contention, and perhaps more importantly, the authority it cites is not persuasive. The Underlying Plaintiffs are condominium owners—not shareholders nor securities purchasers. *See* Liberty Mem. in Supp. at 16-17, Dkt. No. 62-3. Moreover, the owners' claims in the Underlying Lawsuit are not based upon their interest in some nominal security they hold in the AOAO. The claims are based on misrepresentations and omissions on the part of the developers and others responsible for building and marketing the condominium. As such, Section 25.18(b) of the Policy does not apply.

To qualify as a *Securities Action* under the Policy, the underlying claim must involve the purchase or sale of securities, or it must be brought by securities holders. Policy § 25.18, *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 10. The theory of the Underlying Lawsuit is that MLP, as a developer of the Project, "hid the truth" and "misrepresented" the status of the Project, [*36] and its financial state, among other things, thereby injuring the Underlying Plaintiffs. *See* Liberty Mem. in Supp. at 16, Dkt. No. 62-3 (citing *Impac, 634 Fed. Appx. at 615* (affirming coverage denial due to lack of underlying securities claim against insured entity)). The Court agrees with Liberty that such a theory necessarily prevents characterization of the Underlying Lawsuit as an action "aris[ing] from the purchase or sale of, or offer to purchase or sell, any securities issued by the Insured Organization[.]" Policy § 25.18(a), *as amended by* Endorsement No. 9, Dkt. No. 10-5 at 10.[9]

As such, the Underlying Lawsuit cannot be a *Securities Action* under the Policy.

### CONCLUSION

_____

[9] For similar reasons, Section 25.18(a) would not apply, even were MLP to argue for its application.

2018 U.S. Dist. LEXIS 56949, *36

For the above-stated reasons, Liberty's Motion for Summary Judgment (Dkt. No. 62) and MLP's Motion for Partial Summary Judgment (Dkt. No. 64) are GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

DATED: April 3, 2018 at Honolulu, Hawai'i

/s/ Derrick K. Watson

Derrick K. Watson

United States District Judge

---

**End of Document**



**User Name:** Joe Grady
**Date and Time:** Thursday, November 21, 2024 12:55:00 PM EST
**Job Number:** 239207617

## Document (1)

1. *H.L. Libby Corp. v. Fireman's Fund Ins. Co., 2006 U.S. Dist. LEXIS 50433*
   **Client/Matter:** 21047.24000
   **Search Terms:** H. L. Libby Corp. v Fireman's Fund Ins. Co., 2006 U.S. Dist. LEXIS 50433 (W.D. Pa 2006)
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

✚ Positive
As of: November 21, 2024 5:55 PM Z

## *H.L. Libby Corp. v. Fireman's Fund Ins. Co.*

United States District Court for the Western District of Pennsylvania

July 24, 2006, Decided ; July 24, 2006, Filed

2:03cv601

### Reporter

2006 U.S. Dist. LEXIS 50433 *; 2006 WL 2054089

H.L. LIBBY CORP., and REGENCY INDIANA ENTERPRISES, L.P., Plaintiffs, v. FIREMAN'S FUND INSURANCE COMPANY and NATIONAL SURETY CORPORATION, Defendants.

## Core Terms

insurer, damages, bad faith, coverage, duty to defend, Defendants', Plaintiffs', allegations, summary judgment, discovery, costs, insurance policy, triggered, property damage, ambiguous, insurance company, bodily injury, injunctive, non-moving, monetary, genuine

## Case Summary

### Procedural Posture

Plaintiffs, a partnership and a company, sued defendants, insurers, in state court and alleged a breach of contract based on the failure to defend under a commercial liability insurance policy, and violation of *42 Pa. Cons. Stat. § 8371* concerning good faith and fair dealing on the part of the insurers. The insurers removed the action to the instant court and moved for partial summary judgment.

### Overview

The instant action arose from the insurers refusal to pay pretender defense costs in an underlying lawsuit, as well as the failure to provide a defense in a subsequent and separate underlying action adjudicated in state court. The underlying lawsuits resulted from the alleged pollution of a collection pond following a heavy rain. The court held that a reasonably intelligent person would define "damages" within the commercial general liability policy as relating to the payment of money. Such a definition of "damages" was clear and unambiguous within the policy and gave plain and ordinary meaning to the word "damages." Thus, the insurers were contractually obligated to defend the partnership and

company against any civil suit seeking monetary damages against the partnership and company as the result of bodily injury or property damage. The partnership and company also set forth twelve individual instances of bad faith on the part of the insurers. However, as the policy did not trigger a duty to defend, the insurers' denial was clearly legitimate. It was axiomatic that where no duty to defend existed, a bad faith claim regarding the insurer's denial of coverage had to fail.

### Outcome

The insurers did not have a duty to defend the action as a matter of law. The partnership and company's bad faith claims were also dismissed. However, there were genuine issues of material fact in existence that precluded a finding that the insurers did not engage in bad faith in its refusal to pay costs incurred by the partnership and company in the first underlying case.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN1*[⤓] **Summary Judgment, Entitlement as Matter of Law**

Pursuant to *Fed. R. Civ. P. 56(c)*, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be

both genuine and material, i.e., one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN2*[📥] **Burdens of Proof, Movant Persuasion & Proof**

When the party moving for summary judgment has carried its burden under *Fed. R. Civ. P. 56(c)*, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. The non-moving party must respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial.

> Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Forum & Place

> Insurance Law > Choice of Law

*HN3*[📥] **Choice of Law, Forum & Place**

A court is bound in determining which law to apply by the choice of law rules in the state in which it sits. Pennsylvania's conflict of laws principles dictate that an insurance contract is guided by the law of the state in which it is delivered.

> Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Duty to Defend

> Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Indemnification

*HN4*[📥] **Good Faith & Fair Dealing, Duty to Defend**

The duty to defend is separate and distinct from the duty to indemnify under Pennsylvania law. Under Pennsylvania law, it is clear that the allegations in the complaint are the sole points of reference for determining whether an insurer has an obligation to defend a claim.

> Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Duty to Defend

> Insurance Law > ... > Coverage > Triggers > General Overview

*HN5*[📥] **Good Faith & Fair Dealing, Duty to Defend**

An insurer has a duty to defend whenever the allegations in a complaint against its insured, when taken as true and construed in favor of the insured, set forth a claim which potentially falls within the coverage provided by the policy. The duty to defend is triggered even if the allegations against the insured are groundless, false, or fraudulent.

> Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Duty to Defend

> Insurance Law > ... > Coverage > Triggers > General Overview

*HN6*[📥] **Good Faith & Fair Dealing, Duty to Defend**

It is not the particular cause of action pleaded within a complaint that is determinative of whether coverage has

2006 U.S. Dist. LEXIS 50433, *50433

been triggered. Rather, it is necessary to look at the factual allegations contained in the complaint. Otherwise, litigation would be encouraged through the use of artful pleadings to avoid exclusions in liability insurance policies. Therefore, if the complaint avers facts that might support recovery under the policy, coverage is triggered and the insurer has a duty to defend.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Duty to Defend

Insurance Law > Claim, Contract & Practice Issues > Policy Interpretation > General Overview

*HN7*[📥] **Good Faith & Fair Dealing, Duty to Defend**

The potential scope of coverage under an insurance policy must be examined before it can be determined whether a complaint is potentially covered by the policy. The inquiry into coverage is antecedent to ascertaining whether the duty to defend exists.

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Construction Against Insurers

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > Unambiguous Terms

*HN8*[📥] **Ambiguous Terms, Construction Against Insurers**

Interpretation of an insurance policy is a question of law. The basic inquiry a court must make is whether the insurance contract's disputed terms are ambiguous. In construing the policy, if the words of the policy are clear and unambiguous, the court must give them their plain and ordinary meaning. When a term is ambiguous, and the intention of the parties cannot be discerned from the policy, the court may look to extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract. Ambiguous terms must be strictly construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist.

Insurance Law > ... > Policy Interpretation > Ambiguous Terms > General Overview

*HN9*[📥] **Policy Interpretation, Ambiguous Terms**

A policy provision is ambiguous if reasonably intelligent people would honestly differ as to its meaning when considering it in the context of the entire policy.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > General Overview

*HN10*[📥] **Liability & Performance Standards, Good Faith & Fair Dealing**

See *42 Pa. Cons. Stat. § 8371*.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > General Overview

*HN11*[📥] **Liability & Performance Standards, Good Faith & Fair Dealing**

The term "bad faith" is not defined in the statute, but the Pennsylvania Superior Court has defined it as any frivolous or unfounded refusal to pay proceeds of a policy. To prove a claim of bad faith, plaintiffs must show by clear and convincing evidence that the insurer (1) does not have a reasonable basis for denying benefits under the policy; and (2) knows or recklessly disregards its lack of a reasonable basis in denying the claim. However, the statute does not require a plaintiff to prove that the insurer consciously acts pursuant to such a motive or interest; it is enough if the insurer recklessly disregards the lack of a reasonable basis in denying benefits.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > General Overview

*HN12*[📥] **Liability & Performance Standards, Good Faith & Fair Dealing**

Pennsylvania law defines reckless conduct as the acting or failing to act in complete disregard of a risk of harm to

others which is known or should be known to be highly probable and with a conscious indifference to the consequences. It is a long-standing principle that mere negligence in ascertaining whether a claim is covered is insufficient to support a recovery for bad faith insurance practices. Moreover, an incorrect analysis of the applicable law is insufficient to sustain bad faith liability.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > Duty to Defend

*HN13*[ ] **Good Faith & Fair Dealing, Duty to Defend**

It is axiomatic that where no duty to defend exists, a bad faith claim regarding the insurer's denial of coverage must fail.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > General Overview

*HN14*[ ] **Liability & Performance Standards, Good Faith & Fair Dealing**

Under Pennsylvania law, bad faith is actionable regardless of whether it occurs before, during, or after litigation. However, this does not mean that insureds may recover under Pennsylvania's bad faith statute for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim. In cases involving nothing more than alleged discovery violations, the courts have declined to find bad faith, but bad faith claims involving conduct intended to evade the insurer's obligations under an insurance contract have been permitted to go forward.

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > General Overview

*HN15*[ ] **Liability & Performance Standards, Good Faith & Fair Dealing**

The finding of liability against an insurer must arise out of the contractual relationship with the insured and occur during pending litigation. It is important to note that insurer's dishonest conduct during discovery could

potentially violate its fiduciary duty of candor.

**Counsel:** [*1]  For H.L. LIBBY CORP., REGENCY INDIANA ENTERPRISES, L.P., Plaintiffs: Stanley P. DeGory, Bonya, Gazza & DeGory, Indiana, PA.

For FIREMAN'S FUND INSURANCE COMPANY, NATIONAL SURETY CORPORATION, Defendants: Matthew M. Haar, Saul Ewing, Harrisburg, PA.

**Judges:** David Stewart Cercone, United States District Judge.

**Opinion by:** David S. Cercone

# Opinion

## I. INTRODUCTION

### MEMORANDUM OPINION

On March 25, 2003, Plaintiffs, H.L. Libby Corp., and Regency Indiana Enterprises, L.P. ("Plaintiffs"), filed a complaint in the Court of Common Pleas of Indiana County, Pennsylvania, alleging a breach of contract based on the failure to defend under a commercial liability insurance policy, and violation of

*42 PA. CON. STAT. ANN. § 8371* concerning good faith and fair dealing on the part of Defendants, Fireman's Fund Insurance Company and National Surety Corporation ("Defendants"). Pursuant to *28 U.S.C. § 1441*, Defendants removed the action to this Court based upon complete diversity of citizenship and an amount in controversy in excess of Seventy-Five Thousand ($ 75,000.00) Dollars. *28 U.S.C. § 1332*. Defendants have filed a motion for [*2] partial summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure.* Plaintiffs have responded and the matter is now before the Court.

### II. STATEM ENT OF THE CASE

This is an action for breach of contract and alleged bad faith arising from Defendants' refusal to pay pretender defense costs in an underlying lawsuit ("Specialty I"), as well as the failure to provide a defense in a subsequent and separate underlying action ("Specialty II") adjudicated in the Court of Common Pleas of Indiana County, Pennsylvania.

2006 U.S. Dist. LEXIS 50433, *2

The underlying lawsuits resulted from the alleged pollution of a collection pond following a heavy rain. Specialty I was filed in April 2001 in the Court of Common Pleas of Indiana County, Pennsylvania at Civil Action No. 50792. At the time, Plaintiffs had a Commercial General Liability ("CGL") long form CG 00 01 07 98 insurance policy with Defendants. Defendants did render a defense in Specialty I, however, Defendants only paid approximately one-third of Plaintiffs' alleged overall legal costs in the litigation. The parties' breach of contract dispute involving these costs is not a subject of this motion **[*3]** for partial summary judgment. The allegations of bad faith in Defendants' failure to pay such costs, however, are included in the motion.

Specialty II was filed in the Court of Common Pleas of Indiana County at Civil Action No. 51728. This action was consolidated for purposes of discovery and trial with cases at Nos. 52753 and 11843. The action at 51728 was entitled a "Complaint in Equity," and sought only equitable relief in the form of a "special, preliminary, and permanent injunction." *See* Defendants' Exhibit 3. The complaint did not seek any form of legal or monetary damages, including any diminution in property value. *Id.*

Defendants assigned both of the Plaintiffs' claims for coverage in Specialty I and II to Ms. Irene Varga. Ms. Varga determined that the action at 51728 did not fall within coverage and Defendants declined to defend Plaintiffs in Specialty II. In Specialty II, Plaintiffs filed Preliminary Objections to the Complaint. Plaintiffs allege that the Motion in Opposition to those Preliminary Objections sought damages for diminution in value to the property. Defendants, however, contend that they were not provided with that document at that time. Defendants' **[*4]** Brief in Support, p. 4. Further, no such allegations of damage were set forth in the Complaint at 51728. *See* Defendants' Exhibit

3. On January 30, 2002, Defendants' denied coverage in Specialty II on the basis that it was not an occurrence as defined within the policy; it was an action for injunctive relief only. *See* Defendants' Exhibit 7.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

*HN1*[⬆] Pursuant to *FED. R. CIV. P 56(c)*, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support

denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.,* one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both **[*5]** genuine and material. *Id.* The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 180 (3d Cir. 1999), Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).*

*HN2*[⬆] When the moving party has carried its burden under *Rule 56(c)*, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P 56(e).* Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.1989)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).* **[*6]** The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F. 3d 639, 643 n. 3 (3d Cir. 1998),* quoting *Fuentes v. Perskie, 32 F.3d 759, 762 n.1 (3d Cir. 1994).*

### IV. DISCUSSION

*HN3*[⬆] This Court is bound in determining which law to apply by the choice of law rules in the state in which it sits. *Kruzits v. Okuma Mach Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994);* citing *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941).* Pennsylvania's conflict of laws principles dictate that an insurance contract is guided by the law of the state in which it is delivered. *I.C.D. Industries, Inc., v. Federal Insurance Co., 879 F.Supp. 480, 484 (E.D. Pa. 1995).* Here, no proof has been offered as to where the

contract was delivered and the law will presume that the insured's state of residence is the place of delivery. *Id.; Jamison v. Miracle Mile Rambler, Inc., 536 F.2d 560, 562 n.1 (3d Cir. 1976)* [*7] *citing Crawford v. Manhattan Life Ins. Co., 208 Pa. Super. 150, 155, 221 A.2d 877 (Pa. Super. 1966)*. Because the insured Plaintiff is a Pennsylvania resident, the Court will apply Pennsylvania law.

A. <u>Duty to Defend</u>

The substantive Pennsylvania law regarding the duty to defend for an insurer is both compelling and rich. Moreover, **HN4**[⬆] the duty to defend is separate and distinct from the duty to indemnify under Pennsylvania law. *Erie Ins. Exchange v. Transamerica Ins. Co., 516 Pa. 574, 533 A.2d 1363, 1368 (Pa. 1987)*. [1] Under Pennsylvania law, it is clear that the allegations in the complaint are the sole points of reference for determining whether an insurer has an obligation to defend a claim. *I.C.D. Industries, Inc., v. Federal Insurance Co., 879 F. Supp. at 487; Aetna Casualty & Sur. Co. v. Roe, 437 Pa. Super. 414, 650 A.2d 94, 98 (Pa. Super. 1994); Stidham v. Millvale Sportsmen's Club, 421 Pa. Super. 548, 618 A.2d 945, 953-54 (Pa. Super 1993); see also Wilson v. Maryland Casualty Co., 377 Pa. 588, 594, 105 A.2d 304 (1959)* ("[T]he rule everywhere is that the obligation of a casualty insurance company to defend an action brought against the insured [*8] is to be determined solely by the allegations of the complaint in the action").

**HN5**[⬆] An insurer has a duty to defend whenever the allegations in a complaint against its insured, when taken as true and construed in favor of the insured, set forth a claim which potentially falls within the coverage provided by the policy. *Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 821 (3d Cir. 1994)*. The duty to defend is triggered even if the allegations against the insured are groundless, false, or fraudulent. *D'Auria v. Zurich Ins. Co., 352 Pa. Super. 231, 507 A.2d 857, 859 (Pa. Super. 1986)*.

Moreover, **HN6**[⬆] it is not the particular cause of action pleaded within a complaint that is determinative of whether coverage has been triggered. Rather, it is necessary to look at the factual allegations contained in the complaint. *Mutual Beneficial Ins. Co. v. Haver, 555 Pa. 534, 538-39, 725 A.2d 743 (1999)*. [*9] Otherwise,

as Justice Zappala succinctly noted, "litigation would be encouraged through the use of artful pleadings to avoid exclusions in liability insurance policies." *Id. at 539*. Therefore, if the complaint avers facts that might support recovery under the policy, coverage is triggered and the insurer has a duty to defend. *Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 226 (3d Cir. 2005) citing Gen. Accident Ins. Co. of Am. v. Allen, 547 Pa. 693, 692 A.2d 1089, 1095 (Pa. 1997)*.

However, **HN7**[⬆] the potential scope of coverage under an insurance policy must be examined before it can be determined whether a complaint is potentially covered by the policy. *Lucker Mfg., 23 F.3d at 813*. The inquiry into coverage is antecedent to ascertaining whether the duty to defend exists. *Id.; citing Erie Ins. Exchange v. Transamerica Ins. Co., 516 Pa. 574, 533 A.2d 1363, 1368 (Pa. 1987)*.

**HN8**[⬆] Interpretation of an insurance policy is a question of law. *Sikirica v. Nationwide Ins. Co., 416 F.3d at 220 citing Westport Ins. Corp. v. Bayer, 284 F.3d 489, 496 (3d Cir. 2002)*. *See also Standard Venetian Blind Co. v. American Empire Ins. Co., 503 Pa. 300, 304, 469 A.2d 563 (1983)*. [*10] The basic inquiry a court must make is whether the insurance contract's disputed terms are ambiguous. *See St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991)*. In construing the policy, if the words of the policy are clear and unambiguous, the court must give them their plain and ordinary meaning. *Sikirica v. Nationwide Ins. Co., 416 F.3d at 220 citing Pac. Indem. Co. v. Linn, 766 F.2d 754, 760-61 (3d Cir. 1985)*. When a term is ambiguous, and the intention of the parties cannot be discerned from the policy, the court may look to extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract. *Pac. Indem. Co. v. Linn, 766 F.2d at 761*. Ambiguous terms must be strictly construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist. *Id*.

In the instant action, the CGL states the following: Section I - Coverages

Coverage A. Bodily Injury and Property Damage Liability

1. Insuring Agreement

We will pay those sums that the insured [*11] becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. We will have the right and duty to defend the

---

[1] The duty to indemnify in the instant action is not at issue, as the ultimate resolution of the underlying cases was in favor of the Plaintiffs. Defendants' Brief in Support, p. 4.

insured against anysuit seeking those damages. However, we will have no duty to defend the insured against any suit seeking damages for **bodily injuryor property damage** to which this insurance does not apply. We may at our discretion investigate any **occurrence** and settle any claim or **suit** that may result.

Defendants' Exhibit 9, p. 1. (emphasis in original). "Suit" is further defined within the policy as "a civil proceeding in which damages because of **bodily injury, property damage** or **personal and advertising injury** to which this insurance applies are alleged." Defendants' Exhibit 9, p.15 (emphasis in original).

HN9[⬆] A policy provision is ambiguous if reasonably intelligent people would honestly differ as to its meaning when considering it in the context of the entire policy. Westport Ins. Corp., 284 F.3d at 497; citing Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir. 1982). Black's Law Dictionary distinguishes the singular **[*12]** "damage" from its plural form, "damages," which are succinctly defined as "compensation in money for a loss or damage." BLACK'S LAW DICTIONARY 351 (5th ed. 1979). The RESTATEMENT, SECOND OF TORTS, § 12A, defines "damages" as "a pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another. A sum of money awarded to a person injured by the tort of another." Id. at 352..

Moreover, this Court is mindful of the persuasive authority of other courts concerning the meaning of the term "damages," especially in environmental insurance law. Those courts have adopted a definition of the word "damages" which precludes equitable claims, such as those for response costs and injunctive relief. See Maryland Casualty Co. v. Armco, Inc., 822 F.2d 1348, 1352 (4th Cir. 1987), cert. denied, 484 U.S. 1008, 108 S. Ct. 703, 98 L. Ed. 2d 654 (1988) (distinguishing "damages" from claims for injunctive or restitutionary relief, and stating that "damages" are 'payments to third persons when **[*13]** those persons have a legal claim for damages.'"); Cincinnati Ins. Co. v. Milliken & Co., 857 F.2d 979, 981 (4th Cir. 1988) (applying South Carolina law and finding that the term "damages" in an insurance context is not ambiguous and means "legal damages."); Continental Insurance Cos. v. Northeastern Pharmaceutical & Chemical Co., 842 F.2d 977 (8th Cir. 1988) (en banc), cert denied, 488 U.S. 821, 109 S. Ct. 66, 102 L. Ed. 2d 43 (1988); Patrons Oxford Mutual

Insurance Co. v. Marois, 573 A.2d 16, n. 48 (Me. 1990).

All of the above definitions share a common theme of damages being rooted in a theory of monetary compensation. A reasonably intelligent person, therefore, would define damages within the CGL policy as relating to the payment of money. Such a definition of "damages" is clear and unambiguous within the policy and gives plain and ordinary meaning to the word "damages." Thus, the Defendants were contractually obligated to defend Plaintiffs against any civil suit seeking monetary damages against Plaintiffs as the result of bodily injury or property damage.

Applying this clear and unambiguous coverage analysis to the insurance policy, **[*14]** it is clear that Plaintiffs' argument in favor of the duty to defend fails. Moreover, Plaintiffs deny the clear Pennsylvania case law that the duty to defend springs from the allegations within the complaint, but offer no authority otherwise. Plaintiffs' Brief in Opposition, pp. 7-8.

The Complaint at 51728 prays for only equitable relief, specifically a "special, preliminary, and permanent injunction," at the end of each count. Nowhere in the complaint are monetary damages either alleged or prayed for. Therefore, there was no duty to defend on the part of the Defendant insurer because Specialty II was not a civil action seeking legal damages against Plaintiffs as the result of bodily injury or property damage.

Plaintiffs further argue that their attorney believed that the plaintiffs' counsel in the Complaint at 51728 was seeking money damages for a continuing trespass and diminution of value in their property. Id. at 9. Plaintiffs point to phone conversations between opposing counsel in Specialty II and the Plaintiff's Brief in Opposition to Regency's Preliminary Objections, which stated that Plaintiff seeks "money damages for diminution in value," in an attempt to bolster **[*15]** their argument. Plaintiffs, however, never provided Defendants with the brief that alleged such damages. See Defendants' Exhibit 6. Irregardless, it is an undisputed fact that the Complaint at 51728 was never amended to seek recovery for any monetary damages, thereby remaining a complaint based in equity.

Defendants correctly cite to Scopel v. Donegal Mutual Insurance Company, 698 A.2d 602 (Pa. Super. 1997) (holding that the "allegations included within the four corners of the complaint must be dispositive of an insurer's duty to defend), which is instructive on this issue. In Scopel, the complaint filed by the insured

alleged intentional torts. *Id. at 604-05*. During discovery, a potential count of negligence was uncovered, but Scopel never amended his complaint. *Id. at 606-07*. The insurance company refused to defend based on a policy exclusion against intentional torts. Scopel argued that the duty to defend was triggered by the discovery testimony. *Id. at 606*. The court disagreed with this argument, finding that even if the depositions had been properly supplemented as part of the certified record, there **[*16]** was "no reason to expand the well-reasoned and long-standing principle that an insurer's duty to defend is triggered, if at all, by the factual averments contained in the complaint itself." *Id.; see also Mutual Benefit Ins. Co. v. Haver, 555 Pa. at 538; General Accident Insurance Co. of America v. Allen, 547 Pa. 693, 706, 692 A.2d 1089 (1997)*. In a similar fashion, Plaintiffs assert that there was additional, or outside, information which put the insurance company on notice that plaintiffs in Specialty II were seeking damages. To give credence to such a claim would force insurance companies to constantly monitor all phases of pre-trial litigation to determine if coverage could be potentially triggered. Such a decision would be contrary to well-established Pennsylvania law setting forth the duty of an insurer to defend.

Furthermore, Plaintiffs argue that the simply boilerplate phrase, "costs, attorney's fees and other and further relief as the Court deems just and proper," is in itself a claim for damages. Plaintiffs cannot cite any Pennsylvania cases for this proposition, and the Third Circuit Court of Appeals case cited does not hold that such a "catchall **[*17]** phrase" will suffice as a claim for legal damages. *Lewis v. Hyland, 554 F.2d 93, 103 (3d Cir. 1977)* ("While we do concede that in many circumstances that phrase may be so read, we decline to give it that content here.").

The record, even in a light most favorable to Plaintiffs, fails to show that Defendant's had a duty to defend as a matter of law. Therefore, the motion for partial summary judgment with respect to the failure to render a defense in the underlying action at No. 51728 must be granted.

B. Bad Faith

At common law there was no redress for an insurer's bad faith denial of claims under an insurance policy. *See D'Ambrosio v. Pennsylvania National Mutual Casualty Ins. Co., 494 Pa. 501, 431 A.2d 966 (Pa. 1981)*. The Pennsylvania legislature created a statutory remedy for such conduct by enacting *42 PA. CONS. STAT. § 8371*, which provides:

**HN10**[⬆] In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured **[*18]** in an amount equal to the prime rate of interest plus 3%;

(2) Award punitive damages against the insurer; and

(3) Assess court costs and attorney's fees against the insurer.

*42 PA. CONS. STAT. § 8371*.

**HN11**[⬆] The term "bad faith" is not defined in the statute, but the Pennsylvania Superior Court has defined it as "any frivolous or unfounded refusal to pay proceeds of a policy." *W.V. Realty Inc. v. Northern Insurance Company of New York, 334 F.3d 306, 311-12 (3d Cir. 2003); quoting Terletsky v. Prudential Prop. and Cas. Ins. Co., 437 Pa. Super. 108, 649 A.2d 680, 688 (Pa. Super. 1994)*. To prove a claim of bad faith, Plaintiffs must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim. *W.V. Realty Inc. v. Northern Insurance Company of New York, 334 F.3d at 312; Keefe v. Prudential Prop. and Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000); Klinger v. State Farm Mutual Auto Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997)*. However, **[*19]** the statute does not require a plaintiff to prove that the insurer consciously acted pursuant to such a motive or interest; it is enough if the insurer recklessly disregarded the lack of a reasonable basis in denying benefits. *Klinger v. State Farm Mutual Auto Ins. Co., 115 F.3d at 233; quoting Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d at 688*.

**HN12**[⬆] Pennsylvania law defines reckless conduct as the "acting or failing to act in complete disregard of a risk of harm to others which is known or should be known to be highly probable and with a conscious indifference to the consequences." *See* Pennsylvania's Suggested Standard Jury Instructions § 3.17. It is a long-standing principle that mere negligence in ascertaining whether a claim is covered is insufficient to support a recovery for bad faith insurance practices. *Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994); Jung v. Nationwide Mutual Ins. Co., 949 F. Supp. 353, 356 (E.D. Pa. 1997)*. Moreover, an

incorrect analysis of the applicable law is insufficient to sustain bad faith liability. *See Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d at 752*; **[\*20]** *Jung v. Nationwide Mutual Ins. Co., 949 F. Supp. at 356*; *Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d at 690*.

Here, Plaintiffs set forth twelve (12) individual instances of bad faith on the part of the Defendants. *See* Plaintiffs' Brief in Opposition, pp. 5-6. Several allegations of bad faith pertain to Defendants' denial of coverage in the action at 51728. *Id.* at 16-17. However, as the policy did not trigger a duty to defend, Defendants' denial was clearly legitimate. *HN13*[↑] It is axiomatic that where no duty to defend exists, a bad faith claim regarding the insurer's denial of coverage must fail. *See USX Corp. v. Liberty Mut. Ins. Co., 444 F.3d 192, 202 (3d Cir. 2006)*; *Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 751 n.9 (3d Cir. 1999)* (affirming district court holding that, under Pennsylvania law, "bad faith claims cannot survive a determination that there was no duty to defend, because the court's determination that there was no potential coverage means that the insurer had good cause to refuse to defend."); *see also Ash v. Gainsco, Inc., 23 Fed Appx. 797, 798 (9th Cir. 2001)*; **[\*21]** *Home Ins. Co. v. Hartford Fire Ins. Co., 164 Fed Appx. 950 (11th Cir. 2006)* (finding that because coverage didn't exist, there can be no bad faith); *VBF, Inc. v. Chubb Group of Ins. Cos., 263 F.3d 1226, 1234 (10th Cir. 2001)*.

Plaintiffs further allege that Defendants have engaged in misconduct during litigation, specifically the deposition testimony of Kathleen Reilly. Plaintiffs' Brief in Opposition, p.18. *HN14*[↑] Under Pennsylvania law, bad faith is actionable regardless of whether it occurs before, during, or after litigation. *W.V. Realty Inc. v. Northern Insurance Company of New York, 334 F.3d at 313; citing O'Donnell v. Allstate Ins. Co., 1999 PA Super 161, 734 A.2d 901, 906 (Pa. Super. 1999)*. However, this does not mean that insureds may recover under Pennsylvania's bad faith statute "for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim." *W.V. Realty Inc. v. Northern Insurance Company of New York, 334 F.3d at 313; quoting Slater v. Liberty Mut. Ins. Co., 1999 U.S. Dist. LEXIS 3753, 1999 WL 178367, at \*2 n.3 (E.D. Pa. March 30, 1999)*. In **[\*22]** cases involving nothing more than alleged discovery violations, the courts have declined to find bad faith, but bad faith claims involving conduct intended to evade the insurer's obligations under an insurance contract have been permitted to go forward. *W.V. Realty Inc. v. Northern Insurance Company of*

*New York, 334 F.3d at 313-14*.

In reviewing Kathleen Reilly's deposition testimony in a light most favorable to Plaintiffs, it can possibly be viewed as evasive. *See* Plaintiffs' Exhibit 64, pp. 45-48, 55-57, 63-68, and 75-82. The question, however, is whether her testimony and actions fall into the "discovery violation as insurance bad faith" category. *See W.V. Realty Inc. v. Northern Insurance Company of New York, 334 F.3d at 314*. The record, however, fails to supply the clear and convincing evidence of discovery violations, let alone discovery violations that rise to the level of insurance bad faith.

The Court is aware that, under *O'Donnell*, there are cases in which the insurer's conduct during the course of litigation is a violation of the insurer's fiduciary duty to the insured. *See W.V. Realty Inc. v. Northern Insurance Company of New York, 334 F.3d at 315*; **[\*23]** *O'Donnell v. Allstate Ins. Co., 734 A.2d at 909*. *HN15*[↑] The finding of liability against an insurer must arise out of the contractual relationship with the insured and occur during pending litigation. *See W.V. Realty, Inc., 334 F.3d at 315* It is important to note that insurer's dishonest conduct during discovery could potentially violate its fiduciary duty of candor. *Id.* The record does not support a claim that Defendants breached a duty of good faith during this litigation. Summary judgment on Plaintiffs' claim of bad faith with regard to the denial of coverage in the action at 51728 shall be granted.

Plaintiffs also allege bad faith in Defendants' refusal to pay costs incurred by Plaintiffs' retained counsel in Specialty I. Specifically, Plaintiffs accuse Defendants of recklessly disregarding that notice to its agent is notice to the insurer. Plaintiffs' Brief in Opposition, p. 16. Defendants admit that there is a dispute between the parties as to whether or not Plaintiffs are entitled to those fees. Defendants' Brief in Support, p. 13.

Defendants further argue that their position was reasonable under the language of the policy and an agency **[\*24]** agreement. *Id.* However, this Court cannot find an absence of bad faith as a matter of law.

## V. CONCLUSION

For the foregoing reasons, the Court finds that Defendants did not have a duty to defend the action at No. 51728 (Specialty II) as a matter of law. Plaintiffs' bad faith claims related to the action at No. 51728 will also be dismissed. However, there are genuine issues of material fact in existence that preclude a finding that

2006 U.S. Dist. LEXIS 50433, *24

Defendants did not engage in bad faith in its refusal to pay costs incurred by Plaintiffs in Specialty I.

An appropriate order will follow.

s/ David Stewart Cercone

United States District Judge

---

**End of Document**